**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THEODORE LACHMAN, Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>REVLON, INC., PAUL MEISTER, DEBRA PERELMAN, VICTORIA DOLAN, WENDEL F. KRALOVICH, SIOBHAN ANDERSON, FABIAN T. GARCIA, JUAN R. FIGUEREO AND CHRISTOPHER H. PETERSON,<br><br>Defendants. | Case No.: 1:19-CV-02859-ARR-RER<br><br>Hon. Allyne R. Ross<br><br>JURY TRIAL DEMANDED |

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I. NATURE OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 3

III. PARTIES ........ 4

IV. CONTROL PERSON ALLEGATIONS ........ 5

V. OVERVIEW OF FRAUD ........ 7

A. Company Background ........ 7

B. Revlon Decided To Update Its Enterprise Resource Planning System ........ 8

C. Revlon's Approach To The SAP Implementation Was Fatally Flawed ........ 10

D. Revlon Prematurely Launched SAP Due To Internal Pressures ........ 11

E. The Premature SAP Launch Caused Serious Disruptions to Revlon's Operations ........ 13

1. Revlon Failed To Properly Train And Prepare Its Employees For SAP Transition ........ 13

2. Defendants Failed To Take Adequate Risk Management Measures ........ 15

F. Management Was Directly Involved In And Apprised Of The SAP Implementation Issues ........ 18

G. Revlon's Frantic Efforts To Remediate The Botched SAP Roll-Out ........ 20

H. Revlon Misled Investors By Downplaying The Severity Of SAP Issues ........ 20

I. Revelation Of The Truth ........ 22

VI. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 25

VII. CLASS ACTION ALLEGATIONS ........ 40

VIII. LOSS CAUSATION AND ECONOMIC LOSS ........ 42

IX. PRESUMPTION OF RELIANCE ........ 43

X. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........ 45

XI. CLAIMS FOR RELIEF ........ 46

COUNT I For Violations of Section 10(b) of the Exchange Act, and Rule 10b-5 Promulgated Thereunder, Against All Defendants ........ 46

COUNT II For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ........ 49

PRAYER FOR RELIEF ........ 50

JURY TRIAL DEMAND ........ 50

Lead Plaintiffs Theodore Lachman and OOO iK Barna Group ("Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based on, among other things, their counsel's investigation, which includes, without limitation: (a) a review and analysis of Defendant Revlon Inc.'s ("Revlon" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by the Company; (c) a review of other publicly available information concerning the Company; and (d) investigative interviews with persons having first-hand knowledge of the Company's operations.

## I. NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Revlon securities from March 3, 2017 through March 28, 2019, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2. During the Class Period, Revlon was involved in a disastrous implementation and launch of a new enterprise resource planning system, SAP, at the Company's largest manufacturing facility in Oxford, North Carolina. First, the team responsible for designing the system did not have the requisite experience for such an enormous and complex project, and the Company failed to bring in an outside consulting firm with the necessary know-how. Second, the design team failed to sufficiently adapt the new system to the actual business and production processes at Oxford. Third, the Company did not commit adequate resources for training personnel to use the new system. Fourth, despite three launch postponements, three failed mock

launches, zero successful mock launches, consistently low performance ratings by operations personnel, and dire warnings provided directly to senior executives, the Company rushed to launch the system on February 2018. And fifth, even after having decided to launch the new SAP system before it was ready, the Company still failed to maintain an adequate safety stock of inventory to keep up with customer orders.

3. The debacle was a foregone conclusion. Consistent with what was being reported directly to Revlon's senior management throughout 2017, the SAP roll-out at the Oxford plant was a failure. Almost immediately after the launch in February 2018, the plant began experiencing serious production disruptions. Starting in March 2018, the Company assembled a crisis team to remediate the problems. Nonetheless, the disruptions caused a production hole that took most of 2018 to recover from, and the Company was unable to manufacture sufficient quantities of finished goods and fulfill shipments to several large retail customers.

4. By the end of the Class Period, the Company disclosed that: "ERP-related disruptions caused the Company to incur expedited shipping fees and other unanticipated expenses in connection with actions that the Company implemented to remediate the decline in customer service levels. The Company estimates that this ERP launch resulted in the Company being unable to fulfill product shipments representing approximately $64 million of net sales during 2018 and incurring $53.6 million of incremental charges in 2018, mainly related to actions that the Company implemented to remediate the decline in customer service levels." In addition, the Company disclosed a material weakness in its internal controls relating to the implementation of SAP.

5. Although Revlon's senior executives were fully aware of the disastrous design, implementation, and roll-out of the SAP system, Defendants' statements to investors first

concealed and then misleadingly downplayed the true extent of the problem. Even when Defendants reported production disruptions in March 2018, they still sought to falsely reassure investors by stating that "the overall implementation steps are on schedule" and that the Company had "taken immediate actions to address the situation [and] ha[d] implemented a robust service recovery plan." Such statements failed to fully and accurately apprise investors of the business and financial risks arising from the botched SAP roll-out. When the full extent of the problem was finally disclosed to investors, the price of Revlon's stock declined significantly.

## II. JURISDICTION AND VENUE

6. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

8. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

9. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

10. Lead Plaintiff Theodore Lachman, as set forth in the certification previously filed with the Court (ECF No. 6-2) and incorporated by reference herein, suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

11. Lead Plaintiff OOO iK Barna Group, as set forth in the certification previously filed with the Court (ECF No. 9-2) and incorporated by reference herein, suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12. Defendant Revlon is a leading global beauty cosmetics company. Revlon is incorporated under the laws of the state of Delaware and its headquarters are located in New York, New York. The Company trades on the New York Stock Exchange ("NYSE") under the ticker symbol "REV."

13. Defendant Paul Meister ("Meister") served as Executive Vice Chairman from January 2018 until November 2018, a Director since 2016, and the Company's interim Principal Executive Officer from January 2018 until May 22, 2018.

14. Defendant Debra Perelman ("Perelman") has served as the Company's President and Chief Executive Officer ("CEO") since May 22, 2018. She served as the Company's Chief Operating Officer ("COO") from January 2018 until November 2018, and as a Director of Revlon since June 2015.

15. Defendant Victoria Dolan ("Dolan") has served as the Company's Chief Financial Officer ("CFO") since March 12, 2018.

16. Defendant Wendel F. Kralovich ("Kralovich") served as the Company's Senior Vice President, Chief Accounting Officer & Controller from October 2017 to December 2018.

17. Defendant Siobhan Anderson ("Anderson") served as the Company's Vice President, Chief Accounting Officer, Corporate Controller, and Treasurer from October 2014 until August 31, 2017.

18. Defendant Fabian T. Garcia ("Garcia") served as the Company's President and CEO from April 15, 2016 until January 28, 2018.

19. Defendant Juan R. Figuereo ("Figuereo") served as the Company's CFO from April 2016 until June 6, 2017.

20. Defendant Christopher H. Peterson ("Peterson") served as the Company's COO from April 17, 2017, until July 31, 2018, and the Company's CFO from June 6, 2017 to March 12, 2018.

21. Defendants Meister, Perelman, Dolan, Kralovich, Anderson, Garcia, Figuereo, and Peterson are collectively referred to herein as the "Individual Defendants." Defendant Revlon and the Individual Defendants will be collectively referred to as "Defendants."

## IV. CONTROL PERSON ALLEGATIONS

22. Each of the Individual Defendants, by virtue of their high-level positions with Revlon, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and had access to the adverse undisclosed information about the Company's business, operations, financial statements and present and future business prospects via access to internal corporate documents. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material

misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

23. The Individual Defendants, as senior executive officers of Revlon, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants had access to and were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

24. As senior officers and controlling persons of a publicly-held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the New York Stock Exchange ("NYSE"), the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Revlon's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

25. In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Revlon, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to Revlon.

## V. OVERVIEW OF FRAUD

### A. Company Background

26. Revlon is a leading global beauty cosmetics company. Revlon is incorporated under the laws of the state of Delaware and its headquarters are located in New York, New York. The Company was founded in New York City in 1932 and went public in 1955. The Company trades on the NYSE under the ticker symbol "REV."

27. Since its inception, Revlon has been a manufacturer of cosmetic goods and has grown to be a leading global beauty and personal care company. The Company develops, manufactures, markets, distributes and sells worldwide an extensive array of beauty and personal care products, including hair products, fragrances, skin care products, beauty tools, men's grooming products, and other beauty care products.

28. In 1985, Revlon underwent a hostile takeover, which resulted in MacAndrews & Forbes (which is owned by Defendant Perelman's father, Ron Perelman) owning a large majority of Revlon's shares. Indeed, at the start of the Class Period, MacAndrews & Forbes owned over 77% of the Company's outstanding shares, and 85.8% of the outstanding shares by the end of 2018. After Ron Perelman gained control of the Company, Revlon engaged in a series of restructuring transactions, including selling off some of its brands and divisions and acquiring other companies and competitors. Notable recent acquisitions include Revlon's purchase of Colomer Group in 2013 for $660 million, CBBeauty in 2015, Elizabeth Arden, Inc. in 2016 for $870 million, and Cutex brands in 2016.

29. Currently, Revlon operates in four segments: Revlon, Elizabeth Arden, Portfolio, and Fragrances. The Revlon segment is comprised of Revlon branded cosmetics, hair care products and product tools which are primarily marketed and distributed in mass retail and large volume retailers, chain drug and food stores, general merchandise stores, e-commerce sites,

departments stores, and other stores. The Elizabeth Arden segment is comprised of Elizabeth Arden branded cosmetics, fragrances, and skin and body care products which are sold in prestige retailers, department and specialty stores. The Portfolio segment is comprised of various branded cosmetics, hair care products, men's grooming, deodorant, and skin and body care products that are sold to mass retailers, salons, and salon distributors. Finally, the Fragrances segment includes the development, marketing and distribution of owned and licensed fragrances as well as the distribution of fragrance brands owned by third parties. The Company's products from all four segments are sold in the U.S. and internationally, totaling approximately 150 countries. The U.S. is by far the Company's largest market. In 2018, the U.S. accounted for approximately 48% of the Company's net sales. The three largest international customers are Canada, Spain and Australia, which together accounted for approximately 13% of the Company's 2018 net sales.

30. The Company's products are primarily produced at Revlon-owned facilities. There are two manufacturing facilities in the U.S. (Oxford, North Carolina and Jacksonville, Florida), and one manufacturing facility in South Africa, Spain, Italy and Mexico. The Company also utilizes third-party facilities around the world. Revlon's Oxford facility is its largest manufacturing facility and its Jacksonville facility is the second largest. The Company also owns several distribution facilities and distributes its products through its wholly-owned subsidiaries as well as third-party distributors.

**B. Revlon Decided To Update Its Enterprise Resource Planning System**

31. Large companies, particularly those such as Revlon that operate in various segments of the supply chain, utilize enterprise resource planning ("ERP") software. ERP software is used to manage day-to-day business activities such as accounting, procurement, project management, risk management and compliance, and supply-chain operations. ERP software essentially tie together a multitude of business processes and enable the flow of data

between them. ERPs assist in processes in various functional areas, including financial accounting, human resources management, manufacturing, order processing and supply chain management, project management, and customer relationships. For instance, examples of the manufacturing processes that ERP systems assist with are: producing work orders, scheduling and engaging manufacturing processes, optimizing manufacturing flow, product life cycle management, managing inventory and shipping, analyzing sales and reporting, and warehousing. Further, examples of financial accounting processes are: tracking general ledgers, payables to suppliers for raw materials, receivables for finished products sold to customers, collection and payment of accounts receivable and payable. In short, ERP systems are intricate software designed to streamline and track the complex transactions and processes in large enterprises.

32. Prior to the Class Period, Revlon ran 50 different business entities. Across these 50 different entities, there were 21 different ERP systems. After acquiring the Colomer Group in 2013, Revlon set out to upgrade its ERP system and create one universal ERP to use across all of the Company's different sites. The Colomer Group ran on the SAP ERP, and thus Revlon decided to upgrade its ERP system to SAP – the ERP system developed by German software developer SAP SE.

33. Confidential Witness ("CW") 1 was employed by Revlon from September 1981 to May 2018. CW1 held various positions at Revlon, including Global Process Owner, Manufacturing. By the end of CW1's tenure at Revlon, CW1 reported to Deborah O'Neil, Vice President of Global Supply Chain. CW1 worked out of Revlon's Oxford manufacturing facility and was part of the team putting together the ERP upgrade.

34. CW1 explained that Revlon's plan was to take the template that Colomer Group used for its SAP implementation and apply it to all the areas of the newly merged company.

According to CW1, Revlon devoted a team of "probably 100 people" consisting of "15 or 16 process owners, between operations and finance," "IT consultants" and subject matter experts in operations. However, as explained in more detail below, the implementation was poorly executed and was plagued with issues.

35. CW7 was the Senior Vice President of Global Quality and Technical Services, first at Elizabeth Arden, and then at Revlon after the Company acquired Elizabeth Arden at the end of 2016. CW7 explained that Revlon used the Colomer IT team to lead the SAP project. The problem was that Colomer served the professional salon channel, not retail. In addition, the Colomer manufacturing plants were very small and uncomplicated, while the Oxford plant was a "behemoth" and "very complex." Nonetheless, Revlon failed to bring in an outside consulting firm to serve as an implementation partner. Instead, Revlon attempted to implement SAP mainly by itself.

### C. Revlon's Approach To The SAP Implementation Was Fatally Flawed

36. The consensus among those involved with Revlon's SAP implementation was that it was a debacle of an extraordinary magnitude. CW7 called it a "shit show." CW8, a Senior SAP Quality Management Consultant who worked for Revlon from January to June 2018, stated that the mismanagement was "unlike any project I had ever participated in." CW9, a Process Engineer and then an Operations Manager at Revlon from June 2016 to June 2018, who was one step removed from Oxford leadership meetings, stated that the SAP roll-out was a "nightmare" because the Company was "completely unorganized" and "wasn't prepared."

37. The core problem, according to CW7, was that the Colomer team failed to develop the SAP system to support business processes, but instead attempted to fit the business processes into the SAP system. The design team, cobbled together from different areas of the Company, simply did not understand Revlon's businesses.

38. CW7 provided the following example: The team that designed the pre-weigh system wanted to implement more structure – "all the things you do when you make a pharmaceutical drug." Under this system, employees were required to conduct pre-weighs using the oldest bag of materials first. "So, somewhere on the pallet was the oldest bag. You were required to find, in that pallet of 40 bags, the oldest bag and start with that one. Otherwise, the system wouldn't let you get started." This decision "sextupled the time it took you to weigh the stuff." According to CW7, this "very high-rigor approach," while appropriate for pharmaceutical drugs, was not appropriate for Revlon's products.

39. According to CW8, before a company goes live with its system, it should perform user acceptance testing. Typically, a company uses very detailed test scripts that represent all business processes and check that everything is working before going live. CW8 found that Revlon's user acceptance testing was "grossly inadequate" in some areas, and senior management ignored employees' negative feedback.

40. Moreover, developments unrelated to SAP made implementation more difficult and complicated. At the end of 2016, Revlon acquired Elizabeth Arden and decided to in-source Elizabeth Arden production to Oxford. To make room for this, Revlon moved its finished goods warehouse to Roanoke, Virginia. And Revlon replaced its financial reporting system. All of this occurred during the implementation of the SAP system.

### D. Revlon Prematurely Launched SAP Due To Internal Pressures

41. Revlon set out to upgrade its ERP in 2014 across each of its facilities. However, the Company faced issues with SAP implementation at its Oxford facility (the Company's largest manufacturing site) and delayed the launch on multiple occasions. As corroborated by multiple CWs, these delays created pressure throughout the Company to launch the product prematurely. Thus, when SAP was finally launched at the Oxford facility on February 1, 2018,

Revlon was ill-prepared, which resulted in significant issues with Revlon's production and accounting processes.

42. According to CW1, by the time SAP launched, the project had been postponed on four different occasions. CW2, who worked at Revlon from early 2017 to mid-2018 as a Vice President in operations, was "almost positive" that Defendant CFO and COO Peterson personally intervened and delayed the project twice. CW2 was involved with the SAP implementation and was responsible for ensuring members of the planning team were adequately trained.

43. CW7 stated that, in late 2017, Revlon conducted three mock runs of the SAP system to determine whether it was ready to go live. But "none of the mocks made it to the end. They should have said 'no mas' – but they forged ahead." Similarly, CW9 stated there were some mock runs and they all failed. Based on these failed runs, CW9 stated that Revlon was not ready to launch SAP in February 2018, and, consequently, CW9 had never seen such a "disaster" of a roll-out.

44. Revlon even considered delaying the launch until April 2018, explained CW7. However, the Oxford managers stated that pushing the launch from February to April would not help because the whole system needed to be reassessed. Thus, the Company decided to keep the February launch date not because the system was ready, but because "if you're just postponing until April, we might as well go ahead."

45. CW3 was the Vice President of Manufacturing at Revlon and worked with the Company from July 2015 to June 2018. CW3 was the plant manager of the Oxford facility during the SPA implementation. CW3 explained that because of the postponements of the SAP launch, "There were a lot of rumors that a lot of peoples' jobs were on the line and had to go live or they would lose their jobs. . . . I think people were feeling the pressure. . . ." CW4 confirmed

the pressure throughout the Company to launch. CW4 was a Revlon employee from November 2010 to October 2017 and held several positions. By the time CW4 left, CW4 held the title of Supplier Operations Analyst and reported to Ross Hammond, the Senior Director of Material Supply Management. CW4's boss, Ross Hammond, said his boss informed him that "We are going to launch February 1, no matter what. There will be no more delays."

46. With the pressure to launch looming, the Company ultimately launched SAP at the Oxford facility on February 1, 2018 despite not having all the issues ironed out.

### E. The Premature SAP Launch Caused Serious Disruptions to Revlon's Operations

47. As Defendants admitted a year later, the launch had disastrous consequences. As explained below, the launch was premature because Revlon had failed to adequately train its employees to properly utilize the SAP software and the Company failed to implement adequate risk controls to mitigate the risk of an unsuccessful launch. As a result, when SAP launched, Revlon was unable to fulfill approximately $64 million in product shipments and ultimately incurred an additional $53.6 million of incremental remedial charges. Also, the SAP resulted in material weaknesses in the Company's internal control over financial reporting.

#### 1. <u>*Revlon Failed To Properly Train And Prepare Its Employees For SAP Transition*</u>

48. The biggest issue plaguing the SAP implementation was the inadequate training of employees to use the SAP system and training on manual work-arounds when SAP problems were presented. CW4 explained that part of the implementation entailed the "discovery phase" in which teams would identify any gaps in the new ERP system and work to resolve them. There were implementation teams for each function, including production, materials management, warehouse shipping/receiving logistics, quality, finance, and engineering. Each team had key

users and process owners. The key users were trained to use the SAP system, with the idea that they would later train all other relevant employees.

49. When gaps were identified during the discovery phase, the teams would work with the process owners to resolve them. Gaps that could not be resolved by the teams would be presented to a steering committee, which according to CW4, was made up of "higher management." The steering committee would then assess the gap analysis and estimated cost to resolve the gap and determine whether they would authorize funds to fix the gap. According to CW4, when funding to correct gaps was approved, "consultants would make the change [and] the key user would test the change." However, "[i]f the gap was an infrequent issue and there was a manual work-around," sometimes the cost would not justify implementing the change to fix the gap.

50. CW4 was concerned about the implementation all along, but became even more concerned in summer of 2017 as the Company was gearing up for the launch. CW4 stated that "once we went through training, it became clear that it was very difficult for people to understand some of the manual work-arounds and some of the reprogramming that weren't manual work-arounds. Even where the gap-fill was approved, the fix was complicated to understand and analyze." Despite this complexity, Revlon did not adequately train its employees. As CW4 reflected, "[w]e had three days of training and that was it. . . . there were a lot of things we didn't know – we hadn't been trained – and then the training wasn't very robust."

51. The lack of training was a concern across the Company throughout the implementation. As CW2 explained, one the reasons CW2 was brought on "was to look at and support the ERP transition from the supply side" which entailed sitting "in Oxford during the transition, to make sure people were ready from the planning side . . . making sure people were

trained and qualified." CW2 "was shocked when we actually started up and the other areas were not as ready as I expected." When the launch failed, CW2 explained that it was partly because there were "not many people appropriately trained – mainly in the production area – and in the warehouse area, to some degree."

52. This is consistent with CW5's account. CW5 was a Revlon employee from March 2015 to April 2018 and held various titles. At CW5's departure from the Company, CW5's role was Operations Manager. CW5 explained that "[f]rom the operations end, it was very last minute, to get the employees trained. . . . We were on call, went through training and that training wasn't where it needed to be." CW5 also addressed that the "training wasn't clear" and management "tried to schedule other trainings last minute. They determined the training was ineffective, so they went back to the white board and created new training."

53. CW10 was an SAP Training Manager Consultant at Revlon from February to October 2017, overseeing SAP training. According to CW10, the SAP training department was essentially just one person, CW10. Usually, in CW10's experience, there are six to seven personnel devoted to training, creating manuals and exercises. Revlon, however, refused to budget for that.

2. *Defendants Failed To Take Adequate Risk Management Measures*

54. When SAP launched, Revlon encountered a wave of issues. The largest issue was that Revlon was not able to manufacture its products in a timely manner. And, unsurprisingly, because Revlon's employees were not adequately trained to deal with those issues, the consequences of the issues amplified.

55. CW6 was a Revlon employee from April 2015 through July 2018 as a Director of Financial Planning & Analysis for the Global Consumer Division. CW6 explained that when Revlon "went live, they couldn't get the mix correct" and thus could not produce the products.

According to CW2, the inability to produce was because SAP's "three systems didn't talk to each other." CW2 explained that there were three systems to SAP: (i) the overall SAP system; (ii) the production batch-making system, which handles tasks such as weighing out ingredients; and (iii) the warehouse management system. According to CW2, who had been part of other SAP roll-outs in other companies, the fact that the systems did not communicate was a huge concern, which was amplified by the small number of people that were adequately trained to understand how the three systems connect. CW5 confirmed that this issue was never worked out. As CW5 explained, "SAP had to work with another system for raw materials. The integration was never worked out. It caused the plant to almost close down."

56. CW9, who was part of the post-launch "crisis team," observed the production problems. Revlon was trying to coordinate simple transactions of SAP that would not go through, and so production stopped. The Company was unable to communicate between its various IT systems. There were errors in the way materials or ingredients were allocated and errors in where materials were located in the warehouse. For example, SAP would indicate a certain location for a raw material held in Revlon's warehouse, but the material would not be there. As a result, the company would fail to complete production orders, and "everything snowballed." There was a constant conflict between what was in the system and what was physically in the warehouse, causing a "massive backup." According to CW9, "We were basically locked in a conference room, moving parts, having people from the procurement department order materials that we probably found in the warehouse two days later." Revlon constructed a "makeshift cage" in which to place lost items once they were found. All the while, replacement orders for temporarily lost items were being rushed in.

57. These issues were further exacerbated because Revlon failed to implement sufficient risk management measures. For example, the Company had failed to produce enough safety stock of inventory to prepare for such a situation. As a result, the Company was not able to fulfill orders with its customers. CW1 explained that by the end of 2017, "We all started getting really concerned" that the Company had not "built up enough safety stock to mitigate. You know you're going to have problems with a SAP implementation." According to CW6, Revlon's preemptive measure for this anticipated issue was to "ship an extra cushion of supplies to vendors. We told them we were going live in SAP, and we sold them extra inventory as a cushion." However, this was a "fiasco" because Revlon oversold products to vendors and sent out wrong orders. Vendors charge penalties for over-shipments and wrong shipments, which CW6 described were the biggest losses CW6 saw because it was from Revlon's gross net. As CW1 summed it up, Revlon was "building for success, but we hadn't planned for failure – to mitigate those risks."

58. CW7 explained that Revlon built an inventory safety stock pursuant to a plan premised on launching in July 2017. But when the launch was pushed back to October 2017 and then to February 2018, Revlon failed to refresh their inventory plan. Consequently, instead of having a month's worth of stock at the time of the launch, the Company had only two weeks' worth. CW7 stated that soon after launch, the low stock levels were triggering "major alarm bells" and that Revlon was "going to start starving the filling lines." Soon the Oxford plant was in a "two-month [manufacturing] hole."

59. CW6 noted that the Company's outside auditor was also concerned about the issues facing Revlon's SAP roll out. In preparation of the 2018 Form 10-K, KPMG informed the Company that it was going to make a note in the financials because of all the concerns. However,

the Company decided to delay filing its Form 10-K in an effort to convince KPMG not to make the note.

### F. Management Was Directly Involved In And Apprised Of The SAP Implementation Issues

60. As confirmed by multiple CWs, upper management was informed of these issues, which were prevalent throughout the implementation process. As explained above, according to CW4, during the discovery phase in which gaps were identified, process owners were informed of the issues, who then communicated it to the steering committee, which was made up of upper management. CW1 was a process owner of the manufacturing team and explained that during implementation, they had regular meetings discussing risks and they would "communicate those up to management." CW1 continued "we absolutely were communicating to management our concerns." Further, during implementation, CW4 noted that the steering committee periodically visited the Oxford facility, and that the CEO visited on five different occasions.

61. CW7 stated that as the launch approached, Revlon held weekly meetings involving all the key business holders and the implementation team. Among others, Defendant CFO and COO Peterson and Chief Supply Chain Officer Alan Blake attended these weekly meetings. During these weekly meetings, CW7 explained, attendees would discuss the mock runs – which all failed – and ratings from operational personnel regarding level of readiness – which were "Cs and Ds on performance." Prior to the launch, CW7 was responsible for the Quality component of the SAP system. That component never received a rating above "D."

62. CW2 and CW3 corroborated that the steering committee and upper management were directly informed about the status of the implementation. As stated above, CW2 explained that the CFO had intervened twice to delay the launch. Also according to CW2, during the implementation there were meetings "7 days a week even Saturdays and Sundays." CW2 noted

that Peterson and Blake were present at some of the meetings that CW2 attended regarding the status of the implementation. Similarly, CW3 reported that there were pre-launch meetings with the steering committee that involved corporate management and that "the steering committee was being presented with accurate updates as to launch preparations. Further, after SAP launched in February 1, 2018, CW3 had direct contact with the COO and the CFO visited the Oxford facility as a result of the problems that occurred from the SAP launch. CW3 further described the roll-out as an "all-hands-on-deck" situation. The Oxford plant received "full support by the corporation. Anything we needed – extra resources, extra money – the corporation was committed. . . . Everybody – to the COO, the CEO, to the chairman – everybody was involved in 'How do we turn this around? What do we need?'"

63. Moreover, throughout implementation, Revlon ran several mock runs and was presented with problems each time, which also informed Defendants and Revlon employees involved in the implementation of the various issues the SAP launch would entail. As CW5 explained "[t]here were a few trials in the preceding months. We'd do a live environment for a job on certain parts. There were certain criteria, and I don't think it ever fully passed. But we still just kept proceeding."

64. Indeed, CW7 stated, "The warning signs [to senior management] were the mocks." Revlon "couldn't get the mocks to go from end-to-end. They should have been able to do that in a simulation – and none of the mocks were successful. But they stepped of the bridge and said, 'Let's do it anyway.'" According to CW7, Defendant Peterson and Blake were directly provided with negative information from Oxford; they were personally informed that the SAP system was not working. Specifically, Glen Sharpe, the Senior Vice President of North American Delivery, was the most vocal that the system was not ready. Moreover, in the lead-up to the

launch, William Welz, Senior Vice President of Manufacturing for Revlon Americas, expressed serious concerns based on IT consultants who had analyzed the situation in 2017.

65. Thus, according to CW7, Defendant Peterson and senior management as a whole "had plenty of warning."

**G. Revlon's Frantic Efforts To Remediate The Botched SAP Roll-Out**

66. CW7 stated that, less than one month after the SAP system went live on February 1, 2018, "it was on its knees." It was at that time, according to CW7, Revlon brought in Pierre Pirard, who was a former head of supply chain management, back to the Company to help lead the "triage." CW7 spent nine months attempting to fix the various problems with the SAP system, which entailed working seven days a week starting in March 2018.

67. This frantic effort was critical to Revlon's business prospects. According to CW7, the botched roll-out was endangering the Company's sales at major retailers such as Walmart and Walgreens.

68. CW9 stated that after the SAP launch, Revlon held many "crisis management meetings," which CW9 attended as a member of the "crisis team."

**H. Revlon Misled Investors By Downplaying The Severity Of SAP Issues**

69. Immediately after the February 1, 2018 launch, Revlon experienced significant issues with producing enough products and with internal control over financial reporting. In spite of their knowledge, Defendants misled the public and downplayed the negative impact of the SAP roll out.

70. Defendants first addressed the SAP roll out to investors on March 15, 2018, when Revlon filed its 2017 Form 10-K. Although Defendants informed investors that there were disruptions because of the roll out, Defendants vastly downplayed the severity of the disruption and exaggerated the efficacy of their recovery plans. The Company's 2017 Form 10-K stated:

> ***Difficulties in implementing the Company's new ERP system have disrupted the Company's business operations and ongoing disruptions with such implementation could have a material adverse effect on the Company's business, prospects, results of operations, financial condition and/or cash flows.***

71. However, Defendants misled investors during the earnings conference call held on the same day. During this call, Defendant CFO and COO Peterson reassured investors stating:

> Before closing, I wanted to provide a brief update on the implementation of our new SAP ERP system, which went live at the beginning of February. The system is designed to support new customer technologies and processes and to improve performance. ***While the overall implementation steps are on schedule, our production capabilities and inventory recovery have been slower than expected, affecting our current order fulfillment levels. We have taken immediate actions to address the situation, have implemented a robust service recovery plan and have communicated with our key customers.*** Once the recovery plan is complete, we expect the new ERP system to provide significant new capabilities and benefits for the company.

72. These statements were made just several weeks after the SPA roll out and the ensuing disaster, at which point it was a total "fiasco" and "all-hands-on-deck" situation. Thus, Defendants' reassurances were misleading as they knew but did not disclose the true extent of the SPA failure.

73. Defendants continued to make these false assurances throughout the year. On May 10, 2018, the Company filed its quarterly report with the SEC for the first quarter of 2018 and held an earnings conference call attended by investors and securities analysts. Defendant Paul Meister started off with an updated on the Oxford facility recovery stating "***we implemented a recovery plan and returned our manufacturing capacity to normal levels by early April.***" Defendant Peterson reiterated this sentiment stating "***we are now producing at levels in excess of those pre-SAP***."

74. On August 9, 2018, the Company issued its financials for the second quarter of 2018 and held the earnings conference call. Defendant Perelman began with restating the

assurances Defendants conveyed in the previous quarter: "***We have resolved the fundamental issue and our plan is back to producing at greater than 3SAP levels. Sales have seen recovery in second quarter in North America, with other markets following as the products reach them.***"

75. Likewise, on November 9, 2018, the Company issued its third quarter of 2018 financial results and held an earnings conference call. During the call, Defendant Perelman reiterated that "***As mentioned on our second quarter call, our plan is back to producing a pre-SAP level, and we continue to fill customer pipelines internationally. The Oxford impact to our third quarter results was significantly lower than the second quarter, and we expect continued improvement going forward.***"

76. However, while making these reassurances, Defendants knew that the impact of the SAP failure was much more significant and the recovery was not going as smoothly as Defendants led investors to believe.

### I. Revelation Of The Truth

77. On March 18, 2019, Revlon filed a Form 12b-25, disclosing it was unable to timely file its annual report for the 2018 year because it identified a material weakness in its internal controls relating to its ERP system. Contrary to Defendants assurances that the recovery plan was on track and back to pre-SAP levels by 3Q18, the SEC filing explained that:

> ***The Company expects to disclose in its 2018 Form 10-K that it identified a material weakness in its internal control over financial reporting as of year-end 2018, primarily related to the lack of design and maintenance of effective controls in connection with the previously-disclosed implementation of its enterprise resource planning ("ERP") system in the U.S.***
>
> The Company does not expect any changes to its previously-reported preliminary financial results, including the financial results that it previously reported in its press release furnished as Exhibit 99.1 to the Company's Current Report on Form 8-K filed with the SEC on March 18, 2019. Upon completion of the audits, the Company expects to file its 2018 Form 10-K within the extension period of 15

> calendar days as provided under Rule 12b-25 under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

78. In short, for an entire year following the roll-out that was filled with Defendants' assurances, Revlon still did not have the SAP issues under control.

79. On March 28, 2019, Revlon filed its Form 10-K for the 2018 year, in which Defendants finally disclosed the true extent of the SAP failure and its remediation efforts. The Form 10-K stated:

> During February 2018, the Company launched the new ERP system in the U.S., which caused its Oxford, N.C. manufacturing facility to experience service level disruptions that impacted the Company's ability to manufacture certain quantities of finished goods and fulfill shipments to several large retail customers in the U.S. ***Also, these ERP-related disruptions caused the Company to incur expedited shipping fees and other unanticipated expenses in connection with actions that the Company implemented to remediate the decline in customer service levels. The Company estimates that this ERP launch resulted in the Company being unable to fulfill product shipments representing approximately $64 million of net sales during 2018 and incurring $53.6 million of incremental charges in 2018, mainly related to actions that the Company implemented to remediate the decline in customer service levels.*** As of December 31, 2018, the Company's Oxford, N.C. manufacturing facility was operating at pre-SAP levels and the Company was continuing to re-fill inventories across its retail partners, particularly internationally. If these disruptions occur in larger magnitudes or continue to persist over time, it would continue to negatively impact the Company's ability to fulfill product shipments to customers and cause the Company to incur additional remediation costs, which in turn would continue to negatively impact the Company's competitive position and its relationships with its customers.
>
> * * *
>
> The Company's management, under the oversight of the Chief Executive Officer and Chief Financial Officer, assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2018 and in making this assessment used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission *Internal Control-Integrated Framework* (2013). In connection with this assessment***, the Company's management identified the following deficiencies in its internal control over financial reporting:***

(i) ***the Company did not perform an effective continuous risk assessment process that adequately identified an assessed risks affecting the Company's internal controls over financial reporting associated with the implementation of its new ERP system in the U.S.,***

(ii) ***the Company did not maintain a sufficient number of knowledgeable, trained personnel in the U.S. operations impacted by the ERP system implementation and in various other operations across the Company who understood and were held accountable for their assigned responsibilities for the design, implementation and operation of internal controls over financial reporting; and***

(iii) ***as a result, the Company did not design, implement and consistently operate effective process-level controls*** to ensure that it appropriately (a) recorded and accounted for inventory, accounts receiveable, net sales and cost of goods sold, (b) reconciled balance sheet accounts, (c) reviewed and approved the complete population of manual journal entries and (d) used complete and accurate information in performing manual contorls.

While these control deficiencies did not result in any material misstatement of the Company's 2018 Consolidated Financial Statements, ***the Company's management concluded that these deficiencies represented a material weakness, and that the Company's internal control over financial reporting was not effective as of December 31, 2018.***

The Company's independent registered public accounting firm, KPMG LLP, who audited the 2018 Consolidated Financial Statements included in this 2018 Form 10-K issued an adverse report on the Company's internal control over financial reporting reflecting this material weakness as of December 31, 2018, which report appears on page F-3 of the 2018 Consolidated Financial Statements.

* * *

(d) **<u>Management's Remediation Plan.</u>** To remediate this material weakness, the Company will: (i) implement enhancements to company-wide risk assessment processes; (ii) enhance the Company's review and sign-off procedures for IT implementations; (iii) train responsible staff and supplement staff; (iv) supplement internal resources with third-party consultants; (v) enhance its process and control documentation; (vi) implement new processes and controls relative to the execution and oversight of inventory, accounts receivable, net sales and cost of goods sold; (vii) enhance and reinforce policies around account reconciliations

> and manual journal entries; (viii) clearly identify and communicate individual employee responsibilities; and (ix) implement controls and new reporting tools to ensure the completeness and accuracy of information used in performing manual controls. The Company is also continuing to evaluate additional controls and procedures that may be required to remediate the material weakness.

80. In sum, Defendants knew about the SAP-related problems even before the SAP was launched and were aware of the actual impact of the failed launch. Despite knowing this, when Defendants discussed SAP, they misleadingly downplayed the impact it had on the Company and reassured investors that the recovery plan was on target and robust. Defendants reassured investors for an entire year until they finally disclosed what they knew all along: the SAP failure had a catastrophic effect on production and consequently the Company's ability to fulfil customer demand, and that the failed SAP resulted in the unreliability of Defendants accounting practices and internal controls.

## VI. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

81. On March 3, 2017, Revlon filed its annual report on Form 10-K for the year ended December 31, 2016 with the SEC (the "2016 10-K"). The 2016 10-K was signed by Defendants Garcia, Figuereo, and Anderson. The 2016 10-K contained signed SOX certifications by Defendants Garcia and Figuereo attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

82. The 2016 10-K stated the following risk regarding Revlon's ERP system in relevant part:

> ***The failure of the Company's information technology systems and/or difficulties or delays in implementing new information technology systems could disrupt the Company's business operations which could have a material adverse effect on the Company's business, prospects, results of operations, financial condition and/or cash flows.***

* * *

> The Company is currently implementing a company-wide SAP enterprise resource planning ("ERP") system. The Company's anticipated implementation of this SAP ERP system may not result in improvements that outweigh its costs and may disrupt the Company's operations. This system implementation subjects the Company to substantial costs, the majority of which are capital expenditures, and inherent risks associated with migrating from the Company's legacy systems. These costs and risks could include, but are not limited to:
>
> - inability to fill customer orders accurately or on a timely basis, or at all;
> - inability to process payments to vendors accurately or in a timely manner;
> - disruption of the Company's internal control structure;
> - inability to fulfill the Company's SEC or other governmental reporting requirements in a timely or accurate manner;
> - inability to fulfill federal, state and local tax filing requirements in a timely or accurate manner;
> - increased demands on management and staff time to the detriment of other corporate initiatives;
> - significant capital and operating expenditures.
>
> If the Company is unable to successfully plan, design or implement this new SAP ERP system, in whole or in part, or experience unanticipated difficulties or delays in doing so, it could have a material adverse effect on the Company's business, prospects, results of operations, financial condition and/or cash flows.

83. As to Revlon's internal controls, the 2016 10-K stated "Revlon's management determined that the Company's internal control over financial reporting was effective as of December 31, 2016."

84. The statements above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Revlon failed to create measures to monitor the ERP system appropriately once implemented; (2) Revlon failed to design, implement and consistently operate effective process-level controls to ensure that it appropriately (a) recorded and accounted for inventory, accounts

receivable, net sales and cost of goods sold, (b) reconciled balance sheet accounts, (c) reviewed and approved the complete population of manual journal entries, (d) used complete and accurate information in performing manual control, which constituted a material weakness in its internal controls over financial reporting, and (e) trained personnel; (3) as a result of the poor preparation and planning of the implementation of the ERP system, Revlon was unable to fulfill product shipments of approximately $64 million of net sales and the Company incurred $53.6 million of incremental charges to remediate the decline in customer services levels; and (4) as a result, Defendants' statements about Revlon's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis at all relevant times.

85. On April 21, 2017, Revlon filed its proxy statement on Form 14A with the SEC (the "2017 Proxy Statement"). The 2017 Proxy Statement included a cover letter signed by Defendant Garcia in his role as President and CEO.

86. The 2017 Proxy Statement stated that, based on his performance ratings under their 2016 Individual Annual Bonus Performance Factors, Defendant Garcia received 115% of his 2016 Annual Bonus Program payment. The description of Defendant Garcia's "Achievement of Performance Targets and Payouts under the 2016 Annual Bonus Programs" stated, in relevant part:

> ***Elizabeth Arden Integration***: Led the planning and implementation of integrating the Elizabeth Arden organization into the Revlon organization, by which the Company has already identified approximately $190 million of annualized synergies and cost reductions that would be achieved through integration activities such as shifting to a brand centric model, in-sourcing manufacturing from Elizabeth Arden's 3rd party supplier network, creating a finance shared services organization, ***moving to a single ERP system***, consolidating offices, eliminating duplicative activities and streamlining back-office support;

87. The 2017 Proxy Statement stated that, based on his performance ratings under their 2016 Individual Annual Bonus Performance Factors, Defendant Figuereo received 100% of

his 2016 Annual Bonus Program payment. The description of Defendant Figuereo's "Achievement of Performance Targets and Payouts under the 2016 Annual Bonus Programs" stated, in relevant part:

> ***Elizabeth Arden Integration:*** Co-led the planning and implementation of integrating the Elizabeth Arden organization into the Revlon organization, by which the Company has already identified approximately $190 million of annualized synergies and cost reductions that would be achieved through integration activities such as shifting to a brand centric model, in-sourcing manufacturing from Elizabeth Arden's 3rd party supplier network, creating a finance shared services organization, ***moving to a single ERP system***, consolidating offices, eliminating duplicative activities and streamlining back-office support;

88. The statements above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Revlon failed to create measures to monitor the ERP system appropriately once implemented; (2) Revlon failed to design, implement and consistently operate effective process-level controls to ensure that it appropriately (a) recorded and accounted for inventory, accounts receivable, net sales and cost of goods sold, (b) reconciled balance sheet accounts, (c) reviewed and approved the complete population of manual journal entries, (d) used complete and accurate information in performing manual control, which constituted a material weakness in its internal controls over financial reporting, and (e) trained personnel; (3) as a result of the poor preparation and planning of the implementation of the ERP system, Revlon was unable to fulfill product shipments of approximately $64 million of net sales and the Company incurred $53.6 million of incremental charges to remediate the decline in customer services levels; and (4) as a result,

Defendants' statements about Revlon's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis at all relevant times.

89. On November 3, 2017, the Company filed its quarterly report with the SEC for the quarter ended September 30, 2017 (the "3Q17 10-Q"). That same day, the Company held an earnings conference call attended by investors and analysts. On that call, Defendant Peterson stated, in relevant part:

> We continue to focus on delivering the cost synergies that we have committed to when we acquired Elizabeth Arden, and are determined to identify opportunities to accelerate and realize additional cost reductions.
>
> And as I said on my first earnings call, I believe that there are significant opportunities for improvements in operational excellence. Much of this is related to core systems and processes, which should improve our cost structure and facilitate our speed to market through better data collection and information management, and ultimately, faster decision-making.
>
> ***We have several initiatives behind this, including new ERP systems***, a simplification of our SKU portfolio, rationalization of our distribution center network, and a new management reporting and forecasting system, to name a few. All of these initiatives are contributing to an aggressive transformation agenda for the company, which we expect to lead to better financial results over the next several years.

90. The statements above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Revlon failed to create measures to monitor the ERP system appropriately once implemented; (2) Revlon failed to design, implement and consistently operate effective process-level controls to ensure that it appropriately (a) recorded and accounted for inventory, accounts receivable, net sales and cost of goods sold, (b) reconciled balance sheet accounts, (c) reviewed

and approved the complete population of manual journal entries, (d) used complete and accurate information in performing manual control, which constituted a material weakness in its internal controls over financial reporting, and (e) trained personnel; (3) as a result of the poor preparation and planning of the implementation of the ERP system, Revlon was unable to fulfill product shipments of approximately $64 million of net sales and the Company incurred $53.6 million of incremental charges to remediate the decline in customer services levels; and (4) as a result, Defendants' statements about Revlon's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis at all relevant times.

91. On March 15, 2018, Revlon filed its annual report on Form 10-K for the year ended December 31, 2017 with the SEC (the "2017 10-K"). The 2017 10-K was signed by Defendants Meister, Peterson, and Kralovich. The 2017 10-K contained signed SOX certifications by Defendants Meister and Peterson attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

92. The 2017 10-K stated the following risk regarding Revlon's ERP system in relevant part:

> ***Difficulties in implementing the Company's new ERP system have disrupted the Company's business operations and ongoing disruptions with such implementation could have a material adverse effect on the Company's business, prospects, results of operations, financial condition and/or cash flows.***
>
> The Company is implementing a new company-wide SAP enterprise resource planning ("ERP") system, which subjects the Company to inherent risks associated with migrating from the Company's legacy systems to a new IT platform, including, without limitation:
>
> - the inability to fill customer orders accurately or on a timely basis, or at all;

- increased demands on management and staff time to the detriment of other corporate initiatives;
- significant capital and operating expenditures;
- the inability to process payments to vendors accurately or in a timely manner;
- disruption of the Company's internal control structure; and/or
- the inability to fulfill federal, state and local reporting and filing requirements in a timely or accurate manner.

> During February 2018, the Company launched the new ERP system in the U.S., which caused its Oxford, N.C. manufacturing facility to experience service level disruptions that have impacted the Company's ability to manufacture certain quantities of finished goods and fulfill shipments to several large retail customers in the U.S. The Company cannot provide assurances that it will remedy the ERP systems issues in time to fully recover these sales and/or that the ERP implementation will not continue to disrupt the Company's operations and its ability to fulfill customer orders. Also, these ERP-related disruptions have caused the Company to incur expedited shipping fees and other unanticipated expenses in connection with actions that the Company has implemented to remediate the decline in customer service levels, which could continue until the ERP systems issues are resolved. To the extent that these disruptions occur in larger magnitudes or continue to persist over time, it could negatively impact the Company's competitive position and its relationships with its customers and thus could have a material adverse effect on the Company's business, prospects, results of operations, financial condition and/or cash flows.

93. As to Revlon's internal controls, the 2017 10-K stated "Revlon's management determined that the Company's internal control over financial reporting was effective as of December 31, 2017."

94. On March 15, 2018, the Company hosted an earnings conference call with investors and analysts. In his opening remarks on the call, Defendant Peterson stated, in relevant part:

> Before closing, I wanted to provide a brief update on the implementation of our new SAP ERP system, which went live at the beginning of February. The system is designed to support new customer technologies and processes, and to improve performance. While the overall implementation steps are on schedule, our

production capabilities and inventory recovery have been slower than expected, affecting our current order fulfillment levels.

We have taken immediate actions to address the situation, have implemented a robust service recovery plan and have communicated with our key customers. Once the recovery plan is complete, we expect the new ERP system to provide significant new capabilities and benefits for the company.

95. During the question and answer session, Defendant Peterson continued to downplay the severity of the Company's disastrous ERP rollout:

**<Q - Grant Jordan>:** Okay. And then on the systems issues you guys are facing, can you give any sort of estimate in terms of top line or bottom line impact?

**<A - Christopher H. Peterson>:** Too soon to tell at this point. As I mentioned in the prepared remarks, the implementation steps are on schedule. We have had our production capabilities and inventory recovery been a little-been slower than expected, but we're taking immediate actions to address the situation, and we've implemented a robust sales recovery plan.

* * *

**<Q - Hale Holden>:** Okay. And I just had two other ones. The SAP issue, is that going to result in less product on shelf associated with your brand resets this spring? Is that something I guess we would see in an issue of sell-out or lack of availability, or is it specifically on the inventory side?

**<A - Christopher H. Peterson>:** Yeah. So, as I mentioned, the implementation has impacted our customer service levels, but we have taken immediate action steps to address the situation, and we've got a robust service recovery plan in place. And so, it's too early to say exactly what the impact is from this, but we've got a robust service recovery plan in place. And once the recovery plan is complete, we expect the ERP system to give us significant new capabilities and benefits that - for the company.

* * *

**<Q - Colleen Elizabeth Burns>:** Thanks. Most of mine have been answered, but just to circle back on the SAP, ERP rollout issues, just to make sure I understand correctly, the order fulfillment issues that you're experiencing, is it delaying inventory being shipped to customers, and then if so, have you had to offer thus far, discounts or incentives, to customers to make up for the issues?

**<A - Christopher H. Peterson>:** No, we have not had to offer discounts or incentives to make up for the issues. What it's resulting in is we - when we - as we implemented, we came up, we started shipping to customers, but our customer service level is lower than what we would expect and what we are planning to ultimately achieve. And so, our fill rate is lower than target, and that's why we've taken immediate actions to address the situation and put a robust service recovery plan in the place.

96. The statements above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Revlon failed to create measures to monitor the ERP system appropriately once implemented; (2) Revlon failed to design, implement and consistently operate effective process-level controls to ensure that it appropriately (a) recorded and accounted for inventory, accounts receivable, net sales and cost of goods sold, (b) reconciled balance sheet accounts, (c) reviewed and approved the complete population of manual journal entries, (d) used complete and accurate information in performing manual control, which constituted a material weakness in its internal controls over financial reporting, and (e) trained personnel; (3) as a result of the poor preparation and planning of the implementation of the ERP system, Revlon was unable to fulfill product shipments of approximately $64 million of net sales and the Company incurred $53.6 million of incremental charges to remediate the decline in customer services levels; and (4) as a result, Defendants' statements about Revlon's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis at all relevant times.

97. On May 10, 2018, the Company filed its quarterly report with the SEC for the quarter ended March 31, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendants Meister, Dolan, and Kralovich. The 1Q18 10-Q contained signed SOX certifications by

Defendants Meister and Dolan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

98. In the 1Q18 10-Q, Defendants stated the following concerning the Company's internal controls relating to its new, ERP system:

> **(b) Changes in Internal Control Over Financial Reporting ("ICFR").** During February 2018, the Company implemented its new ERP system that supports a significant portion of the Company's business in North America, which resulted in certain changes to the Company's processes and procedures. While this new ERP implementation has resulted in service level disruptions in the Company's Oxford, N.C. manufacturing facility, the ERP implementation has not materially affected, nor is it reasonably likely to materially affect, the Company's ICFR.

99. On May 10, 2018, the Company hosted an earnings conference call with investors and analysts. In his opening remarks on the call, Defendant Meister stated, in relevant part:

> As you saw from the release this morning, our financial results for the first quarter were heavily impacted by several non-recurring events, most notably the service-level disruptions following the SAP implementation at our Oxford facility at the beginning of February that we mentioned on our last call.
>
> Although the first quarter financial results are disappointing, we implemented a recovery plan and returned our manufacturing capacity to normal levels by early April. While our net sales continue to be impacted, we are now refilling the inventory pipeline in both our own and our customers' warehouses.

100. Defendant Peterson continued to downplay the severity of the Company's disastrous ERP rollout in his opening remarks:

> Paul. I would like to first expand upon the service-level disruptions at the company's Oxford, North Carolina manufacturing facility and provide an update on where we stand in our remediation efforts. In early February, we rolled out SAP for a large part of our North American business to integrate planning, sourcing, manufacturing, distribution and finance. We expect this rollout to provide greater visibility into real-time transactional information that will enable better and faster decision-making, improved customer service efficiency, and better working capital management. However, we experienced issues during the

SAP changeover that caused the plant to ramp up capacity slower than anticipated. This resulted in an estimated quarter-over-quarter sales decline on lost shipments of approximately $20 million mostly in North America.

Additionally, we incurred approximately $10 million in incremental charges in our manufacturing facility as a result of these disruptions principally due to reduced overhead absorption stemming from lower than normal production levels. We dedicated significant internal and external resources to resolve these issues and, as of early April, returned the Oxford plant back to normal production capacity. In fact, we are now producing at levels in excess of those pre-SAP.

101. Defendant Dolan also downplayed the severity of the Company's ERP problems in her opening remarks, stating in relevant part:

In closing, our financial performance in both net sales and adjusted EBITDA was heavily impacted by the service-level disruptions in our Oxford, North Carolina production facility. We continue to be focused on remediation efforts and are currently operating at capacity so that we can satisfy the continued demand for a wide array of products. We believe in the power of our brand portfolio and are encouraged by the consumers' response to our digital transformation initiatives and new advertising campaign.

102. During the question and answer session, Defendant Meister falsely stated that the Company had expected the SAP rollout to be flawless:

**<Q - Carla Casella>:** Okay. And then is it just bad luck that you were doing the facility transition at the same time as doing the Almay and restated Ulta? Or was there a timing issue where you're expected to do the rollout sooner and the facility later or just bad luck?

**<A - Paul M. Meister>:** Well, I think the honesty answer is we did not expect to have the issues on the facility that we get. So, in hindsight, the phasing looks a little off, but the reality is we were expecting to execute flawlessly on the SAP situation at Oxford.

103. The statements above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to

disclose that: (1) Revlon failed to create measures to monitor the ERP system appropriately once implemented; (2) Revlon failed to design, implement and consistently operate effective process-level controls to ensure that it appropriately (a) recorded and accounted for inventory, accounts receivable, net sales and cost of goods sold, (b) reconciled balance sheet accounts, (c) reviewed and approved the complete population of manual journal entries, (d) used complete and accurate information in performing manual control, which constituted a material weakness in its internal controls over financial reporting, and (e) trained personnel; (3) as a result of the poor preparation and planning of the implementation of the ERP system, Revlon was unable to fulfill product shipments of approximately $64 million of net sales and the Company incurred $53.6 million of incremental charges to remediate the decline in customer services levels; and (4) as a result, Defendants' statements about Revlon's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis at all relevant times.

104. On August 9, 2018, the Company filed its quarterly report with the SEC for the quarter ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendants Perelman, Dolan, and Kralovich. The 2Q18 10-Q contained signed SOX certifications by Defendants Perelman and Dolan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

105. In the 2Q18 10-Q, Defendants stated the following concerning the Company's internal controls relating to its new, ERP system:

> **(b) Changes in Internal Control Over Financial Reporting ("ICFR").** There have not been any changes in the Company's internal control over financial reporting during the quarter ended June 30, 2018 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. During February 2018, the Company implemented its new ERP system that supports a significant portion of the Company's business in

> North America, which resulted in certain changes to the Company's processes and procedures. While this new ERP implementation has resulted in service level disruptions in the Company's Oxford, N.C. manufacturing facility, the ERP implementation has not materially affected, nor is it reasonably likely to materially affect, the Company's ICFR.

106. On August 9, 2018, the Company hosted an earnings conference call with investors and analysts. Defendant Perelman used her opening remarks to downplay the severity of the Company's SAP problems, stating in relevant part:

> Since becoming CEO in May, I've already identified ways to reduce our cost structure for the rest of the year and going forward. As we build for the future and enhance our business operations, I also wanted to update you on our progress recovering from the SAP supply disruptions that affected us in first quarter and into second quarter. We have resolved the fundamental issues and our plant is back to producing at greater than pre-SAP levels.
>
> Sales have seen recovery in second quarter in North America with other markets following as the products reach them. I am excited and honored to be taking the leadership position at this point in time. I believe that our transformation strategy is taking hold both within our company and with our consumers. I'm looking forward to the months ahead.
>
> * * *
>
> In closing, we believe in the power of our brands and are encouraged by the consumers' response to our digital transformation initiatives and new advertising campaigns. In addition, we have identified opportunities to both optimize our business practices and control costs in the remainder of the year and going forward. With most of the SAP disruption behind us, we are focused on realizing the opportunities in our business and building for the future, including growing our brands, better serving our customers and our obsession with our consumer

107. In her opening remarks on the call, Defendant Dolan also sought to minimize the ongoing SAP problems, stating in relevant part:

> Let me now provide a further update on our SAP implementation. As you know, our production capabilities in our Oxford, North Carolina production facility were severely affected starting early April and were re-established back to pre-SAP levels during the month of April. During that time, inventory levels in Revlon distribution centers and with our major retail and distribution partners both

> domestic and international were depleted. Since then, we've been rebuilding these inventory levels and service levels have significantly improved.
>
> The need to cycle production through several thousand SKUs is the primary driver for the recovery duration and we continue to see improvements with each successive month. As many companies have experienced, ERP implementations are extremely complex. Since identifying the production issues, we have had dedicated internal teams consisting of operations, information technology and finance, along with external business process experts, involved in scrutinizing our process and system changes and are completing the final phases of improvements.
>
> We have accomplished a tremendous amount since the implementation and have continued to learn and evolve our internal processes and procedures as we move forward. We are confident that SAP will drive a stronger supply chain which will allow us to better serve our customers through service efficiency and support improved decision making.

108. The statements above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Revlon failed to create measures to monitor the ERP system appropriately once implemented; (2) Revlon failed to design, implement and consistently operate effective process-level controls to ensure that it appropriately (a) recorded and accounted for inventory, accounts receivable, net sales and cost of goods sold, (b) reconciled balance sheet accounts, (c) reviewed and approved the complete population of manual journal entries, (d) used complete and accurate information in performing manual control, which constituted a material weakness in its internal controls over financial reporting, and (e) trained personnel; (3) as a result of the poor preparation and planning of the implementation of the ERP system, Revlon was unable to fulfill product shipments of approximately $64 million of net sales and the Company incurred $53.6 million of incremental charges to remediate the decline in customer services levels; and (4) as a result,

Defendants' statements about Revlon's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis at all relevant times.

109. On November 9, 2018, the Company filed its quarterly report with the SEC for the quarter ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Perelman, Dolan, and Kralovich. The 3Q18 10-Q contained signed SOX certifications by Defendants Perelman and Dolan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

110. In the 3Q18 10-Q, Defendants stated the following concerning the Company's internal controls relating to its new, ERP system:

> **(b) Changes in Internal Control Over Financial Reporting ("ICFR").** There have not been any changes in the Company's internal control over financial reporting during the quarter ended September 30, 2018 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. During February 2018, the Company implemented its new ERP system that supports a significant portion of the Company's business in North America, which resulted in certain changes to the Company's processes and procedures. While this new ERP implementation has resulted in service level disruptions in the Company's Oxford, N.C. manufacturing facility, the ERP implementation has not materially affected, nor is it reasonably likely to materially affect, the Company's ICFR.

111. On November 9, 2018, the Company hosted an earnings conference call with investors and analysts. Defendant Perelman again used her opening remarks to downplay the severity of the Company's SAP problems, stating in relevant part:

> Next, let me provide you with an update on our Oxford plant. As mentioned on our second quarter call, our plan is back to producing at pre-SAP level and we continue to fill customer pipelines internationally. The Oxford impact to our third quarter results was significantly lower than the second quarter and we expect continued improvement going forward.

112. The statements above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Revlon failed to create measures to monitor the ERP system appropriately once implemented; (2) Revlon failed to design, implement and consistently operate effective process-level controls to ensure that it appropriately (a) recorded and accounted for inventory, accounts receivable, net sales and cost of goods sold, (b) reconciled balance sheet accounts, (c) reviewed and approved the complete population of manual journal entries, (d) used complete and accurate information in performing manual control, which constituted a material weakness in its internal controls over financial reporting, and (e) trained personnel; (3) as a result of the poor preparation and planning of the implementation of the ERP system, Revlon was unable to fulfill product shipments of approximately $64 million of net sales and the Company incurred $53.6 million of incremental charges to remediate the decline in customer services levels; and (4) as a result, Defendants' statements about Revlon's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis at all relevant times.

## VII. CLASS ACTION ALLEGATIONS

113. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased or otherwise acquired Revlon securities during the Class Period and that were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Revlon during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or

had a controlling interest; (v) Revlon's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

114. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Revlon stock actively traded on the NYSE under the ticker symbol "REV." According to the Company's Form 10-K filed on March 28, 2019, Revlon had 52,867,961 shares outstanding, 45,348,321 of which were beneficially owned by MacAndrews & Forbs and 7,519,640 were owned by the public.

115. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

a. whether the Exchange Act was violated by Defendants;

b. whether Defendants misrepresented material facts;

c. whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d. whether Defendants knew or recklessly disregarded that their statements were false and misleading, and/or omitted material facts;

e. whether the price of Revlon securities was artificially inflated; and

f. the extent of damage sustained by Class members and the appropriate measure of damages.

116. Plaintiffs' claims are typical of the claims of members of the Class because both Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

117. Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

118. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII. LOSS CAUSATION AND ECONOMIC LOSS

119. Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs' and class members' economic loss. Plaintiffs' claims for securities fraud are asserted under the fraud on the market theory of reliance. The market price of Revlon securities, actively traded on the NYSE, were artificially inflated by the false and misleading statements and material omissions complained of herein, including misleading statements and omissions concerning Revlon disastrous roll-out of its new ERP system.

120. These false and misleading statements had the intended effect and caused Revlon securities to trade at artificially inflated levels throughout the Class Period.

121. The Class Period inflation in Revlon securities was removed when the Company's disastrous SAP roll-out concealed by Defendants' false and misleading statements and omissions, or the financial, regulatory, and operational impacts thereof, were revealed to the market. The information was disseminated through partial disclosures that revealed the nature

and extent of Revlon's disastrous SAP roll-out. These disclosures, more particularly described below, removed artificial inflation from Revlon securities and caused economic injury to Plaintiffs and other members of the Class.

122. The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below:

a. On March 18, 2019, after market hours, Revlon filed a Form 12b-25, disclosing it was unable to timely file its annual report for the fiscal year ended December 31, 2018 due to the identification of a material weakness in its internal controls relating to its ERP system. On this news, shares of Revlon fell $1.33 per share, or nearly 6.87%, to close at $18.02 per share on March 19, 2019.

b. On March 28, 2019, after the market closed, Revlon filed its annual report on Form 10-K for the year ending December 31, 2018 with the SEC. The 2018 Form 10-K revealed further details about Revlon's the problems with the ERP system, internal control weaknesses, and the reasons for these weaknesses. On this news, shares of Revlon fell another $1.33 per share or over 6.4% to close at $19.38 per share on March 29, 2019.

## IX. PRESUMPTION OF RELIANCE

123. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. the Company's common stock traded in an efficient market;

d. the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e. Plaintiffs and other members of the Class purchased or acquired Revlon securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

124. At all relevant times, the market for Revlon securities was efficient for the following reasons, among others:

a. as a regulated issuer, Revlon filed periodic public reports with the SEC;

b. Revlon regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

c. Revlon was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Jeffries Group LLC, J.P. Morgan Chase & Co., Wright Investors Services, Goldman Sachs, Wells Fargo Securities, LLC, Citigroup Inc., Imperial Capital, Sterling Capital, which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

d. Revlon securities were actively traded on an efficient market, the NYSE, where the Company's common stock trades under the ticker symbol "REV."

125. As a result of the foregoing, the market for Revlon securities promptly digested current information regarding Revlon from all publicly available sources and reflected such information in Revlon securities. Under these circumstances, all purchasers and acquirers of Revlon securities during the Class Period suffered similar injury through their purchases or acquisitions of Revlon securities at artificially inflated prices, and the presumption of reliance applies.

126. Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its operations, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## X. INAPPLICABILITY OF STATUTORY SAFE HARBOR

127. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Revlon and the

Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Revlon who knew that those statements were false and misleading when made.

## XI. CLAIMS FOR RELIEF

### COUNT I
**For Violations of Section 10(b) of the Exchange Act, and**
**Rule 10b-5 Promulgated Thereunder, Against All Defendants**

128. Plaintiffs repeat, incorporate, and reallege each allegation above as if fully set forth herein.

129. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

130. During the Class Period, Defendants disseminated or approved the false statements specified herein, among others, which they knew, or recklessly disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

131. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, which: (i) deceived the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflated and maintained the market price of Revlon securities; and (iii) caused Plaintiffs and other members of the Class to purchase or otherwise

acquire Revlon securities at artificially inflated prices. In furtherance of this unlawful course of conduct, Defendants, each one of them, took the actions set forth herein.

132. Pursuant to the above course of conduct, and by the use of means or instrumentalities of interstate commerce and/or of the mails, Defendants made statements in SEC filings and other public statements described above that were designed to influence the market for Revlon securities. Such statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Revlon's business prospects. Specifically, Defendants misleadingly failed to inform investors throughout the Class Period the full extent of Revlon's botched SAP roll-out.

133. As described above, Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

134. Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Revlon. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Revlon's businesses, operations, future financial condition, and future prospects.

135. As a result of the dissemination of the aforementioned false and misleading public statements, the market price of Revlon securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Revlon's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased

Revlon securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

136. During the Class Period, Revlon securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Revlon securities at prices artificially inflated by Defendants' wrongful conduct.

137. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Revlon securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Revlon securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

138. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

139. As a direct and proximate result of the wrongful conduct of Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

140. Plaintiffs repeat, incorporate, and reallege each allegation above as if fully set forth herein.

141. During the Class Period, the Individual Defendants participated in the operation and management of Revlon, and conducted and participated, directly and indirectly, in the conduct of Revlon's business affairs. Because of their senior positions, they knew the adverse non-public information about Revlon's business prospects, including that there was substantial evidence in support of anticompetitive conduct by Revlon.

142. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Revlon's financial condition and business prospects, and to correct promptly any public statements issued by Revlon which had become materially false or misleading.

143. Because of their positions of control and authority as senior officers of Revlon, the Individual Defendants were able to, and did, control the contents of the various public statements that Revlon made and disseminated in the marketplace during the Class Period concerning Revlon's results of operations and business prospects. In their capacities as senior officers of Revlon, the Individual Defendants had direct involvement in the day-to-day operations of the Company and reviewing and approving the Company's public statements. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Revlon to engage in the wrongful acts complained of herein.

144. The Individual Defendants, therefore, were "controlling persons" of Revlon within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Revlon's securities.

145. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Revlon.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED: November 11, 2019

**GLANCY PRONGAY & MURRAY LLP**

By: *<u>/s/ Joshua L. Crowell</u>*

Joshua L. Crowell (JC-0914)
Vahe Mesropyan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Email: jcrowell@glancylaw.com
vmesropyan@glancylaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Putative Class*

DATED: November 11, 2019

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Phillip Kim*
Phillip Kim (PK 9384)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs and the Putative Class*