**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THEODORE LACHMAN, individually and on behalf of all others similarly situated, <br><br> *Plaintiff*, <br><br> vs. <br><br> REVLON, INC., PAUL MEISTER, DEBRA PERELMAN, VICTORIA DOLAN, WENDEL F. KRALOVICH, SIOBHAN ANDERSON, FABIAN T. GARCIA, JUAN R. FIGUEREO AND CHRISTOPHER H. PETERSON, <br><br> *Defendants*. | No. 19-cv-02859 (ARR) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

Sharon L. Nelles
Nicolas Bourtin
Matthew A. Schwartz
Akash M. Toprani
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel for defendants Revlon, Inc., Paul Meister, Debra Perelman, Victoria Dolan, Wendel F. Kralovich, Siobhan Anderson, Juan R. Figuereo, and Christopher H. Peterson*

January 10, 2020

## TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ................................................................................ 1

**ALLEGATIONS OF THE AMENDED COMPLAINT** ............................................ 4

    A.    The Parties ........................................................................................... 4

    B.    Revlon's Plan to Update Its ERP System ............................................. 4

    C.    Revlon's Implementation of the ERP System ....................................... 5

    D.    Revlon's Disclosures of Disruptions ..................................................... 6

    E.    Revlon's Remediation Efforts................................................................ 7

    F.    Revlon's Continuing Disclosures of the Ongoing Financial Impact of the SAP Implementation and Remediation Efforts........................................ 7

    G.    Revlon's Internal Control Over Financial Reporting............................. 8

    H.    Revlon's Disclosure of a Material Weakness in Its ICFR ..................... 9

**LEGAL STANDARD** ........................................................................................... 10

**ARGUMENT** ...................................................................................................... 10

I.    **PLAINTIFFS FAIL TO ALLEGE ANY MATERIAL MISSTATEMENTS** .......... 10

    A.    Revlon Disclosed the Risks Associated with the SAP Launch ........................... 12

    B.    Revlon Disclosed the Disruptions Caused by the SAP Launch ......................... 15

    C.    Revlon's Disclosures About the Remediation Efforts Were Accurate ............... 17

    D.    Plaintiffs Allege No Facts Showing That Revlon's ICFR Was Ineffective Before December 31, 2018 ..................... 19

    E.    Plaintiffs Can Advance Claims Only Against the Individual Defendants That Made an Alleged Misstatement ................... 21

II.    **PLAINTIFFS ALSO FAIL TO ALLEGE A "STRONG INFERENCE" OF SCIENTER** ...................... 21

    A.    Plaintiffs Do Not Plead Any "Motive or Opportunity" to Commit Fraud .......... 22

    B.    Plaintiffs' Allegations About Operations Issues Do Not Establish That Any Defendant Consciously or Recklessly Made a Misstatement ..................... 23

        1.    Plaintiffs Make No Viable Allegations of Scienter Against the Individual Defendants ..................... 23

        2.    Plaintiffs Have Provided No Basis to Find Corporate Scienter ............... 25

3.    Revlon's Repeated Disclosures About the SAP Implementation
      Negate Any Inference of Scienter ........................................................... 26

**CONCLUSION** ..................................................................................................... 27

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ........................................................19

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) .....................................................................................21

*BankUnited, N.A.* v. *Merritt Envtl. Consulting Corp.*,
360 F. Supp. 3d 172 (S.D.N.Y. 2018) .....................................................................4

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) ...........................................................12

*Chill* v. *Gen. Elec. Co.*,
101 F.3d 263 (2d Cir. 1996) ...................................................................................22

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010) ....................................................................23

*City of Livonia Employees' Ret. Sys. & Local 295/Local 851* v. *Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ..................................................................................23

*City of Omaha, Neb. Civilian Emps.' Ret. Sys.* v. *CBS Corp.*,
679 F.3d 64 (2d Cir. 2012) .....................................................................................10

*Crafton* v. *Powerwave Techs., Inc.*,
2008 WL 11338622 (C.D. Cal. Apr. 17, 2008) ...............................................14, 15

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
2017 WL 4049253 (S.D.N.Y. June 28, 2017) ........................................................11

*ECA & Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ...................................................................................10

*Gagnon* v. *Alkermes PLC*,
368 F. Supp. 3d 750 (S.D.N.Y. 2019) ....................................................................26

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ....................................................................22

*Janus Capital Grp., Inc.* v. *First Derivative Traders*,
564 U.S. 135 (2011) ..............................................................................................221

*JSMS Rural LP* v. *GMG Capital Partners III, LP*,
    2006 WL 2239681 (S.D.N.Y. Aug. 4, 2006) ........................................................3

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001) ...............................................................................23

*In re Kandi Techs. Grp., Inc. Sec. Litig.*,
    2019 WL 4918649 (S.D.N.Y. Oct. 4, 2019) .......................................................13

*Lasker* v. *New York State Elec. & Gas Corp.*,
    1995 WL 867881 (E.D.N.Y. Aug. 22, 1995) ...........................................12, 13, 18

*Lefkowitz* v. *Synacor, Inc.*,
    2019 WL 4053956 (S.D.N.Y. Aug. 28, 2019) ...............................................18, 24

*Livingston* v. *Cablevision Sys. Corp.*,
    966 F. Supp. 2d 208 (E.D.N.Y. 2013) ................................................................18

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) ............................................................20, 24

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014) ......................................................19, 20, 25

*Miyahira* v. *Vitacost.com, Inc.*,
    2012 WL 12895513 (S.D. Fla. June 28, 2012) ....................................................14

*In re Molycorp, Inc. Sec. Litig.*,
    2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) .....................................................25

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006) .................................................................16

*Novak* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ...........................................................................2, 16

*Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ............................................................................................13

*Parkcentral Global Hub Ltd.* v. *Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014) .................................................................................4

*In re PXRE Grp. Ltd. Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) .................................................................26

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004) ..........................................................................11, 14

*Rothman* v. *Gregor*,
  220 F.3d 81 (2d Cir. 2000)...................................................................................22

*S. Cherry St., LLC* v. *Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009)...................................................................................22

*Shemian* v. *Research In Motion Ltd.*,
  2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) .........................................................12

*Singh* v. *Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019)...................................................................................10

*Slayton* v. *Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)...................................................................................4

*In re Smith Barney Transfer Agent Litig.*,
  884 F. Supp. 2d 152 (S.D.N.Y. 2012)....................................................................21

*Stark Trading & Shepherd Invs. Int'l, Ltd.* v. *Falconbridge Ltd.*,
  2008 WL 153542 (E.D. Wis. Jan. 14, 2008) ..........................................................26

*In re SunEdison, Inc. Sec. Litig.*,
  300 F. Supp. 3d 444 (S.D.N.Y. 2018)....................................................................20

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008)............................................................................22, 26

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................................21

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) .........................................................25

*In re Veon Ltd. Sec. Litig.*,
  2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) .........................................................25

*Wilson* v. *Dalene*,
  2010 WL 1189459 (E.D.N.Y. Jan. 4, 2010) ...........................................................27

**Statutes & Rules**

15 U.S.C. § 78u-4(b).............................................................................................11

15 U.S.C. § 78u-5(c).............................................................................................18

17 C.F.R. § 240.10b-5...........................................................................................21

## PRELIMINARY STATEMENT

In this action, Plaintiffs improperly seek to bring securities fraud claims based on challenges that Revlon Inc. ("Revlon" or the "Company") faced in implementing a new company-wide enterprise resource planning system ("ERP").  But not only did Revlon inform investors in three consecutive annual reports that it was planning to implement this new system (called "SAP"), it also prominently disclosed in those same reports that implementing SAP came with substantial risks, including, potentially, Revlon's "inability to fill customer orders accurately or on a timely basis, or at all," and "disrupt[ion to] the Company's internal control structure."  (Ex. 1 (2014 10-K) at 19; Ex. 2 (2015 10-K) at 20; Ex. 3 (2016 10-K) at 23.)[1]

Ultimately, some of the risks Revlon disclosed materialized.  And when they did, Revlon informed the market immediately.  Indeed, within weeks of launching SAP, Revlon disclosed that the Company had experienced service-level disruptions that impacted the Company's ability to manufacture goods and fulfill shipments to several large retail customers. (Ex. 4 (2017 10-K) at 22.)  Revlon also told investors that it was implementing a remediation plan, but cautioned that it could not provide assurances that the plan would remedy the systems issues in time to fully recover the sales and its ability to fulfill customer orders, or that the SAP implementation would not continue to disrupt operations.  Revlon thereafter updated investors regularly on the recovery plan (Ex. 5 (May 10, 2018 Earnings Call) at 2; Ex. 6 (2018 Q3 10-Q) at 51), and was just as transparent about the financial impact of the SAP implementation, disclosing its estimates of lost sales and remediation costs every quarter (Ex. 5 (May 10, 2018 Earnings Call) at 2;  Ex. 7 (Aug. 9, 2018 Earnings Call) at 3; Ex. 6 (2018 Q3 10-Q) at 38).  And when the Company

---

[1] Citations to "Ex." are to exhibits to the Declaration of Akash M. Toprani, filed concurrently herewith.

determined that, primarily because of the SAP implementation effort, it had identified a material weakness in its internal control over financial reporting ("ICFR"), it disclosed that too, notwithstanding that those control deficiencies did not result in any material misstatement of the financial statements or require any changes to its previously reported financial results.  (Ex. 8 (Mar. 18, 2019 Form 12b-25) at 2; Ex. 9 (2018 10-K) at 25.)  In short, Revlon made appropriate and timely disclosure every step of the way.

Nonetheless, Plaintiffs opportunistically seize on declines in Revlon's stock price coinciding with the material weakness disclosures to concoct securities fraud claims.  Faced with Revlon's clear disclosures, however, Plaintiffs cannot claim that investors were kept in the dark about the risks and challenges associated with the SAP implementation.  Thus, Plaintiffs resort to alleging that Defendants should have been more dire in their statements.  But arguments that Defendants did not use "overly gloomy" language to describe company problems are not enough, *Novak* v. *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000), and indeed, companies may no more paint a too dire picture than they may a too rosy one.  This Court should dismiss Plaintiffs' claims for the following two independent reasons.

*First*, Plaintiffs fail to allege that any of Defendants' public statements was materially false or misleading.  Plaintiffs assert that Revlon failed to warn the market about the problematic SAP launch, but that is false on its face, as the numerous public disclosures Plaintiffs themselves cite throughout the Amended Complaint make clear.  Plaintiffs next accuse Revlon of "downplaying" the issues caused by the launch, but Revlon made timely disclosures of both the processing issues and the estimated financial losses—none of which Plaintiffs allege was inaccurate.  Plaintiffs also claim that Revlon's disclosures about its remediation efforts misled investors, but can point to nothing that was either false or omitted.  Finally, Plaintiffs assert that

Revlon issued false certifications attesting to effectiveness of its internal controls before it identified a material weakness, but Plaintiffs fail to allege any earlier material weakness, let alone that the certifications—which are statements of opinion—were not believed when made.

*Second*, Plaintiffs fail to plead facts giving rise to the required "strong inference" that either Revlon or its management acted with intent to defraud Revlon's shareholders. Rather, the fact that Revlon *repeatedly* disclosed its challenges with the SAP implementation negates any inference that Defendants were trying to hide anything. And Plaintiffs make not a single allegation that any Individual Defendant believed prior to the March 2019 disclosure that Revlon had a material weakness in its controls. Plaintiffs' reliance on "confidential witnesses" to lay out deficiencies with the implementation is no help either. All that those witnesses establish is that the Company knew there were implementation risks and that the SAP launch was problematic— which is *precisely* what Revlon disclosed to the market over and over again.

Plaintiffs may not turn the securities laws into a "'partial downside insurance policy'" for a decline in Revlon's stock price. *JSMS Rural LP* v. *GMG Capital Partners III, LP*, 2006 WL 2239681, at *2 (S.D.N.Y. Aug. 4, 2006) (*quoting Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 348 (2005)). The facts, as pleaded in the Amended Complaint and shown in Revlon's public disclosures, raise the strong inference that Defendants tried to—and did—repeatedly and accurately disclose to investors the challenges with the SAP implementation and negative results. Accordingly, this Court should dismiss the Amended Complaint with prejudice.

## ALLEGATIONS OF THE AMENDED COMPLAINT[2]

### A.    The Parties

Plaintiffs Theodore Lachman and OOO iK Barna Group purport to represent a class that purchased or otherwise acquired publicly traded Revlon stock from March 3, 2017 through March 28, 2019 ("putative class period").  (AC ¶¶ 1, 10-11.)

Defendant Revlon is a leading global beauty company that manufactures, markets, distributes and sells an array of beauty and personal care products around the world.  (AC ¶¶ 26-29.)  The Individual Defendants are certain of Revlon's current or former executives:  Paul Meister (interim CEO, January 28, 2018 to May 22, 2018), Debra Perelman (CEO since May 22, 2018), Juan R. Figuereo (CFO, April 2016 to June 6, 2017), Christopher R. Peterson (COO, April 17, 2017 to July 31, 2018; CFO, June 6, 2017 to March 12, 2018), Victoria Dolan (CFO since March 12, 2018), Wendel F. Kralovich (Chief Accounting Officer & Controller, October 2017 to December 2018), and Siobhan Anderson (Chief Accounting Officer & Controller, October 2014 to August 31, 2017).  (AC ¶¶ 13-21.)[3]

### B.    Revlon's Plan to Update Its ERP System

Revlon, like most large consumer products companies, manages its day-to-day operations with an ERP.  (Amended Complaint ("AC") ¶ 31.)  In 2015, Revlon announced that,

---

[2] For purposes of this motion, Defendants accept the non-conclusory allegations in the Amended Complaint.  *See Parkcentral Global Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 202, 208 (2d Cir. 2014).  This Court may also consider "'documents incorporated into the complaint by reference'" and "'legally required public disclosure documents filed with the SEC,'" *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 763 n.2 (2d Cir. 2010), as well as "documents 'integral' to the complaint," "even if not attached or incorporated by reference," and "facts of which judicial notice may properly be taken," *BankUnited, N.A.* v. *Merritt Envtl. Consulting Corp.*, 360 F. Supp. 3d 172, 183 (S.D.N.Y. 2018).

[3] Plaintiffs name Fabian T. Garcia (CEO, April 15, 2016 to January 28, 2018) as a defendant, but have not effected service of process on him.  (Dkt. 15.)

because many of Revlon's business units then used different ERP systems, it would implement a company-wide ERP system called SAP.  (Ex. 1 (2014 10-K) at 19.)  Revlon recognized that transitioning to a single system carried substantial risks, including that the SAP implementation could cause disruptions in filling customer orders, processing payments, and the Company's internal controls.  (*Id.*)  Revlon disclosed all of those risks to the market in 2015, and also warned that "[i]f the Company is unable to successfully plan, design or implement this new SAP ERP system, in whole or in part, or experience unanticipated difficulties or delays in doing so, it could have a material adverse effect on the Company's business, financial condition and/or results of operations."  (*Id.*)  Revlon further disclosed specifically that challenges with the SAP implementation could lead to the "inability to fulfill the Company's SEC or other governmental reporting requirements in a timely or accurate manner." (*Id.*)  Revlon made these same disclosures in each of the annual reports preceding the SAP rollout.  (Ex. 2 (2015 10-K) at 20; Ex. 3 (2016 10-K) at 23.)

### C.   Revlon's Implementation of the ERP System

Revlon went live with SAP at its Oxford, North Carolina plant, the Company's largest manufacturing facility, in early February 2018.  (AC ¶¶ 2, 46.)  Revlon assigned a team of approximately 100 people to implement SAP, including experts in finance, information technology ("IT"), and operations. (AC ¶ 34.)  According to Plaintiffs, Revlon had initially planned to roll out SAP before 2018, but implementation was delayed at least four times because the Company was not yet prepared.  (AC ¶¶ 41-42.)  Also according to Plaintiffs, Revlon considered delaying the SAP rollout from February 2018 to April 2018, but determined that additional time would not help fix problems that might occur with the implementation.  (AC ¶ 44.)

Once started, it quickly became clear that the rollout was affecting a number of Revlon's business operations.  (AC ¶¶ 41, 47.)  The new system introduced inefficiencies in how

raw materials were weighed (AC ¶ 38), and led to difficulties locating materials and ingredients in the warehouse (AC ¶ 56).  The various operational issues diminished the Oxford facility's manufacturing capabilities, meaning that Revlon was not able to meet all of its customer orders. (Ex. 4 (2017 10-K) at 22; AC ¶ 92.)

### D. Revlon's Disclosures of Disruptions

Revlon was completely transparent with the market about the difficulties with the SAP implementation.  On March 15, 2018—Revlon's first periodic disclosure date after the launch—Revlon reported that the SAP launch "caused its Oxford, N.C. manufacturing facility to experience service level disruptions that have impacted the Company's ability to manufacture certain quantities of finished goods and fulfill shipments to several large retail customers in the U.S." (Ex. 4 (2017 10-K) at 22; AC ¶ 92.)  Revlon further disclosed that it was implementing a plan "to remediate the decline in customer service levels," but was clear that it could not "provide assurances that it will remedy the ERP systems issues in time to fully recover these sales and/or that the ERP implementation will not continue to disrupt the Company's operations and its ability to fulfill customer orders." (Ex. 4 (2017 10-K) at 22; AC ¶ 92.)  In addition, Revlon disclosed that "ERP-related disruptions have caused the Company to incur expedited shipping fees and other unanticipated expenses in connection with actions that the Company has implemented to remediate the decline in customer service levels, which could continue until the ERP systems issues are resolved." (Ex. 4 (2017 10-K) at 22; AC ¶ 92.)

Revlon executives amplified these robust disclosures in an earnings call held the same day.  Christopher Peterson explained that "our production capabilities and inventory recovery have been slower than expected, affecting our current order fulfillment levels," and that it was "too soon to tell" what the precise financial impact of the disruptions would be. (Ex. 10 (Mar. 15, 2018 Earnings Call) at 4, 6; AC ¶ 95.)  Mr. Peterson also explained that "[w]e have taken immediate

actions to address the situation, have implemented a robust service recovery plan and have communicated with our key customers." (Ex. 10 (Mar. 15, 2018 Earnings Call) at 4); AC ¶ 94.)

### E.  Revlon's Remediation Efforts

As Plaintiffs acknowledge, Revlon took immediate and significant steps to remediate the challenges caused by the SAP launch, including (i) bringing back Pierre Pirard, a former head of supply chain management, (ii) asking employees to work weekends, and (iii) holding regular management meetings. (AC ¶¶ 66, 68.) Tellingly, as Plaintiffs' own CW states, Revlon treated the SAP remediation as an "'all-hands-on-deck' situation" where "[t]he Oxford plant received 'full support by the corporation. Anything we needed—extra resources, extra money—the corporation was committed.'" (*Id.* ¶ 62.)

### F.  Revlon's Continuing Disclosures of the Ongoing Financial Impact of the SAP Implementation and Remediation Efforts

Revlon continued to keep the market informed about the financial costs of the SAP implementation. On Revlon's May 10, 2018 earnings call, Mr. Peterson told investors that "the SAP changeover . . . resulted in an estimated quarter-over-quarter sales decline on lost shipments of approximately $20 million mostly in North America," and that Revlon had "incurred approximately $10 million in incremental charges" arising from the changeover. (Ex. 5 (May 10, 2018 Earnings Call) at 2; AC ¶ 100.) Mr. Peterson also gave an update on Revlon's remediation efforts, noting that Revlon had "dedicated significant internal and external resources to resolve these issues and, as of early April, returned the Oxford plant back to normal production capacity. In fact, we are now producing at levels in excess of those pre-SAP." (Ex. 5 (May 10, 2018 Earnings Call) at 2; AC ¶ 100.) And Mr. Meister reported that Revlon had "implemented a recovery plan and returned manufacturing capacity to normal levels by early April." (Ex. 5 (May 10, 2018 Earnings Call) at 2; AC ¶ 62.)

On Revlon's August 9, 2018 earnings call, Ms. Dolan disclosed "negative sales impact of approximately $30 million or $20 million in gross profit from our SAP supply disruption at our Oxford, North Carolina manufacturing facility," as well as "$23 million in costs associated with the remediation plan for the SAP supply disruptions." (Ex. 7 (Aug. 9, 2018 Earnings Call) at 3.)  As to remediation efforts, Revlon disclosed that the fundamental issue of manufacturing capability had been resolved and that the Oxford facility was producing at greater than pre-SAP levels, leading to recovery in sales in North America. (Ex. 7 (Aug. 9, 2018 Earnings Call) at 2; AC ¶ 74.)

On November 9, 2018, Revlon gave another update, reporting that the "SAP-related disruptions in the Oxford plant" were estimated to have "driven a loss of approximately $12 million in net sales during the [third] quarter" (Ex. 11 (Nov. 9, 2018 Earnings Call) at 3), as well as "approximately $50 million in incremental charges" for the year to date, "mainly related to actions that the Company has implemented to remediate the decline in customer service levels" (Ex. 6 (2018 Q3 10-Q) at 38).  Ms. Perelman also addressed the financial impact of the SAP rollout, noting that "[t]he Oxford impact to our third quarter results was significantly lower than the second quarter, and we expect continued improvement going forward." (Ex. 11 (Nov. 9, 2018 Earnings Call) at 2; AC ¶ 111.)

## G.      Revlon's Internal Control Over Financial Reporting

As a public company, Revlon is responsible for maintaining a system of ICFR that "provides reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes." (Ex. 12 (Public Company Accounting Oversight Board, Auditing Std. No. 2201) at 131.)  This requires Revlon to (i) maintain records that reflect the company's transactions, (ii) provide assurances that records are maintained in accordance with accounting principles, and (iii) prevent or timely detect use or disposition of the company's assets

that could have a material effect on financial statements.  (*Id.* at App. A, p. 160.)  In its report for the first quarter of 2018, filed on May 10, 2018, Revlon certified that despite the "service level disruptions," "the ERP implementation has not materially affected, nor is it reasonably likely to materially affect, the Company's ICFR."  (Ex. 13 (2018 Q1 10-Q) at 41; AC ¶ 98.)  Revlon again certified in its reports for the second and third quarters of 2018 that "the ERP implementation has not materially affected, nor is it reasonably likely to materially affect, the Company's ICFR." (Ex. 14 (2018 Q2 10-Q) at 50; Ex. 6 (2018 Q3 10-Q) at 53; AC ¶¶ 105, 110.)

### H.    Revlon's Disclosure of a Material Weakness in Its ICFR

On March 18, 2019, Revlon filed a Form 12b-25, alerting the market that it expected "to disclose in its 2018 [annual report] that it identified a material weakness in its [ICFR] as of year-end 2018, primarily related to the lack of design and maintenance of effective controls in connection with the previously disclosed implementation of its enterprise resource planning ('ERP') system in the U.S."  (Ex. 8 (2018 Form 12b-25) at 2; AC ¶ 77.)  The Company also disclosed that it did "not expect any changes to its previously-reported preliminary financial results, including the financial results that it previously reported." (Ex. 8 (2018 Form 12b-25) at 2; AC ¶ 77.)

As anticipated, ten days later, on March 28, 2019, Revlon disclosed in its 2018 annual report that, as of December 31, 2018, the Company (i) "did not perform an effective continuous risk assessment process" to identify risks affecting the Company's ICFR associated with the SAP rollout, (ii) "did not maintain a sufficient number of knowledgeable, trained personnel in the U.S. operations impacted by the ERP system implementation" that were responsible for ICFR, and (iii) "as a result, the Company did not design, implement and consistently operate effective process-level controls" to ensure accurate accounting in certain areas.  (Ex. 9 (2018 10-K) at 52-53; AC ¶ 79.)  Working with its outside auditor KPMG, the

Company "concluded that these deficiencies represented a material weakness, and that the Company's internal control over financial reporting was not effective as of December 31, 2018." (Ex. 9 (2018 10-K) at 52-53; AC ¶ 79.) The Company made clear, however, that "these control deficiencies did not result in any material misstatement of the Company's 2018 Consolidated Financial Statements." (Ex. 9 (2018 10-K) at 52-53; AC ¶ 79.)

## LEGAL STANDARD

To state a claim under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Plaintiffs must adequately plead (i) a material misstatement or omission; (ii) scienter; (iii) a connection between the misstatement or omission and the purchase or sale of a security; (iv) reliance by the plaintiff (or transaction causation); (v) economic loss; and (vi) loss causation. *Singh* v. *Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019). Under the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("Reform Act"), courts routinely grant motions to dismiss securities fraud cases, including in cases where the plaintiff filed a complaint longer than the 50-page Amended Complaint here.[4] Here, this Court should dismiss the Amended Complaint because Plaintiffs have failed to plead the independently required elements of material misstatement and scienter.

## ARGUMENT

## I.    PLAINTIFFS FAIL TO ALLEGE ANY MATERIAL MISSTATEMENTS.

Under the Reform Act and Rule 9(b), to plead a violation of Section 10(b), Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on

---

[4] *See, e.g.*, *City of Omaha, Neb. Civilian Emps.' Ret. Sys.* v. *CBS Corp.*, 679 F.3d 64 (2d Cir. 2012) (affirming dismissal of 77-page securities fraud complaint); *ECA & Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) (190-page complaint).

information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see also* Fed. R. Civ. P. 9(b).

Plaintiffs come nowhere close to meeting the required pleading standard.  To start, it is unclear why Plaintiffs contend most of the statements at issue are false or misleading, especially given that Plaintiffs use the same rote explanation for the alleged falsity of *every* alleged misstatement for a 21-month time period.  (*See* AC ¶¶ 81-112.)  These boilerplate allegations, which leave Defendants and this Court to guess at Plaintiffs' arguments, are patently insufficient to "explain why the statements were fraudulent." *Rombach* v. *Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (internal quotation marks omitted).  For example, Plaintiffs claim that Defendants' statements *before* the SAP launch were false or misleading in part because Defendants failed to disclose the extent of lost shipments and remediation expenses incurred *after* the launch.  (*E.g.*, AC ¶¶ 89-90.)  This is clearly nonsensical.  Indeed, this case closely resembles *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017), where the complaint, like here, reproduced "large block quotations" containing the alleged misrepresentations, followed by "the same conclusory formula" meant "to cover *all* of the allegedly material misrepresentations." The *Deutsche Bank* court observed that "[t]his manner of pleading was squarely rejected by the Second Circuit," and concluded that, "[o]n that basis alone, the complaint fails to meet the pleading requirements necessary to state a claim." *Id.*  The same result should follow here.

Even ignoring this fatal pleading defect, Plaintiffs fail to allege that any of Defendants' statements concerning (i) risks associated with the SAP launch; (ii) disruptions caused by the SAP launch; (iii) remediation efforts; and (iv) Revlon's ICFR, were materially false or misleading:

### A.      Revlon Disclosed the Risks Associated with the SAP Launch.

Before February 2018, Revlon made numerous updated disclosures informing the market that it intended to launch a new ERP system.  (Ex. 3 (2016 10-K) at 23; AC ¶ 82; Ex. 15 (Nov. 3, 2017 Earnings Call) at 4; AC ¶ 89.)  Plaintiffs do not contend that these statements were false, as there is no dispute that Revlon was in fact working towards implementing SAP throughout 2017.  (AC ¶ 41.)  Instead, Plaintiffs contend these statements were misleading because Revlon should have disclosed that, according to Plaintiffs, Revlon "failed to create measures to monitor the ERP system appropriately once implemented."  (AC ¶¶ 84, 88, 90.)

Plaintiffs' argument fails out of the gate because they have identified no obligation for Revlon to disclose its "measures to monitor the ERP system."  It is well established that "[i]n a fraud on the market case, silence absent a duty to disclose, is not misleading."  *Lasker* v. *New York State Elec. & Gas Corp.*, 1995 WL 867881, at *8 (E.D.N.Y. Aug. 22, 1995) (Ross, J.), *aff'd*, 85 F.3d 55 (2d Cir. 1996) (internal quotation marks and alteration omitted).  Further, Revlon's alert to the market that it was upgrading its ERP system did not impose on it an obligation to discuss every facet of the SAP implementation.  *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) ("The requirement to be complete and accurate, however, does not mean that by revealing one fact . . . one must reveal all others that, too, would be interesting . . . but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead") (internal quotation marks omitted); *see also Shemian* v. *Research In Motion Ltd.*, 2013 WL 1285779, at *20 (S.D.N.Y. Mar. 29, 2013) (statement that "the launch of the PlayBook will be the most significant development for RIM since the launch of the first BlackBerry . . . did not create any legal duty to catalog the Playbook's potential shortcomings") (internal quotation marks and alterations omitted), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).

In any event, Plaintiffs themselves plead throughout their Amended Complaint that Revlon actually adopted many "measures to monitor the ERP system," and so there could be no obligation to disclose a lack thereof.  (*See* AC ¶¶ 34, 35.)  According to Plaintiffs, the SAP rollout involved a team of about 100 people, including operations and finance professionals as well as IT consultants.  (AC ¶ 34.)  This team included an IT team from Revlon's Colomer business unit, which had previously successfully launched SAP at the Colomer Group before it was acquired by Revlon.  (AC ¶¶ 32, 35.)  And, as part of the rollout, the implementation team ran various quality control measures, including user acceptance testing (AC ¶ 39) and several mock runs (AC ¶ 43).  Simply because, in hindsight, these measures may have proved insufficient to prevent the ultimate challenges with the SAP launch does not mean they were not "appropriate" when designed.  "Falsity is a failure to be truthful—it is not a misapprehension, misunderstanding or mistake of fact at the time a statement was made."  *In re Kandi Techs. Grp., Inc. Sec. Litig.*, 2019 WL 4918649, at *8 (S.D.N.Y. Oct. 4, 2019) (internal quotation marks omitted).

Moreover, even though Revlon was not required to warn the market that the SAP rollout might not proceed as planned, Revlon nonetheless did, disclosing that "[t]he Company's anticipated implementation of this SAP ERP system . . .  may disrupt the Company's operations."  (Ex. 3 (2016 10-K) at 23; AC ¶ 82.)  Indeed, Revlon specifically disclosed that the SAP launch could result in an "inability to fill customer orders accurately or on a timely basis, or at all," as well as "a disruption of the Company's internal control structure."  (Ex. 3 (2016 10-K) at 23; AC ¶ 82.)  Reasonable investors are assumed to read securities disclosures "in light of all its surrounding text, including hedges, disclaimers and apparently conflicting information."  *Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015); *see also Lasker*, 1995 WL 867881, at *7 (dismissing securities claim where plaintiff "must have

read [a] sentence [from an annual report] alone and ignored the lines preceding it").)  With this clear cautionary language, no reasonable investor could have been misled that the SAP rollout would absolutely proceed smoothly, and without the risk of causing disruptions to Revlon's operations.  *See, e.g., Miyahira* v. *Vitacost.com, Inc.*, 2012 WL 12895513, at *7 (S.D. Fla. June 28, 2012) (dismissing Securities Act claims based on "failed implementation of [company's] enterprise resource planning system" where company's disclosures warned that it "may experience delays in implementing this system or this system may not function as expected"), *aff'd*, 715 F.3d 1257 (11th Cir. 2013).

Plaintiffs' efforts to bolster their claims based on various unnamed CWs in non-executive manufacturing, operations, or financial planning roles at Revlon are to no avail.  (*See, e.g.*, AC ¶ 43 (certain pre-launch tests had failed); ¶ 50 (CW4 explaining how they received three days of training on SAP).)  Revlon made no public statements that contradict the CWs' statements, which in fact are entirely consistent with Revlon's express warnings about the launch.  (Ex. 3 (2016 10-K) at 23; AC ¶ 82.)[5]

In *Crafton* v. *Powerwave Techs., Inc.*, 2008 WL 11338622, at *4 (C.D. Cal. Apr. 17, 2008), the Central District of California addressed a similar, and similarly defective, claim.  There, plaintiffs alleged the company's "revenue projections in 2006 were knowingly false or misleading because [the company] was experiencing 'visibility issues' arising from its Enterprise Resource Planning ('ERP') software implementation."  2008 WL 11338622 at *3.  The *Crafton*

---

[5] The CWs' allegations also fail to establish that Defendants' statements were false "when made." *Rombach*, 355 F.3d at 173.  For example, CW7 states that three failed mock runs occurred at some unspecified point in "late 2017," which could very well have been *after* the statements Plaintiffs allege to be false.  Even if Defendants' public statements could be contorted into a guarantee of a smooth SAP launch, and even if CWs' allegations show that the SAP launch was bound to be a failure, Plaintiffs' allegations would *still* fail, because they do not temporally connect the alleged evidence of falsity with the supposed misstatements.

court dismissed the claim because defendants had specifically warned about "delays in ERP implementation that could weaken systematic internal controls." *Id.* at *4. Revlon's warnings in this action were even more consistent and detailed than those in *Crafton*. *See supra* at pp. 4-5.

**B.    Revlon Disclosed the Disruptions Caused by the SAP Launch.**

Shortly after the Oxford facility began experiencing service disruptions related to the February 2018 SAP rollout (AC ¶ 41), Revlon made a number of disclosures that Plaintiffs challenge, including that:

- the Company may incur "expedited shipping fees and other unanticipated expenses in connection with actions that the Company has implemented to remediate the decline in customer service levels, which could continue until the ERP systems issues are resolved" (Ex. 4 (2017 10-K) at 22; AC ¶ 92);

- "[w]hile the overall implementation steps [for the SAP rollout] are on schedule, our production capabilities and inventory recovery have been slower than expected, affecting our current order fulfillment levels" (Ex. 10 (Mar. 15, 2018 Earnings Call) at 4; AC ¶ 94);

- Revlon "experienced issues during the SAP changeover that caused the plant to ramp up capacity slower than anticipated. This resulted in an estimated quarter-over-quarter sales decline on lost shipments of approximately $20 million mostly in North America. Additionally, we incurred approximately $10 million in incremental charges in our manufacturing facility as a result of these disruptions principally due to reduced overhead absorption stemming from lower than normal production levels" (Ex. 5 (May 10, 2018 Earnings Call) at 2; AC ¶ 100);

- Revlon's "financial performance in both net sales and adjusted EBITDA was heavily impacted by the service-level disruptions in our Oxford, North Carolina production facility" (Ex. 5 (May 10, 2018 Earnings Call) at 2; AC ¶ 101); and

- "[the Company] did not expect to have the issues [at] the facility that we [did] . . . . So, in hindsight, the phasing looks a little off, but the reality is we were expecting to execute flawlessly on the SAP situation at Oxford" (Ex. 5 (May 10, 2018 Earnings Call) at 9; AC ¶ 102).

Plaintiffs claim that these statements are misleading because they "downplayed the negative impact of the SAP roll out" (AC ¶ 69), but fail to identify a *single* material fact about the rollout that was not disclosed.  Not only did Revlon disclose exactly what the core problem was—

"service level disruptions that have impacted the Company's ability to manufacture certain quantities of finished goods and fulfill shipments to several large retail customers in the U.S." (Ex. 4 (2017 10-K) at 22; AC ¶ 92; *see supra* at p. 6), it also disclosed the rollout's estimated financial impact, noting an "estimated quarter-over-quarter sales decline on lost shipments of approximately $20 million," as well as "approximately $10 million in incremental charges." (Ex. 5 (May 10, 2018 Earnings Call) at 2; AC ¶ 100.) None of this was downplayed. Revlon expressed quite clearly the magnitude of the issue, noting that its financial performance was "*heavily impacted*" by the SAP-related disruptions. (Ex. 5 (May 10, 2018 Earnings Call) at 2; AC ¶ 99 (emphasis added).) Given these accurate and comprehensive statements, Plaintiffs have failed to identify what there was left to disclose.[6]

Plaintiffs' real grievance seems to be not about the factual accuracy or completeness of Revlon's disclosures, but instead, that Revlon did not use Plaintiffs' preferred apocalyptic descriptions—for example, labeling the SAP rollout as a "disaster," a "fiasco," or "botched." (AC ¶¶ 67, 72.) But the securities laws impose an obligation to accurately disclose material facts, not histrionics. *See Novak*, 216 F.3d at 309 ("[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance.")

---

[6] As for Mr. Meister's statement that Revlon expected the rollout to proceed "flawlessly" (Ex. 5 (May 10, 2018 Earnings Call) at 9; AC ¶ 102), it is patently immaterial—given everything Revlon had disclosed about the *actual* results of the SAP rollout, no reasonable investor would care about Mr. Meister's description of his state of mind before the launch. Further, Plaintiffs allege no facts that Mr. Meister knew that the SAP launch would encounter the challenges that it ultimately did. *Cf. In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 393 (S.D.N.Y. 2006) ("At worst, Plaintiffs can only truly claim that [the individual defendant's] read of the market dynamics of the fourth quarter of 2003 proved to be wrong. That, however, does not mean he knew it was wrong at the time he made this comment.").

**C.      Revlon's Disclosures About the Remediation Efforts Were Accurate.**

Next, Plaintiffs take issue with the various statements Revlon made concerning the

scope and progress of its remediation efforts, including:

- "we implemented a recovery plan and returned our manufacturing capacity to normal levels by early April.  While our net sales continue to be impacted, we are now refilling the inventory pipeline in both our own and our customers' warehouses" (Ex. 5 (May 10, 2018 Earnings Call) at 2; AC ¶ 99);

- "[w]e have resolved the fundamental issues and our plant is back to producing at greater than pre-SAP levels" (Ex. 7 (Aug. 9, 2018 Earnings Call) at 2; AC ¶ 106); and

- "[t]he Oxford impact to our third quarter results was significantly lower than the second quarter and we expect continued improvement going forward" (Ex. 11 (Nov. 9, 2018 Earnings Call) at 2; AC ¶ 111).

Yet again, Plaintiffs fail to allege anything inaccurate or incomplete about Revlon's

statements.   Plaintiffs do not contest that, immediately following the SAP rollout, Revlon

dedicated substantial resources to an aggressive remediation plan.  In fact, the Amended Complaint

supports this fact:  Plaintiffs allege that Revlon ultimately spent over $50 million on remediation

costs.  (Ex. 9 (2018 10-K) at 25; AC ¶ 4.)  Nor do Plaintiffs contest that Revlon did in fact resolve

the fundamental issue caused by the rollout—diminished manufacturing capacity at the Oxford

facility.  As the disclosures explain—and Plaintiffs do not dispute—by April 2018, Revlon was

back to producing at levels greater than before the SAP launch, and was also rebuilding its

inventory.  (*E.g.*, Ex. 5 (May 10, 2018 Earnings Call) at 2; AC ¶ 99.)

To the extent Plaintiffs take issue with Defendants' optimism about Revlon's

remediation efforts—*e.g.*, Revlon's November 9, 2018 statement that it "expect[ed] continued

improvement going forward"—those statements are inactionable for a variety of reasons.  To start,

Plaintiffs do not plead that the Defendants did not expect improvement going forward, or that

improvement did not in fact occur.  Further, statements reflecting a "desire to achieve continued

prosperity" or that a company is "convinced of its business strategy" are, as this Court has said, "just the sort of predictive statements of opinion and belief that courts have found immaterial." *Lasker*, 1995 WL 867881, at *6, *aff'd*, 85 F.3d 55 (2d Cir. 1996).  In any event, because the statements concern "future economic performance," and each of Revlon's disclosures and earnings calls contains "meaningful cautionary language,"[7] the statements are inactionable under the Reform Act's safe harbor for forward-looking statements.  15 U.S.C. § 78u-5(c); *see Lefkowitz* v. *Synacor, Inc.*, 2019 WL 4053956, at *8-9 (S.D.N.Y. Aug. 28, 2019).

Moreover, general statements about the remediation plan's prospects would have to be read in light of Revlon's concurrent risk disclosures in its securities filings.  *See Livingston* v. *Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 217 (E.D.N.Y. 2013) (executive's oral statements "must be considered in conjunction with the substance of the company's unchallenged disclosures").  Revlon clearly disclosed to the market that Revlon "cannot provide assurances that it will remedy the ERP systems issues in time to fully recover these sales and/or that the ERP implementation will not continue to disrupt the Company's operations and its ability to fulfill customer orders."  (Ex. 4 (2017 10-K) at 22; AC ¶ 92.)[8]  Accordingly, no reasonable investor could have read Revlon's statements as a guarantee that problems with the SAP launch had an assured fix.

---

[7] (*See, e.g.*, Ex. 13 (2018 Q1 10-Q) at 42 ("These forward-looking statements are based on the beliefs, expectations, estimates, projections, assumptions, forecasts, plans, anticipations, targets, outlooks, initiatives, visions, objectives, strategies, opportunities, drivers, focus and intents of the Company's management.  While the Company believes that its estimates and assumptions are reasonable, the Company cautions that it is very difficult to predict the impact of known and unknown factors, and, of course, it is impossible for the Company to anticipate all factors that could affect its results.  The Company's actual results may differ materially from those discussed in such forward-looking statements.").)

[8] *See supra* pp. 6-7.

**D.     Plaintiffs Allege No Facts Showing That Revlon's ICFR Was Ineffective Before December 31, 2018.**

Finally, Plaintiffs assert that Revlon's SOX certifications about its ICFR effectiveness were false.  Specifically, Revlon's 2016 and 2017 annual reports "contained signed SOX certifications . . . attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud," as well as a statement that "Revlon's management determined that the Company's internal control over financial reporting was effective as of" the end of the relevant year.  (Ex. 3 (2016 10-K) at 56; Ex. 4 (2017 10-K) at 52; AC ¶¶ 81, 93.)  In its 2018 quarterly reports, Revlon stated that, although the "new ERP implementation has resulted in service level disruptions in the Company's Oxford, N.C. manufacturing facility, the ERP implementation has not materially affected, nor is it reasonably likely to materially affect, the Company's ICFR."  (Ex. 13 (2018 Q1 10-Q) at 41; Ex. 14 (2018 Q2 10-Q) at 50; Ex. 6 (2018 Q3 10-Q) at 53; AC ¶¶ 98, 105, 110.)

Plaintiffs claim that these statements are false and misleading because the SAP implementation was believed to be likely to affect the effectiveness of Revlon's ICFR.  The various SOX certifications, however, are "statements of opinion and plaintiffs must do more than simply allege that the conclusions were wrong.  They must allege adequately that defendants . . . reached a conclusion different from the one stated, or that defendants reached no conclusion at all."  *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *25 (S.D.N.Y. Sept. 9, 2019).  Plaintiffs fail to do so.  As with the rest of the purported misstatements, Plaintiffs offer no reason to suggest that Revlon's opinions about its ICFR were false, let alone that they were not believed when made.  If Plaintiffs are relying on Revlon's ultimate determination in its 2018 annual report that its ICFR was not effective as of December 31, 2018, that reliance is misplaced, as the identification of ICFR deficiencies do not suggest that prior disclosures were false.  *See In re Magnum Hunter Res. Corp.*

*Sec. Litig.*, 26 F. Supp. 3d 278, 284 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442, 446 (2d Cir. 2015); *see also In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014) (statements are actionable only if false "at the time they were made"), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

The fact that Revlon ultimately came to the conclusion that there was a material weakness—and disclosed it to the market—undermines the claim that Revlon willfully concealed it from the market in the months before.  In fact, despite eventually finding a material weakness in its ICFR, Revlon never restated its past financials, and Plaintiffs do not allege they did.  This lack of a restatement strongly weighs against Plaintiffs' claim that the prior SOX certifications were false:  "With no corresponding error in the Company's financial reporting, the Complaint fails to plausibly allege that the certification of effective internal controls was false or misleading.  Claims that successfully allege insufficient internal controls typically involve instances where the failure of internal controls led to restated financial results or were accompanied by misconduct."  *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 470 (S.D.N.Y. 2018).

Finally, Plaintiffs' various CWs do not assist their claim.  Despite their many criticisms of the SAP rollout, not a single one of Plaintiffs' CWs (only one of whom had a role related to finance) purports to opine on the state of Revlon's ICFR at any point in time, let alone that there was a material deficiency in its ICFR.  *See Magnum*, 26 F. Supp. 3d at 295 (confidential witnesses' "litany of criticisms of [company's] accounting practices" insufficient to "adequately plead falsity" of statements concerning effectiveness of controls).  Plaintiffs likewise plead no internal report, auditor opinion, or any other source that should have led the Defendants to believe that Revlon had a material weakness in ICFR before December 31, 2018.

E.    **Plaintiffs Can Advance Claims Only Against the Individual Defendants That Made an Alleged Misstatement.**

Liability for securities fraud attaches only against the person who "make[s]" a misstatement.  17 C.F.R. § 240.10b-5 (2010).  That means that only the signer of a securities filing or certification, or the speaker of an oral statement, can be held liable for the allegedly false certification or statement.  *See Janus Capital Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135, 142-43 (2011) ("[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.").  It makes no difference that each of the Individual Defendants is or was a senior executive at Revlon—without more, they cannot be held liable for any alleged misstatement.  *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 164 (S.D.N.Y. 2012) ("[I]ndividuals who do not 'make' statements cannot be liable solely on account of their close relationship with the 'maker.'").  Accordingly, to the extent this Court finds any alleged misstatements adequately pled, claims against all Individual Defendants except the "maker" of the statement must be dismissed.

II.    **PLAINTIFFS ALSO FAIL TO ALLEGE A "STRONG INFERENCE" OF SCIENTER.**

Under the Reform Act, Plaintiffs must plead that Defendants acted with a "strong inference" of scienter, *i.e.*, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (internal quotation marks omitted).  Plaintiffs may establish this strong inference only by pleading particularized facts that "(1) show[] that the defendants had both motive and opportunity to commit the fraud or (2) constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Regardless of how Plaintiffs try to plead scienter, this Court must be convinced that the inference of scienter is "at least as

compelling" as any competing inferences. *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 197 (2d Cir. 2008) (*quoting Tellabs*, 55 U.S. at 314). Scienter must be based on direct knowledge of falsity, or reckless conduct that "is highly unreasonable and . . . represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (internal quotation marks omitted). "[P]oor business judgment is not actionable under section 10(b) and Rule 10b-5." *Rothman* v. *Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).

Here, Plaintiffs do not come close to pleading scienter, let alone a "strong inference" of it. Plaintiffs allege no personal motive for any of the Defendants to commit fraud, nor any reports Defendants received or meetings they attended through which they learned information contrary to what they disclosed. In fact, given the Amended Complaint's acknowledgement that Defendants were focused on the SAP launch, dedicated significant Company resources to it, and made regular disclosures to Revlon investors (including reporting financial losses and costs on a timely basis), the much *stronger* inference here is that Defendant did *not* act with scienter.

A.   **Plaintiffs Do Not Plead Any "Motive or Opportunity" to Commit Fraud.**

Plaintiffs do not invoke "motive or opportunity" to plead scienter—the Amended Complaint offers no allegations "showing that the defendants benefitted in some concrete and personal way from the purported fraud," *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 371 (E.D.N.Y. 2013) (internal quotation marks omitted), such as suspicious trading or contingent compensation, *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009). At best, Plaintiffs offer only generic allegations regarding the "pressure" to implement SAP, without more. (AC ¶¶ 41-46.) But those "motives" to improve operations are "generally possessed by

most corporate directors and officers [so] do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  Plaintiffs have not.

**B.     Plaintiffs' Allegations About Operations Issues Do Not Establish That Any Defendant Consciously or Recklessly Made a Misstatement.**

Because Plaintiffs have "failed to demonstrate that defendants had a motive to defraud . . . [Plaintiffs] must produce a *stronger* inference of recklessness." *Kalnit*, 264 F.3d at 143 (emphasis added); *see also City of Livonia Employees' Ret. Sys. & Local 295/Local 851* v. *Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013) ("Without a motive to commit securities fraud, businessmen are unlikely to commit it.").  Here, Plaintiffs do not come close to pleading recklessness.

**1.     Plaintiffs Make No Viable Allegations of Scienter Against the Individual Defendants.**

Plaintiffs fail to meet the Reform Act's requirement of pleading specific facts showing that the Individual Defendants received any information that contradicted the public disclosures Revlon made to the market.  To start, Plaintiffs plead literally nothing to establish the scienter of Defendants Meister, Perelman, Dolan, Kralovich, Anderson, Garcia, or Figuereo.  No CW purports to have had discussions with, attended meetings with, or sent reports to any of these Individual Defendants, and Plaintiffs plead no other scienter allegations against them.  It is fatal to Plaintiffs' claims that "they do not allege with specificity that any of the confidential witnesses . . . presented information to the individual defendants." *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010).

The only Individual Defendant against whom Plaintiffs make any scienter allegations is Mr. Peterson:  CW7's states that Mr. Peterson attended weekly meetings (during some unspecified time period) where failed mock runs of the SAP system and low personnel

ratings were discussed. (AC ¶ 61.) However, as Plaintiffs themselves allege, Mr. Peterson "intervened twice to delay the launch," thoroughly undermining the contention that he was pushing to roll out SAP when he believed the Company was not ready. (AC ¶ 62.) At most, CW7's allegation shows that Mr. Peterson was aware of certain risks posed by the SAP launch—risks that *were clearly and repeatedly disclosed*. (*See, e.g.*, Ex. 4 (2017 10-K) at 22; AC ¶ 92.) Critically, nowhere do Plaintiffs explain what Mr. Peterson (or any Individual Defendant) knew that was inconsistent with Revlon's public statements. *See Lululemon*, 14 F. Supp. 3d at 581 ("Though the CWs offer their thoughts and opinions as to various quality issues experienced by the company . . . they do not establish what specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue.").[9]

Plaintiffs' allegations concerning the ICFR disclosures fail to plead scienter for the additional reason that whether a company is experiencing material weakness is a matter of opinion. Not every deficiency in a company's operations constitutes a material weakness in ICFR. Rather, the deficiency must be one creating "a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis." (Ex. 9 (2018 10-K) at F-3, 52.) Here, Plaintiffs assert that Defendants attestations made before December 31, 2018 were false. But "an equally plausible inference is that Defendants believed that any deficiencies were not so acute as to rise to the level of an internal control weakness." *Lefkowitz*, 2019 WL 4053956, at *10. Indeed, Plaintiffs have alleged no internal

---

[9] CW2 and CW3 merely confirm that "Peterson [was] present at some of the meetings that CW2 attended regarding the status of the implementation," and that "the steering committee was being presented with accurate updates as to launch preparations." (AC ¶ 62.) This adds nothing to CW7's description, and fails to establish scienter for the same reason.

report, no CW, no external auditor, nor any other source informing any Individual Defendant of a material weakness in ICFR before December 31, 2018. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014) (rejecting scienter, in part, because "the Complaint does not allege that Turquoise Hill's auditors disapproved of SouthGobi's accounting practices or found any lack of internal controls prior to the restatement"). At bottom, "[a] failure to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability." *Magnum*, 26 F. Supp. 3d at 298 (internal quotation marks omitted).[10]

Apparently recognizing that they have not met the Reform Act's heightened standards for pleading recklessness against specific Individual Defendants, Plaintiffs make vague allegations about "senior management" being apprised of certain issues. Such allegations are plainly defective: "Courts in this Circuit have rejected similar attempts to hold senior officers liable based on their position and complaints to 'senior management' in the absence of specific allegations that the named defendant actually received information about the fraud." *In re Veon Ltd. Sec. Litig.*, 2018 WL 4168958, at *18 (S.D.N.Y. Aug. 30, 2018).

### 2. Plaintiffs Have Provided No Basis to Find Corporate Scienter.

To the extent Plaintiffs attempt to plead scienter against Revlon without having done so for the Individual Defendants, that attempt fails too. To plead scienter "with regard to a corporate defendant without doing so with regard to a specific individual defendant" is not

---

[10] To the extent Plaintiffs seek to plead scienter against certain Individual Defendants on the grounds that they signed certifications under SOX related to ICFR (AC ¶¶ 81, 85, 91, 97, 104, 109), that argument fails as a matter of law. *See, e.g.*, *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1097355, at *12 (S.D.N.Y. Mar. 12, 2015) ("[I]n the absence of more particularized allegations of scienter, that certain Defendants signed or certified SEC disclosures is insufficient to support a finding of scienter.").

impossible, but it is very nearly so.  *See Dynex*, 531 F.3d at 195.  The Second Circuit in *Dynex* set forth a hypothetical that shows the exceptional character of pleading corporate scienter:   If "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero," "[t]here would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false."  *Id.* at 195-96.  Plaintiffs allege nothing close to the "dramatic" hypothetical posited in *Dynex*, so this "second avenue also leads to a dead end."  *Gagnon* v. *Alkermes PLC*, 368 F. Supp. 3d 750, 776 (S.D.N.Y. 2019).

### 3. Revlon's Repeated Disclosures About the SAP Implementation Negate Any Inference of Scienter.

Not only do Plaintiffs fail to establish scienter, but Plaintiffs plead facts completely at odds with any intent to defraud.  For each category of purported misstatement, Defendants made repeated disclosures to the market (*see supra* at pp. 4-10)—and, as courts have noted, "[i]f the defendants possessed a fraudulent intent and arguably were aware of any errors . . . the most reasonable response from the defendants would have been silence."  *Stark Trading & Shepherd Invs. Int'l, Ltd.* v. *Falconbridge Ltd.*, 2008 WL 153542, at *10 (E.D. Wis. Jan. 14, 2008), *aff'd*, 552 F.3d 568 (7th Cir. 2009); *see also In re PXRE Grp. Ltd. Sec. Litig.,* 600 F. Supp. 2d 510 (S.D.N.Y. 2009) ("inference of scienter is further belied by . . . Defendants' willingness to issue a steady stream of press releases, replete with cautionary language, informing the public of PXRE's updated initial loss estimates as more information became available").  Far from being at least equally compelling, Plaintiffs' inference of fraud is thus far *weaker* than the inference that

Defendants did their best to make timely disclosures to the markets about difficulties with the implementation of the SAP system.[11]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Amended Complaint with prejudice.

Dated:      New York, New York
            January 10, 2020

/s/ *Sharon L. Nelles*
Sharon L. Nelles
Nicolas Bourtin
Matthew A. Schwartz
Akash M. Toprani
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel for defendants Revlon, Inc., Paul Meister, Debra Perelman, Victoria Dolan, Wendel F. Kralovich, Siobhan Anderson, Juan R. Figuereo, and Christopher H. Peterson*

---

[11] Because Plaintiffs have failed to state a Section 10(b) claim as to the Individual Defendants, the "control person" claims under Section 20(a) also must be dismissed. *See Wilson* v. *Dalene*, 2010 WL 1189459, at *11 (E.D.N.Y. Jan. 4, 2010) ("Since plaintiff has failed to adequately allege a primary violation of Section 10(b), the control person claims under Section 20(a) fail as well.").