**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| THEODORE LACHMAN, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>vs.<br><br>REVLON, INC., PAUL MEISTER, DEBRA PERELMAN, VICTORIA DOLAN, WENDEL F. KRALOVICH, SIOBHAN ANDERSON, FABIAN T. GARCIA, JUAN R. FIGUEREO AND CHRISTOPHER H. PETERSON,<br><br>*Defendants.* | **Case No.** 19-cv-02859 (RPK) |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ....................................................................................... 1

II.   STATEMENT OF FACTS .............................................................................................. 3

    A.    The Parties .......................................................................................................... 3

    B.    Revlon's Fatally Flawed Enterprise Resource Planning System Implementation........... 4

    C.    Defendants Prematurely Launch ERP System Despite Fatal Flaws ................................ 4

    D.    The Premature SAP Launch Predictably Caused Serious Disruptions to Revlon's Operations that the Company was Unprepared to Mitigate ....................................... 6

        1.    Revlon Failed To Properly Train And Prepare Its Employees For SAP Transition.................................................................................. 6

        2.    Defendants Failed to Take Risk Management Measures ................................. 8

    E.    The Truth Emerges As Revlon Discloses Its Material Weakness. ................................. 9

III.  ARGUMENT.................................................................................................................. 11

    A.    Legal Standard ................................................................................................. 11

    B.    Defendants Made Material and Actionable Misrepresentations ................................... 11

        1.    Defendants Made False And Misleading Statements About Revlon's SAP Implementation...................................................................................... 12

        2.    Defendants Materially Misled Investors About the Severity of the SAP Implementation Problems And Revlon's Remediation Efforts................................. 17

        3.    Defendants Materially Misled Investors About Revlon's Internal Controls... 21

    C.    The Complaint Alleges a Strong and Cogent Inference of Scienter ............................. 23

    D.    Plaintiffs Adequately Pled Control Person Liability ....................................................... 25

IV.   CONCLUSION.............................................................................................................. 25

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008) ....................................................................................... 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................. 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................. 11

*Bruce v. Suntech Power Holdings Co.*,
64 F. Supp. 3d 1365 (N.D. Cal. 2014) ..................................................................... 25

*Caiola v. Citibank, N.A., New York*,
295 F.3d 312 (2d Cir. 2002) ..................................................................................... 12

*Cornwell v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010) ................................................................. 22, 25

*Crafton v. Powerwave Techs., Inc.*,
2008 WL 11338622 (C.D. Cal. Apr. 17, 2008) ....................................................... 17

*Elliott Assocs., L.P. v. Hayes*,
141 F. Supp. 2d 344 (S.D.N.Y. 2000) ....................................................................... 25

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ..................................................................................... 14

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
783 F.3d 395 (2d Cir. 2015) ..................................................................................... 23

*GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*,
838 F.3d 214 (2d Cir. 2016) ..................................................................................... 11

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000) ..................................................................................... 12

*Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) ....................................................................... 25

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013) ....................................................................... 12

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008).................................................................. 15

*In re Cannavest Corp. Sec. Litig.*,
   307 F. Supp. 3d 222 (S.D.N.Y. 2018).................................................................. 25

*In re Carter-Wallace, Inc., Sec. Litig.*,
   220 F.3d 36 (2d Cir. 2000).................................................................................. 24

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013).................................................................. 13

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017).................................................................. 25

*In re MBIA, Inc., Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010).................................................................. 20

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001).................................................................................. 24

*In re SunEdison, Inc. Sec. Litig.*,
   300 F. Supp. 3d 444 (S.D.N.Y. 2018).............................................................. 22, 23

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005)........................................................ 13, 17, 18

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)............................................................................ 12, 14

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016).................................................................................. 24

*Livingston v. Cablevision Sys. Corp.*,
   966 F. Supp. 2d 208 (E.D.N.Y. 2013) ................................................................. 21

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)........................................................................................ 11, 12

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)................................................................................ 12

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)........................................................................ 14, 23, 24

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*,
   741 F. Supp. 2d 474 (S.D.N.Y. 2010).................................................................. 25

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)........................................................................ 25

*S.E.C. v. Gabelli*,
  653 F.3d 49 (2d Cir. 2011).......................................................................... 20

*Sgalambo v. McKenzie*,
  739 F. Supp. 2d 453 (S.D.N.Y. 2010)..................................................... 17, 18

*Shemian v. Research In Motion Ltd.*,
  2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ........................................... 15

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010)................................................................... 16, 21

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ..................................................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................. 11, 23

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976).................................................................................. 12

## Statutes

15 U.S.C. § 78t(a) ......................................................................................... 25

15 U.S.C. § 78u-4(b)(2) ................................................................................. 23

## Regulations

17 C.F.R. § 240.10b-5.................................................................................... 14

## I.    PRELIMINARY STATEMENT

Plaintiffs'[1] Amended Class Action Complaint (the "Complaint") presents strong securities fraud claims on behalf of persons or entities who purchased or otherwise acquired publicly traded Revlon securities from March 3, 2017 through March 28, 2019, inclusive (the "Class Period").

During the Class Period, Revlon was involved in a disastrous implementation and launch of a new enterprise resource planning ("ERP") system, SAP, at the Company's largest manufacturing facility in Oxford, North Carolina. First, the team responsible for designing the system did not have the requisite experience for such an enormous and complex project, and the Company failed to bring in an outside consulting firm with the necessary know-how. Second, the design team failed to sufficiently adapt the new system to the actual business and production processes at Oxford. Third, the Company did not commit adequate resources for training personnel to use the new system. Fourth, despite three launch postponements, three failed mock launches, zero successful mock launches, consistently low performance ratings by operations personnel, and dire warnings provided directly to senior executives, the Company rushed to launch the system on February 2018. And fifth, even after having decided to launch the new SAP system before it was ready, the Company still failed to maintain an adequate safety stock of inventory to keep up with customer orders.

Consistent with what was being reported directly to Revlon's senior management throughout 2017, the SAP roll-out at the Oxford plant was a failure. Almost immediately after the launch in February 2018, the plant began experiencing serious production disruptions. By the end of the Class Period, the Company disclosed that: "ERP-related disruptions caused the Company to incur expedited shipping fees and other unanticipated expenses in connection with actions that the

---

[1] Lead Plaintiffs are Theodore Lachman and OOO iK Barna Group.

1

Company implemented to remediate the decline in customer service levels. The Company estimates that this ERP launch resulted in the Company being unable to fulfill product shipments representing approximately $64 million of net sales during 2018 and incurring $53.6 million of incremental charges in 2018, mainly related to actions that the Company implemented to remediate the decline in customer service levels." In addition, the Company disclosed a material weakness in its internal controls relating to the implementation of SAP.

Although Revlon's senior executives were fully aware of the disastrous design, implementation, and roll-out of the SAP system, Defendants' statements to investors first concealed and then misleadingly downplayed the true extent of the problem. Even when Defendants reported production disruptions in March 2018, they still sought to falsely reassure investors by stating that "the overall implementation steps are on schedule" and that the Company had "taken immediate actions to address the situation [and] ha[d] implemented a robust service recovery plan." Such statements failed to fully and accurately apprise investors of the business and financial risks arising from the botched SAP roll-out. When the full extent of the problem was finally disclosed to investors, the price of Revlon's stock declined significantly.

Defendants' Motion to Dismiss the Complaint (the "Motion") seeks dismissal on falsity and scienter grounds. The Motion should be denied because the well-pleaded facts of the Complaint plausibly allege that Defendants misled investors about the true state of the problems caused by the premature rollout and Revlon's ability to mitigate the damage. Further, Defendants' own admissions in Revlon's corrective disclosure, buttressed by well-founded statements from former employees, create a strong inference of scienter that is more convincing than any non-fraudulent alternative.

## II.    STATEMENT OF FACTS

### A.  The Parties

Defendant Revlon is a leading global beauty cosmetics company. Revlon is incorporated under the laws of the state of Delaware and its headquarters are located in New York, New York. The Company trades on the New York Stock Exchange ("NYSE") under the ticker symbol "REV." ¶¶12.[2] The Company's products are primarily produced at Revlon-owned facilities. There are two manufacturing facilities in the U.S. (Oxford, North Carolina and Jacksonville, Florida), and one manufacturing facility in South Africa, Spain, Italy and Mexico. The Company also utilizes third-party facilities around the world. Revlon's Oxford facility is its largest manufacturing facility and its Jacksonville facility is the second largest. The Company also owns several distribution facilities and distributes its products through its wholly-owned subsidiaries as well as third-party distributors

- Defendant Paul Meister ("Meister") served as Executive Vice Chairman from January 2018 until November 2018, a Director since 2016, and the Company's interim Principal Executive Officer from January 2018 until May 22, 2018.

- Defendant Debra Perelman ("Perelman") has served as the Company's President and Chief Executive Officer ("CEO") since May 22, 2018. She served as the Company's Chief Operating Officer ("COO") from January 2018 until November 2018, and as a Director of Revlon since June 2015.

- Defendant Victoria Dolan ("Dolan") has served as the Company's Chief Financial Officer ("CFO") since March 12, 2018.

- Defendant Wendel F. Kralovich ("Kralovich") served as the Company's Senior Vice President, Chief Accounting Officer & Controller from October 2017 to December 2018.

- Defendant Siobhan Anderson ("Anderson") served as the Company's Vice President, Chief Accounting Officer, Corporate Controller, and Treasurer from October 2014 until August 31, 2017.

- Defendant Fabian T. Garcia ("Garcia") served as the Company's President and

---

[2] "¶_" refers to the Complaint (ECF No. 21).

CEO from April 15, 2016 until January 28, 2018.

- Defendant Juan R. Figuereo ("Figuereo") served as the Company's CFO from April 2016 until June 6, 2017.

- Defendant Christopher H. Peterson ("Peterson") served as the Company's COO from April 17, 2017, until July 31, 2018, and the Company's CFO from June 6, 2017 to March 12, 2018.

Defendants Meister, Perelman, Dolan, Kralovich, Anderson, Garcia, Figuereo, and Peterson are collectively referred to herein as the "Individual Defendants" and, together with Revlon, as "Defendants."

**B. Revlon's Fatally Flawed Enterprise Resource Planning System Implementation**

Enterprise Resource Planning ("ERP") systems are intricate software designed to streamline and track the complex transactions and processes in large enterprises. ¶31. Prior to the Class Period, Revlon ran 21 different ERP systems across 50 different business entities. In 2013, Revlon set out to create one universal ERP—using recently acquired Colomer Group's SAP ERP as a template—to use across all of the Company's different sites. ¶¶32-34.

Revlon used the Colomer IT team to lead the SAP project, which was problematic for two reasons: (i) Colomer served the professional salon channel, not retail; and (ii) Colomer manufacturing plants were very small and simple, while the Oxford plant was a "behemoth" and "very complex." Compounding these problems, Revlon attempted to implement SAP internally rather than bringing in an outside consulting firm to serve as an implementation partner. ¶35.

**C. Defendants Prematurely Launch ERP System Despite Fatal Flaws**

The consensus among those involved with Revlon's SAP implementation was that it was a debacle of an extraordinary magnitude. CW7 called it a "shit show." CW8, a Senior SAP Quality Management Consultant who worked for Revlon from January to June 2018, stated that the mismanagement was "unlike any project I had ever participated in." CW9, a Process Engineer and

4

then an Operations Manager at Revlon from June 2016 to June 2018, who was one step removed from Oxford leadership meetings, stated that the SAP roll-out was a "nightmare" because the Company was "completely unorganized" and "wasn't prepared."

The core problem, according to CW7, was that the Colomer team failed to develop the SAP system to support business processes, but instead attempted to fit the business processes into the SAP system. The design team, cobbled together from different areas of the Company, simply did not understand Revlon's businesses—designing systems that "sextupled" the required time. CW8 found that Revlon's user acceptance testing was "grossly inadequate" because it failed to use detailed test scripts that represent all business processes, and senior management ignored employees' negative feedback.

According to CW1, by the time SAP launched, the project had been postponed on four different occasions due to problems at Oxford. CW2, who worked at Revlon from early 2017 to mid-2018 as a Vice President in operations, was "almost positive" that Defendant CFO and COO Peterson personally intervened and delayed the project twice. CW7 stated that, in late 2017, Revlon conducted three mock runs of the SAP system to determine whether it was ready to go live. But "none of the mocks made it to the end." Similarly, CW9 also stated the mock runs all failed, that Revlon was not ready to launch SAP in February 2018, and CW9 had never seen such a "disaster" of a roll-out. Revlon considered delaying the launch until April 2018, explained CW7, but the Oxford managers stated that would not help because the whole system needed to be reassessed.

CW4 held the title of Supplier Operations Analyst and reported to Ross Hammond, the Senior Director of Material Supply Management. Hammond informed CW4 that "we are going to launch February 1, no matter what. There will be no more delays." With the pressure to launch looming, the Company ultimately launched SAP at the Oxford facility on February 1, 2018 despite

5

not having all the issues ironed out. *Id.*

### D.  The Premature SAP Launch Predictably Caused Serious Disruptions to Revlon's Operations that the Company was Unprepared to Mitigate

As Defendants admitted a year later, the launch had disastrous consequences. As explained below, the launch was premature because Revlon had failed to adequately train its employees to properly utilize the SAP software and the Company failed to implement adequate risk controls to mitigate the risk of an unsuccessful launch. As a result, when SAP launched, Revlon was unable to fulfill approximately $64 million in product shipments and ultimately incurred an additional $53.6 million of incremental remedial charges. Also, the SAP resulted in material weaknesses in the Company's internal control over financial reporting.

#### 1.  Revlon Failed To Properly Train And Prepare Its Employees For SAP Transition.

Defendants The biggest issue plaguing the SAP implementation was the inadequate training of employees to use the SAP system and training on manual work-arounds when SAP problems were presented. CW4 explained that part of the implementation entailed the "discovery phase" in which teams would identify any gaps in the new ERP system and work to resolve them. There were implementation teams for each function, including production, materials management, warehouse shipping/receiving logistics, quality, finance, and engineering. Each team had key users and process owners. The key users were trained to use the SAP system, with the idea that they would later train all other relevant employees.

When gaps were identified during the discovery phase, the teams would work with the process owners to resolve them. Gaps that could not be resolved by the teams would be presented to a steering committee, which according to CW4, was made up of "higher management." The steering committee would then assess the gap analysis and estimated cost to resolve the gap and determine

6

whether they would authorize funds to fix the gap. According to CW4, when funding to correct gaps was approved, "consultants would make the change [and] the key user would test the change." However, "[i]f the gap was an infrequent issue and there was a manual work-around," sometimes the cost would not justify implementing the change to fix the gap.

CW4 was concerned about the implementation all along, but became even more concerned in summer of 2017 as the Company was gearing up for the launch. CW4 stated that "once we went through training, it became clear that it was very difficult for people to understand some of the manual work-arounds and some of the reprogramming that weren't manual work-arounds. Even where the gap-fill was approved, the fix was complicated to understand and analyze." Despite this complexity, Revlon did not adequately train its employees. As CW4 reflected, "[w]e had three days of training and that was it. . . . there were a lot of things we didn't know – we hadn't been trained – and then the training wasn't very robust."

The lack of training was a concern across the Company throughout the implementation. As CW2 explained, one the reasons CW2 was brought on "was to look at and support the ERP transition from the supply side" which entailed sitting "in Oxford during the transition, to make sure people were ready from the planning side . . . making sure people were trained and qualified." CW2 "was shocked when we actually started up and the other areas were not as ready as I expected." When the launch failed, CW2 explained that it was partly because there were "not many people appropriately trained – mainly in the production area – and in the warehouse area, to some degree." 52. This is consistent with CW5's account. CW5 was a Revlon employee from March 2015 to April 2018 and held various titles. At CW5's departure from the Company, CW5's role was Operations Manager. CW5 explained that "[f]rom the operations end, it was very last minute, to get the employees trained. . . . We were on call, went through training and that training wasn't

where it needed to be." CW5 also addressed that the "training wasn't clear" and management "tried to schedule other trainings last minute. They determined the training was ineffective, so they went back to the white board and created new training." CW10 was an SAP Training Manager Consultant at Revlon from February to October 2017, overseeing SAP training. According to CW10, the SAP training department was essentially just one person, CW10. Usually, in CW10's experience, there are six to seven personnel devoted to training, creating manuals and exercises. Revlon, however, refused to budget for that.

### 2. Defendants Failed to Take Risk Management Measures

When SAP launched, Revlon was not able to manufacture its products in a timely manner, and, because Revlon's employees were not adequately trained to deal with those issues, the consequences of the issues amplified. According to CW2, the inability to produce was because SAP's "three systems didn't talk to each other." CW2 explained that there were three systems to SAP: (i) the overall SAP system; (ii) the production batch-making system, which handles tasks such as weighing out ingredients; and (iii) the warehouse management system. According to CW2, who had been part of other SAP roll-outs in other companies, the fact that the systems did not communicate was a huge concern, which was amplified by the small number of people that were adequately trained to understand how the three systems connect. As CW5 explained, "SAP had to work with another system for raw materials. The integration was never worked out. It caused the plant to almost close down."

CW9, who was part of the post-launch "crisis team," observed the production problems. Revlon was trying to coordinate simple transactions of SAP that would not go through, and so production stopped. The Company was unable to communicate between its various IT systems. There were errors in the way materials or ingredients were allocated and errors in where materials

8

were located in the warehouse. For example, SAP would indicate a certain location for a raw material held in Revlon's warehouse, but the material would not be there. As a result, the company would fail to complete production orders, and "everything snowballed." There was a constant conflict between what was in the system and what was physically in the warehouse, causing a "massive backup."

These issues were further exacerbated because Revlon failed to implement sufficient risk management measures. For example, the Company had failed to produce enough safety stock of inventory to prepare for such a situation. As a result, the Company was not able to fulfill orders with its customers. CW1 explained that by the end of 2017, "We all started getting really concerned" that the Company had not "built up enough safety stock to mitigate. You know you're going to have problems with a SAP implementation."

CW7 explained that Revlon built an inventory safety stock pursuant to a plan premised on launching in July 2017. But when the launch was pushed back to October 2017 and then to February 2018, Revlon failed to refresh their inventory plan. Consequently, instead of having a month's worth of stock at the time of the launch, the Company had only two weeks' worth. CW7 stated that soon after launch, the low stock levels were triggering "major alarm bells" and that Revlon was "going to start starving the filling lines." Soon the Oxford plant was in a "two-month [manufacturing] hole."

**E. The Truth Emerges As Revlon Discloses Its Material Weakness.**

On March 18, 2019, Revlon filed a Form 12b-25, disclosing it was unable to timely file its annual report for the 2018 year because it identified a "material weakness in its internal control over financial reporting as of year-end 2018, primarily related to the lack of design and maintenance of effective controls" relating to the implementation of its ERP system. On this news,

shares of Revlon fell $1.33 per share, or nearly 6.87%, to close at $18.02 per share on March 19, 2019.

Ten days later, on March 28, 2019, Defendants finally disclosed the true extent of the SAP failure and its remediation efforts when Revlon filed its Form 10-K for the 2018 year. Defendants admitted that "ERP-related disruptions caused the Company to incur expedited shipping fees and other unanticipated expenses in connection with" remediation efforts. Specifically, Defendants conceded that the "ERP launch resulted in the Company being unable to fulfill product shipments representing approximately $64 million of net sales during 2018" and that the Company incurred "$53.6 million of incremental charges in 2018, mainly related to actions that the Company implemented to remediate the decline in customer service levels."

Further, Defendants disclosed that they had identified certain deficiencies in its internal control over financial reporting: "(i) the Company did not perform an effective continuous risk assessment process that adequately identified an assessed risks affecting the Company's internal controls over financial reporting associated with the implementation of its new ERP system in the U.S., (ii) the Company did not maintain a sufficient number of knowledgeable, trained personnel in the U.S. operations impacted by the ERP system implementation and in various other operations across the Company who understood and were held accountable for their assigned responsibilities for the design, implementation and operation of internal controls over financial reporting; and (iii) as a result, the Company did not design, implement and consistently operate effective process-level controls . . . ." Based on deficiencies, Defendants concluded that "the Company's internal control over financial reporting was not effective as of December 31, 2018."

On this news, shares of Revlon fell another $1.33 per share or over 6.4% to close at $19.38 per share on March 29, 2019. ¶56.

10

### III.    ARGUMENT

#### A.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 & n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling on a 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320–22 & n.4 (2007). A complaint need only contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the claims. *Id.* at 545.

To state a claim under Section 10(b) of the Exchange Act, a complaint must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (citation omitted).

#### B.  Defendants Made Material and Actionable Misrepresentations

The Complaint alleges in detail that Defendants materially misled investors about the Company's SAP readiness and implementation, remediation efforts, and internal controls. Defendants' argument that the Complaint does not establish any false statements is without merit.

Under Rule 10b–5, parties responsible for public disclosures on behalf of public companies may not (1) "make any untrue statement of a material fact," or (2) "omit to state a material fact

11

necessary in order to make the statements made ... not misleading." It is axiomatic that "[o]nce a party chooses to speak, it has a 'duty to be both accurate and complete.'" *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 575 (S.D.N.Y. 2013), *aff'd,* 566 F. App'x 93 (2d Cir. 2014), No. 11–cv–6678 (quoting *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002)). Indeed, in this Circuit, once a party "speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information" on the issue or topic. *Vivendi*, 838 F.3d, at 258; *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (same). Courts determine whether a false statement is material based on a contextual analysis of facts and circumstances. *Matrixx Initiatives, Inc.*, 563 U.S. at 28. "Materiality is a mixed question of law and fact." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). At the pleading stage, a complaint cannot be dismissed "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (citations omitted) (reversing dismissal on immateriality grounds that tied determination to a numerical benchmark).

### 1. Defendants Made False And Misleading Statements About Revlon's SAP Implementation

The Complaint sufficiently alleges that Defendants concealed the disastrous design, implementation, and roll-out of the SAP system. ¶¶34-65. These allegations are largely admitted by Defendants and confirmed by former employees.

Revlon's 2016 10-K purported to disclose to investors "inherent risks associated with migrating from the Company's legacy systems" that "could have a material adverse effect on the Company's business." ¶82. These risk disclosures were false and misleading because they failed to warn about certain risks known to Defendants and provided insufficient warnings about risks

12

that had already materialized. "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) (citation omitted); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("The warnings only warned what might occur if certain contingencies were met; the disclosures did not make clear that such contingencies had, in fact, already occurred.").

Revlon's 2017 Proxy Statement disclosed to investors that Garcia and Figueroa each received bonus compensation for achieving performance targets that included "moving to a single ERP system." ¶¶86-87. These statements were false and misleading because a reasonable investor would assume that the Company would not award bonuses to executives for leading a wholly ineffective implementation of a new ERP system. ¶88.

On an earnings call on November 3, 2017, Peterson told investors that the Company expected its "new ERP systems" to "improve our cost structure and facilitate our speed to market through better data collection and information management, and ultimately, faster decision-making" and "lead to better financial results over the next several years." ¶88. These statements were false and misleading because the Company knew that the ERP system implementation was poorly designed and that the Company was not prepared to mitigate or remediate damage caused by the premature roll-out. ¶89.

Defendants themselves admit that the Company failed to identify risks affecting the SAP roll-out, failed to adequately train its employees to properly utilize the SAP software, and failed to implement process-controls to mitigate the risks of a failed SAP roll-out. ¶79. These admissions have been confirmed by numerous former employees, who describe in detail the Company's

13

failure to adequately design the SAP implementation and the Company's decision to go forward with the roll-out despite knowing how unprepared the Company was to mitigate or remediate the expected fallout from the failed launch. *See Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (holding that a securities fraud complaint may rely on information from confidential witnesses if "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.")).

The Motion's arguments that these misstatements are not actionable are self-contradictory and unconvincing. First, Defendants argue that Defendants had no duty to disclose that the Company had failed to create measures to monitor the ERP system appropriately once implemented. In this Circuit, once a party responsible for a public disclosure "speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information" on the issue or topic. *In re Vivendi, S.A. Securities Litigation*, 838 F.3d at 258. As the Motion concedes, "even though Revlon was not required to warn the market that the SAP rollout might not proceed as planned, Revlon nonetheless did . . . ." Once Defendants chose to speak about the risks of the ERP system implementation and rollout, they had a duty to tell the whole truth so that they would not mislead investors. *See* 17 C.F.R. § 240.10b-5 (it is impermissible "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"). The primary case the Motion relies on proves this point. In *In re Bristol Myers Squibb Co. Sec. Litig.*, the defendants argued that disclosing certain risks about regulatory approval of a settlement agreement did not create a duty to disclose other material facts about the settlement agreement or other risks that

14

would arise as a consequence of non-approval. 586 F. Supp. 2d 148, 159 (S.D.N.Y. 2008) (cited by Motion at 12). The plaintiffs alleged that the defendants' omission of facts about the settlement agreement misled investors into believing that the potential damage to the company in the event of regulatory disapproval "could be mitigated." *Id.* at 160. The court rejected the defendants' argument because the complaint plausibly pleaded that the company's statements "were rendered misleading by the failure to include relevant information about the nature of the settlement negotiations and the terms of the settlement agreement" and "adequately alleged that a reasonable investor would have considered the undisclosed information material in making investment decisions." *Id.* at 161. Similarly, Defendants' failure to disclose that the Company had failed to create measures to monitor the ERP system appropriately once implemented misled investors about the risks of the premature ERP rollout and the Company's ability to mitigate damages from a failed rollout. The Motion also relies on an inapposite holding in *Shemian v. Research In Motion Ltd.*, 2013 WL 1285779, at *20 (S.D.N.Y. Mar. 29, 2013), *aff'd,* 570 F. App'x 32 (2d Cir. 2014) (cited by Motion at 12). In *Shemian*, the court held that the company's general praise of an upcoming project did not create any legal duty to catalog its potential shortcomings because, in part, the general praise was not misleading since "their praise largely matched reviewers' appraisals." *Id.* Here, in contrast, Defendants' statements about ERP implementation and rollout were misleading because they did not accurately reflect appraisals of the ERP implementation, design, or rollout.

Second, the Motion argues that these statements were not false or misleading because the Company did take measures to monitor the ERP system once implemented. Motion at 13. This argument fails because it fails to actually address the Complaint's allegation that the measures the Company took were not "appropriate or "adequate." ¶¶2, 39, 42, 47-59, 84, 88, 90; *see also* Motion

15

at 12 ("according to Plaintiffs, Revlon 'failed to create measures to monitor the ERP system appropriately once implemented.'"). To support this argument, the Motion cites certain of the inadequate and inappropriate measures taken by the Company in preparation for the rollout. In any case, the Motion's argument fails because Defendants have already admitted that the Company "did not maintain a sufficient number of knowledgeable, trained personnel in the U.S. operations impacted by the ERP system implementation and in various other operations across the Company" and "did not design, implement and consistently operate effective process-level controls to ensure that it appropriately (a) recorded and accounted for inventory, accounts receiveable, net sales and cost of goods sold, (b) reconciled balance sheet accounts, (c) reviewed and approved the complete population of manual journal entries and (d) used complete and accurate information in performing manual controls." ¶79.

Third, the Motion argues that the statements were not misleading because the Company used "cautionary language" and disclosed that risks of the ERP rollout could include an "inability to fill customer orders accurately or on a timely basis, or at all" or a "disruption of the Company's internal control structure. These purported risk disclosures were both wholly inadequate and were, themselves, materially misleading. For cautionary language to be meaningful, it must provide "'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010) (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 371–72 (5th Cir. 2004)). The risk factors provided by the Company—and specifically the ones cited in the Motion—are classic boilerplate disclosures that provide no company-specific information. In fact, these risk disclosures were substantively identical to

16

disclosures provided by other companies.[3] Further, the Company repeated the same boilerplate warnings about "the inability to fill customer orders accurately or on a timely basis, or at all" and "disruption of the Company's internal control structure" in both the 2016 and 2017 10-Ks, despite the ERP system having already substantially disrupted the Company's business operations. ¶¶82, 92; *See Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478–79 (S.D.N.Y. 2010) ("the disclaimer provided no company-specific information, failed to link any specific projections to specific risks, and remained constant throughout the Class Period, even as the risks confronting [the company] changed."). Finally, the purported risk disclosure that "[i]f the Company is unable to successfully plan, design or implement this new SAP ERP system, in whole or in part, . . . it could have a material adverse effect on the Company's business, prospects, results of operations, financial condition and/or cash flows" is itself actionably misleading because the Company had already failed to plan and design the ERP rollout. *See Van der Moolen*, 405 F. Supp. 2d, at 400.[4]

### 2. Defendants Materially Misled Investors About the Severity of the SAP Implementation Problems And Revlon's Remediation Efforts

Following Revlon's disastrous rollout of its SAP system in February 2018, Defendants disclosed in the Company's 2017 10-K that "[d]ifficulties in implementing the Company's new

---

[3] *See, e.g.*, Affinia Group Intermediate Holdings Inc.'s Form 10-K, filed with the SEC on March 17, 2015, attached hereto as Exhibit 1 to the accompanying Declaration of Phillip Kim ("The Company is currently implementing modifications and upgrades to its systems . . . . These types of activities subject the Company to inherent costs and risks associated with replacing and changing these systems, ***including impairment of its ability to fulfill customer orders, potential disruption of the Company's internal control structure***, substantial capital expenditures, additional administration and operating expenses, retention of sufficiently skilled personnel to implement and operate the new systems, demands on management time, and other risks and costs of delays or difficulties in transitioning to new systems or of integrating new systems into the Company's current systems. The Company's system implementations may not result in productivity improvements at a level that outweighs the costs of implementation, or at all. In addition, if not anticipated and appropriately mitigated, the implementation of new technology systems may cause disruptions in the Company's business operations and have an adverse effect on the Company's business and operations.") (emphasis added)

[4] The Motion's reliance on *Crafton v. Powerwave Techs., Inc.*, 2008 WL 11338622, at *4 (C.D. Cal. Apr. 17, 2008) is misplaced. Motion at 14-15. The portion of *Crafton* cited by the Motion held that the company's revenue projections were non-actionable because they fell under the PSLRA's safe harbor protection for forward-looking statements. The Motion does not—and cannot—argue that these statements were forward-looking or protected under safe harbor.

17

ERP system have disrupted the Company's business operations." ¶92. However, Defendants continued misleading investors about the severity of the implementation problems and the Company's remediation efforts.

First, Defendants' recitation of the same "inherent risks associated with migrating from the Company's legacy systems" that the Company had used in its 2016 10-K demonstrates that the risk disclosures were boilerplate and not tailored to Revlon's actual ERP implementation. ¶¶82, 92; *see Sgalambo*, 739 F. Supp. 2d at 478–79. Further, Defendants' purported warning that "ongoing disruptions with such implementation could have a material adverse effect on the Company's business" is actionably misleading because the disruptions were already ongoing and having a material adverse effect on the Company. ¶92; *see In re Van der Moolen Holding N.V. Securities Litigation*, 405 F. Supp. 2d at 400.

Second, Defendants systematically downplayed the severity of the problems the Company faced any misled investors about the success and immediacy of the Company's remediation efforts. The same day the Company's 2017 10-K was released:

- Peterson assured investors that "the overall implementation steps are on schedule" and that Defendants had "taken immediate actions to address the situation, have implemented a robust service recovery plan and have communicated with our key customers." ¶94. Peterson also reiterated the same pre-launch confidence he had in the ERM system, saying "we expect the new ERP system to provide significant new capabilities and benefits for the company." *Id.*

- When asked for an estimate of the top line or bottom line impact on the Company, Peterson repeated that "the implementation steps are on schedule" and that "we're taking immediate actions to address the situation, and we've implemented a robust sales recovery plan." ¶95. Peterson repeated these same misleading talking points in responses to two other analysts' questions about the ERP rollout. *Id.*

On the Company's next earnings call, on May 10, 2018, Defendants continued to mislead investors about the severity of the Company's implementation problems and the success of the Company's remediation efforts. ¶99. Meister told investors "we implemented a recovery plan and

18

returned our manufacturing capacity to normal levels by early April." ¶100. Dolan reiterated that the Company was "currently operating at capacity." ¶101. Peterson went even further, assuring investors that "as of early April, returned the Oxford plant back to normal production capacity. In fact, we are now producing at levels in excess of those pre-SAP." Meister then falsely stated that "we were expecting to execute flawlessly on the SAP situation at Oxford." ¶102.

On the Company's August 9, 2018 earnings call, Defendants again sought to minimize the Company's ongoing SAP implementation problems. Perelman boldly—and falsely—claimed that the Company had "resolved the fundamental issues" related to the SAP implementation and that "most of the SAP disruption [is] behind us." ¶106. Dolan then assured investors that the Company was "completing the final phases of improvements." Finally, on November 9, 2018, Perelman stated that the Company "expect[s] continued improvement going forward." ¶¶75, 111.

On March 29, 2019, Defendants admitted in Revlon's 2018 10-K these statements minimizing the extensive problems caused by the Company's premature ERP launch and overstating the Company's progress remediating those problems were false and misleading. The Company admitted that the new ERP system was still disrupting the Company's business operations and that the Company had a "material weakness in its internal control over financial reporting primarily related to the implementation of the Company's new ERP system." ¶77. Importantly, the material weakness was based on deficiencies that existed throughout the Class Period that Defendants repeatedly failed to disclose. These deficiencies exacerbated the problems created by the premature rollout and prevented the Company from effectively mitigating damages from the failed rollout. Each statement downplaying the severity of the problems and overstating the efficacy of the Company's remediation efforts was false and misleading because it omitted these material deficiencies. ¶¶96, 103, 108, 112.

The Motion's argument that these statements were accurate at the time they were made fails because it misstates the well-pleaded facts in the Complaint and sidesteps Plaintiffs' allegations.

First, the Motion asserts that the Complaint "fail[s] to identify a *single* material fact about the rollout that was not disclosed" (Motion at 15, emphasis in original) and that the Complaint "fail[s] to allege anything inaccurate or incomplete about Revlon's [remediation] statements (Motion at 17). In fact, the Complaint clearly and repeatedly identifies the material facts that were not disclosed and explains how these omissions rendered these statements materially misleading. ¶¶47-59, 96, 103, 108, 112. The Company failed to adequately train its employees to properly utilize the SAP software and failed to implement adequate risk controls to mitigate the risk of an unsuccessful launch. Defendants' failure to disclose these material facts misled investors about the severity and duration of the problems caused by the SAP rollout, and the materiality of these omissions was confirmed when Revlon's stock sharply declined once they were revealed. The Motion's argument that Defendants' selective disclosures about the Oxford plant's production levels were literally true (Motion at 17) does not address whether the statements were misleading. *See S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd,* 568 U.S. 442, (2013) ("so-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud"); *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 578 (S.D.N.Y. 2010) ("A statement can [ ] be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact") (citation omitted). The Complaint identifies the material facts that were omitted, and the Motion does not even attempt to argue that they were disclosed.

Second, the Motion argues that certain statements are non-actionable under the PSLRA's safe harbor protection because they are forward-looking statements that were accompanied by

20

meaningful cautionary language. Motion at 18. To qualify for safe harbor protection, cautionary language must be "'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Slayton*, 604 F.3d at 772. The cautionary language cited in the Motion is the very definition of generic boilerplate litany of generally applicable risk factors and does not even accompany the only statement the Motion argues is forward-looking. Motion at 18 & n.7.

Third, the Motion argues that Defendants' oral statements about the Company's remediation efforts "must be considered in conjunction with the substance of the company's *unchallenged* disclosures." Motion at 18 (quoting *Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 218 (E.D.N.Y. 2013)) (emphasis added). This argument is nonsensical because the only disclosure the Motion cites is the risk disclosure from the 2017 10-K that is explicitly *challenged*. Motion at 18; ¶92; *see also supra* § III.B.2.

### 3. Defendants Materially Misled Investors About Revlon's Internal Controls

Garcia and Figuereo signed SOX certifications in Revlon's 2016 10-K and Meister and Peterson signed SOX certifications in the 2017 10-K attesting to "the disclosure of any material changes to the Company's internal controls over financial reporting." ¶¶81, 91. The 2016 and 2017 10-Ks disclosed that "Revlon's management determined that the Company's internal control over financial reporting was effective." ¶¶83, 93. Further, the Company's three quarterly financial disclosures during 2018 stated that "ERP implementation has not materially affected, nor is it reasonably likely to materially affect, the Company's ICFR." ¶¶98, 105, 110. These statements were materially false and misleading when they were made because each Defendant was aware that the ERP implementation had caused a material weakness in the Company's internal control over financial reporting.

21

Defendants admitted in Revlon's 2018 10-K that the Company had a "material weakness in its internal control over financial reporting primarily related to the implementation of the Company's new ERP system." ¶79. Specifically, Defendants disclosed that the material weakness was caused by three deficiencies: (i) the Company did not perform an effective continuous risk assessment process that adequately identified and assessed risks; (ii) the Company did not maintain a sufficient number of knowledgeable, trained personnel in the U.S. operations impacted by the ERP system implementation and in various other operations across the Company; and (iii) the Company did not design, implement and consistently operate effective process-level controls. *Id.* The Complaint plausibly alleges that Defendants were aware of all of these deficiencies at the time the statements were made. ¶¶ 40-46, 60-68*; see Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) (noting that internal control representations about the mitigation of risks are actionable when defendants have information to the contrary).

The Motion's reliance on *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 471 (S.D.N.Y. 2018) is misplaced. In *SunEdison*, the plaintiffs alleged that the company's SOX certifications about the company's internal control over financial reporting were knowingly false at the time they were made because the Company later acknowledged weaknesses in its internal controls. *Id.* The court rejected this argument because the weaknesses identified by the company were about "deficient internal controls related to internal management of cash and management's disclosures to the board, and not to public financial reporting." *Id.* Here, in contrast, Defendants have admitted to having a "material weakness in its internal control over financial reporting primarily related to the implementation of the Company's new ERP system" based on deficiencies that existed at the start of the Class Period.

The Motion also argues that "[t]he fact that Revlon ultimately came to the conclusion that

22

there was a material weakness—and disclosed it to the market—undermines the claim that Revlon willfully concealed it from the market in the months before." Motion at 20. The Motion does not cite any authority for this argument, and rightly so because it raises questions of fact that cannot properly be resolved on a motion to dismiss. See *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405 (2d Cir. 2015).  For instance, Revlon's disclosure of material weakness may have been compelled by its outside auditor, despite its desire to continue concealing it. *See* ¶59. The argument also ignores the inference that Revlon concealed the true extent of the problem in the hope that it would be able to ameliorate it, thereby containing the damage.

## C.  The Complaint Alleges a Strong and Cogent Inference of Scienter

Under the PSLRA, to adequately plead scienter, a plaintiff must allege facts that, when viewed holistically, give rise to a strong inference that the defendant acted with "the required state of mind." 15 U.S.C. § 78u-4(b)(2). Allegations giving rise to a strong inference of scienter may include allegations that the defendants (1) benefited in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting their public statements were not accurate, or (4) failed to check information they had a duty to monitor. *Novak*, 216 F.3d at 307–09, 311. Courts assessing scienter must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 551 U.S. at 323 (emphasis in original). If the inference of scienter is equally as compelling as any innocent inference, the motion to dismiss must be denied. *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008).

Scienter can be established through "strong circumstantial evidence of conscious misbehavior or recklessness." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016)

23

(citation omitted). "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001). Alternatively, a complaint adequately pleads a reckless omission if it alleges that defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." Novak*, 216 F.3d at 308*. "An egregious refusal to see the obvious" is a hallmark of recklessness. *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000).

The Complaint pleads in detail that the Individual Defendants knew or should have known that there was a substantial risk of misleading investors by their public misstatements regarding the SAP launch, the resulting disruption to the Company's operations, and the Company's remediation efforts. ¶¶60-68:

- Peterson attended weekly meetings leading up the launch where attendees would discuss the mock runs – which all failed – and ratings from operational personnel regarding level of readiness – which were "Cs and Ds on performance." Peterson and Blake sometimes attended daily pre-launch meetings where presentations were given accurately describing the Company's unpreparedness to launch SAP.

- Prior to the February 2018 SAP launch, Senior Vice Presidents Glen Sharpe and William Welz directly provided information to Peterson and Blake that Oxford was not ready for the launch.

- Garcia and Figuereo led the planning and implementation of the new ERP system. ¶¶86-87.

- Meister, Perelman, Dolan, Karolvich, and Anderson were involved in the remediation efforts and frequently spoke to investors and analysts about the problems caused by the rollout. *See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 491 (S.D.N.Y. 2010), *as corrected* (Sept. 30, 2010) (CEO was reckless because his lengthy public statements indicated he had knowledge of the subject of fraud); *Bruce v. Suntech Power Holdings Co.*, 64 F. Supp. 3d 1365, 1377 (N.D. Cal. 2014) (defendant's micromanagement of the company's affairs "bolstered the plausibility of the inference that [he] would have reviewed and approved the press releases in which he is quoted.").

24

- As CEO or CFO of Revlon, Perelman, Dolan, Garcia, Figuereo, and Peterson were responsible for establishing and maintaining adequate internal control over our financial reporting. The Complaint's detailed timeline of Revlon's premature launch demonstrates that these Defendants knew the Company's internal controls were insufficient to prevent accounting violations that ***they were overseeing.*** *See Cornwell*, 689 F. Supp. 2d at 631, 638 (direct knowledge of information contradicting adequacy of internal controls or "access to similar information they should have monitored" regarding practices pleads scienter adequately); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013) (finding scienter where defendants "knew or should have known about the weaknesses in [defendants'] internal controls" because of reports noting failure to follow accepted policies, yet made statements to the contrary).

- "Courts in this District have repeatedly held that weak internal controls will support an inference of scienter." *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 246 (S.D.N.Y. 2018) (listing cases).

- Meister's May 2018 statement that "the reality is we were expecting to execute flawlessly on the SAP situation at Oxford" is indicative of scienter because it was a false statement meant to "reassure the public that [the Company] had always communicated transparently about its business model." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 621 (S.D.N.Y. 2017)

The Complaint therefore adequately pleads that each of the Defendants knew and had access to information showing that the challenged statements were false when made.

### D. Plaintiffs Adequately Pled Control Person Liability

Because the Complaint adequately alleges a primary violation of § 10(b) and the Individual Defendants controlled Revlon, Plaintiffs have adequately alleged a *prima facie* case under § 20(a). *See* 15 U.S.C. § 78t(a); *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004).

### IV.    CONCLUSION[5]

For all the above reasons, Defendants' motion to dismiss should be denied in its entirety.

---

[5] In the event that the Court grants the Motion, Plaintiffs respectfully request leave to amend the Complaint. *See, e.g., Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 462 (S.D.N.Y. 2019).

Dated: February 10, 2020

Respectfully submitted,


**THE ROSEN LAW FIRM, P.A.**

By: */s/ Phillip Kim*
Phillip Kim (PK 9384)

275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email:  pkim@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs and the
Putative Class*

**GLANCY PRONGAY & MURRAY LLP**

Joshua L. Crowell (JC-0914)
Vahe Mesropyan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Email: jcrowell@glancylaw.com
        vmesropyan@glancylaw.com

*Co-Lead Counsel for Lead Plaintiffs and the
Putative Class*

26