UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

THEODORE LACHMAN, individually and
on behalf of all others similarly situated,

                     Plaintiffs,

          v.                                              MEMORANDUM & ORDER

                                                    19-cv-2859 (RPK) (RER)

REVLON, INC., PAUL MEISTER, DEBRA
PERELMAN, VICTORIA DOLAN,
WENDEL F. KRALOVICH, SIOBHAN
ANDERSON, FABIAN T. GARCIA, JUAN
R. FIGUEREO, and CHRISTOPHER H.
PETERSON,

                    Defendants.

-------------------------------------------------------x

RACHEL P. KOVNER, United States District Judge:

      Plaintiffs in this putative class action have brought securities fraud claims against Revlon

and various current and former Revlon executives.  The claims arise out of defendants' public

statements about a system that Revlon implemented for tracking different areas of the company's

operations with a single piece of software.  The launch of that new software platform went poorly.

It caused production delays, led to lost sales, and created a material weakness in the company's

internal controls over financial reporting.  These disruptions, in turn, led to a sharp decline in

Revlon's stock price.

      Revlon and its executives disclosed risks associated with adopting the new platform before

the transition occurred.  And they acknowledged harms from the flawed transition afterward.  But

plaintiffs contend that defendants downplayed the risks of moving to the new software platform

before the transition and the severity of the impact on Revlon's business after the transition took

place.  In doing so, plaintiffs argue, defendants made material misrepresentations and omissions, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5.  Plaintiffs also assert that the current and former executives named as defendants are civilly liable for the material misstatements and omissions under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), which imposes "control-person" liability on individuals who directly or indirectly controlled persons or entities found liable for any violation of the Exchange Act.

Defendants have moved to dismiss this lawsuit under Federal Rules of Civil Procedure 9(b) and 12(b)(6).  As explained below, defendants' motion is granted.  Plaintiffs have failed to adequately plead any material misstatement or omission of fact, as necessary for liability under Section 10(b) and Rule 10b-5.  They have also failed to set out facts supporting a strong inference that the defendants acted with an intent to deceive, manipulate, or defraud, as required for liability under those provisions due to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  Plaintiffs' claims against the individual defendants under Section 20(a) must be dismissed because of the failure of plaintiffs' primary claims under the Exchange Act and Rule 10b-5.

<u>BACKGROUND</u>

The facts set forth below are taken from the amended Complaint and are assumed to be true for the purposes of deciding defendants' motion to dismiss.  *See Simon v. KeySpan Corp.*, 694 F.3d 196, 198 (2d Cir. 2012).

1.  <u>The Parties</u>

Plaintiff Theodore Lachman filed this putative class action on behalf of himself and others who purchased or otherwise acquired Revlon securities from March 3, 2017 to March 28, 2019

(the "Class Period").  The defendants are Revlon, an international beauty cosmetics company whose shares are traded on the New York Stock Exchange, Am. Compl. ¶ 12 (Dkt. #21), and eight of the company's current and former executives.  Defendant Paul Meister served as Executive Vice Chairman of the company from January 2018 to November 2018 and was Revlon's interim Principal Executive Officer from January to May 2018.  *Id.* ¶ 13.  Defendant Debra Perelman has served as the company's President and Chief Executive Officer ("CEO") since May 2018.  *Id.* ¶ 14.  She also served as Chief Operating Officer ("COO") from January to November 2018.  *Ibid.* Defendant Victoria Dolan has served as Chief Financial Officer ("CFO") since March 2018.  *Id.* ¶ 15.  Defendant Wendel F. Kralovich served as Senior Vice President and as Chief Accounting Officer & Controller from October 2017 to December 2018.  *Id.* ¶ 16.  Defendant Siobhan Anderson served as Vice President, Chief Accounting Officer, Corporate Controller, and Treasurer from October 2014 to August 2017.  *Id.* ¶ 17.  Defendant Fabian T. Garcia served as the company's President and CEO from April 2016 to January 2018.  *Id.* ¶ 18.  Defendant Juan R. Figuereo served as CFO from April 2016 to June 2017.  *Id.* ¶ 19.  Finally, defendant Christopher H. Peterson served as Revlon's COO from April 2017 to July 2018, and as CFO from June 2017 to March 2018.  *Id.* ¶ 20.

2.  <u>Revlon's Launch of a New Enterprise Resource Planning System</u>

Revlon manufactures, markets, distributes, and sells beauty and personal-care products under multiple brand names worldwide.  *Id.* ¶ 27.  Like many large companies that operate across multiple segments of the supply chain, Revlon tracks its business activities using software known as an enterprise resource planning ("ERP") system.  *Id.* ¶ 31.  ERPs tie together processes such as accounting, procurement, project and risk management, compliance, and supply-chain operations

and facilitate the flow of data between them.  *Ibid.*  Before 2014, Revlon utilized 21 separate ERP systems across 50 different entities.  *Id.* ¶ 32; *see id.* ¶ 41.

In 2014, Revlon decided to combine its ERP processes through a single system called SAP that would be used across all of its business platforms.  *Id.* ¶¶ 32, 41.  To implement that upgrade, Revlon relied on the employees of a recently acquired subsidiary that was already using SAP.  *Id.* ¶¶ 32, 34-35.  The company's plan was to take the template that the subsidiary had used for its own SAP implementation and apply it to the operations of the newly merged company.  *Id.* ¶¶ 34-35.  Revlon created a team of about 100 people to the handle the transition, including IT consultants and subject matter experts.  *Id.* at ¶ 34.  But the team did not have experience using SAP in the retail context, nor had it applied SAP to manufacturing facilities as massive and complex as Revlon's.  *See id.* ¶ 35.

As Revlon tested SAP before its rollout, it encountered problems implementing the software at its manufacturing facility in Oxford, North Carolina—the company's largest.  Those problems led Revlon to delay company-wide adoption of SAP on four occasions.  *Id.* ¶¶ 41-42.  But problems with SAP continued even after the delays.  *Id.* ¶¶ 43, 60-64.  Revlon officials considered pushing back SAP's scheduled launch date yet again, but ultimately decided to move forward with the roll-out.  *Id.* ¶ 44-45.  SAP went live at Revlon's Oxford facility on February 1, 2018.  *Id.* ¶¶ 46.

Almost immediately, Revlon experienced problems with SAP that impaired the company's manufacturing.  *Id.* ¶ 54.  One problem was that the systems for matters such as warehouse management and production were not properly integrated.  *Id.* ¶¶ 55-56.  Another was that Revlon had failed to adequately train its employees in the SAP system.  *Id.* ¶ 48.  As a result, the company had trouble resolving production problems as they cropped up.  *Id.* ¶¶ 48-54.  The production

4

delays caused by the SAP roll-out created a massive backlog at the Oxford facility as orders went unfilled and items were lost in the production process. *Id.* ¶ 56. The Oxford plant's operations were set back by two months as a result. *Id.* ¶¶ 56, 58.

Revlon began a frantic effort to remediate the problems that the SAP launch had caused at the Oxford facility. *Id.* ¶¶ 66-67. High-level company officials convened "crisis management meetings" and allocated extra resources and money to address the situation. *Id.* ¶¶ 62, 68. Some employees worked seven days a week on the effort. *Id.* ¶¶ 62, 66. The company also brought in a former head of supply-chain management to help with remediation. *Id.* ¶ 66.

The company first publicly addressed the dysfunctional roll-out when it filed its 2017 Form 10-K on March 15, 2018. *Id.* ¶ 70. The 10-K noted that the SAP transition had "disrupted the Company's business operations." *Ibid.* It stated that these disruptions "could have a material adverse effect on the Company's business, prospects, results of operations, financial condition and/or cash flows." *Ibid.* The 10-K also stated that Revlon could not "provide assurances that it will remedy the ERP systems issues in time to fully recover [lost] sales and/or that the ERP implementation will not continue to disrupt the Company's operations and its ability to fulfill customer orders." *Id.* ¶ 92. On the same day, the company hosted a conference call with investors and security analysts on which company executives discussed the SAP disruptions. *See id.* ¶ 71. Revlon executives continued to address the SAP roll-out in quarterly earnings reports and on conference calls when each of those reports was released. On the calls, Revlon executives acknowledged ongoing disruptions but emphasized the progress that was being made on remediation efforts and expressed confidence in the company's long-term prospects. *See id.* ¶¶ 73-75.

On March 18, 2019, Revlon disclosed that it was unable to timely file its annual report for 2018 because it had identified a material weakness in its internal controls over financial reporting ("ICFR") stemming from the SAP launch. *Id.* ¶ 77. The company stated, however, that it did not expect to restate its previously reported preliminary financial results for the year. *Ibid.* It also stated that it expected to file its annual report within 15 days. *Ibid.* Revlon's share price fell by approximately 6.87% on the announcement of this news. *Id.* ¶ 122.

Revlon filed its 2018 Form 10-K on March 28, 2019. *Id.* ¶ 79. The 10-K form included a detailed discussion of the SAP failure and its impact on the company's financial performance over the past year. *Ibid.* It disclosed that SAP-related disruptions had cost the company $64 million in net sales and $53.6 million in incremental charges. *Ibid.* The 10-K also described the deficiencies that Revlon identified in its ICFR. Specifically, Revlon stated that it "did not perform an effective continuous risk assessment process that adequately identified and assessed risks" related to SAP's effects on its ICFR and that it "did not maintain a sufficient number of knowledgeable, trained personnel in the U.S. operations impacted by the [SAP] implementation" who understood and were held accountable for their assigned ICFR responsibilities. *Ibid.* "[A]s a result," Revlon stated, the company "did not design, implement, and consistently operate effective process-level controls to ensure that it appropriately . . . recorded and accounted for inventory, accounts receivable, net sales, and cost of goods sold" and "reconciled balance sheet accounts," among other functions. *Ibid.* These deficiencies in the Company's ICFR, however, did not result in any material misstatement of the Revlon's 2018 Consolidated Financial Statements. *Ibid.* On the day Revlon's 2018 10-K was filed, the company's share price fell by an additional 6.4%. *Id.* ¶ 122.

3.  The Alleged Misrepresentations

Plaintiffs' claims that Revlon and the defendant executives violated the securities laws rest on statements that can be broadly divided into three categories: (i) statements concerning the SAP launch prior to the launch, (ii) statements concerning the SAP launch and the company's remediation efforts after the launch, and (iii) statements made before and after the launch concerning Revlon's ICFR.

A.  Pre-SAP Launch Statements

Plaintiffs challenge as materially false or misleading several statements that Revlon and its officials made before the company's transition to SAP.  First, they challenge the statements in Revlon's 2016 10-K, which was filed on March 3, 2017.  *Id.* ¶ 81.  That form stated that the company was "currently implementing a company-wide SAP enterprise resource planning" system which "may not result in improvements that outweigh its costs and may disrupt the Company's operations."  *Id.* ¶ 82.  The 10-K noted that there were "inherent risks associated with migrating from the Company's legacy systems" and included a non-exhaustive list of those risks, which included an "inability to fill customer orders accurately or on a timely basis, or at all" and "disruption of the Company's internal control structure."  *Ibid.*  The company also warned that if the SAP implementation failed or suffered unanticipated delays, it "could have a material adverse effect on the Company's business, prospects, results of operations, financial condition and/or cash flows."  *Ibid.*  The 2016 10-K contained signed Sarbanes-Oxley Act ("SOX") certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's ICFR, and the disclosure of all fraud.  *Id.* ¶ 81.

Next, plaintiffs challenge as false or misleading a proxy statement that Revlon filed with the SEC on April 21, 2017.  *Id.* ¶ 85.  The proxy statement noted that defendant Garcia received a

substantial bonus for his role in the recent acquisition of Elizabeth Arden and its integration into the company. *Id.* ¶ 86. It stated that the bonus was justified based on "approximately $190 million of annualized synergies and cost reductions" that would be achieved, in part, by "moving to a single ERP system." *Id.* ¶ 86. The proxy statement provided the same justification for the bonus paid to defendant Figuereo. *Id.* ¶ 87.

Finally, plaintiffs challenge statements made on a conference call with investors and analysts on November 3, 2017, when Revlon's quarterly report with the SEC for the third quarter of 2017 was filed. *Id.* ¶ 89. On the call, defendant Peterson discussed what he saw as coming "opportunities for improvements in operational excellence . . . including new ERP systems." *Ibid.* He added that "[a]ll of these are contributing to an aggressive transformation agenda for the company, which we expect to lead to better financial results over the next several years." *Ibid.*

B. <u>Post-SAP Launch Statements</u>

Plaintiffs next challenge post-launch statements. They argue that Revlon's 2017 10-K, which was filed roughly six weeks after SAP went live at the Oxford facility, contained false or misleading statements regarding the launch. *See id.* ¶ 91. The 10-K stated, in relevant part, that "[d]ifficulties in implementing the Company's new ERP system have disrupted the Company's business operations and ongoing disruptions with such implementation could have a material adverse effect on the Company's business, prospects, results of operations, financial condition and/or cash flows." *Id.* ¶ 92. The 10-K added that the SAP launch caused Revlon's Oxford facility "to experience service level disruptions that have impacted the Company's ability to manufacture certain quantities of finished goods and fulfill shipments to several large retail consumers in the U.S." *Ibid.* It also stated that Revlon could not "provide assurances that it will remedy the ERP systems issues in time to fully recover these sales and/or that the ERP implementation will not

continue to disrupt the Company's operations and its ability to fulfill customer orders." *Ibid.* Finally, the 10-K noted that the ERP-related disruptions caused the company to incur various expenses and that if the disruptions continued, "it could negatively impact the Company's competitive position and its relationships with its customers and thus could have a material adverse effect on the Company's business, prospects, results of operations, financial condition and/or cash flows." *Ibid.* The 10-K contained signed SOX certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's ICFR, and the disclosure of all fraud. *Id.* ¶ 91.

Plaintiffs also challenge statements of defendant Peterson in an earnings call with investors and security analysts on the day that the 2017 10-K form was released. *See id.* ¶ 94. In opening remarks on the call, defendant Peterson stated of the SAP roll-out that "[w]hile the overall implementation steps are on schedule, our production capabilities and inventory recovery have been slower than expected, affecting our current order fulfillment levels." *Ibid.* He claimed that the company had "taken immediate actions to address the situation" and had "implemented a robust service recovery plan." *Ibid.* Peterson added that Revlon still expected SAP "to provide significant new capabilities and benefits for the company." *Ibid.* During an ensuing question-and-answer session, Peterson said that it was "too soon" to give an estimate of the rollout's impact on the company's top-line or bottom-line. *Id.* ¶ 95.

Plaintiffs next target statements on a conference call on May 10, 2018, when Revlon released its financial results for the first quarter of 2018. *Id.* ¶¶ 97, 99. In his opening remarks during the call, defendant Meister described the results for the quarter as "disappointing," noting that they were "heavily impacted" by "several non-recurring events," including "service-level disruptions following the SAP implementation at our Oxford facility." *Id.* ¶ 99. Meister stated

that the company implemented a recovery plan that had returned the Oxford plant's manufacturing capacity to normal levels by early April. *Ibid.* He cautioned, however, that net sales would continue to be impacted by the SAP disruptions. *Ibid.* Later in the call, Meister claimed that the company was "expecting to execute flawlessly on the SAP situation at Oxford." *Id.* ¶ 102.

Plaintiffs challenge several other statements on the call, as well. Defendant Peterson stated that while the company expected SAP to deliver benefits in the long run, the transition caused disruptions that cost the company approximately $20 million in quarterly sales and $10 million in incremental charges. *Id.* ¶ 100. Like Meister, Peterson stated that Revlon had largely resolved the SAP-related issues by early April and had returned the Oxford plant to normal production levels. *Ibid.* In addition, defendant Dolan weighed in on Revlon's quarterly results, noting that financial performance "was heavily impacted by the service-level disruptions in our Oxford, North Carolina production facility." *Id.* ¶ 101. She noted that the company was still focused on remediation efforts but that the Oxford facility was operating at capacity. *Ibid.*

The next challenged statements occurred on August 9, 2018, when Revlon released its financial results for the second quarter of 2018. *Id.* ¶ 104. On an earnings call that day, defendant Perelman provided an update on the company's "progress recovering from the SAP supply disruptions that affected us in the first quarter and into the second quarter." *Id.* ¶ 106. She stated that Revlon had "resolved the fundamental issues" with SAP and that the Oxford plant was "back to producing at greater than pre-[SAP] levels." *Ibid.* She went on to offer an optimistic perspective, stating, "[w]ith most of the SAP disruption behind us, we are focused on realizing the opportunities in our business and building for the future." *Ibid.* Defendant Dolan also provided an update on the SAP remediation efforts. She stated that production capabilities at the Oxford facility had been "severely affected" by the launch but "were re-established back to pre-SAP levels

during the month of April." *Id.* ¶ 107.  She noted that the disruptions depleted Revlon's inventory levels but stated that "[s]ince then, we've been rebuilding these inventory levels and service levels have significantly improved." *Ibid.*  While noting the significant "recovery duration," she stated that the company was "completing the final phases of improvements" and expressed confidence in SAP's long-term benefits. *Ibid.*

Finally, plaintiffs challenge statements by defendant Perelman on a conference call when Revlon released its financial results for the third quarter of 2018. *Id.* ¶ 109.  On that call, which took place on November 9, 2019, Perelman reiterated her points from the second quarter earnings call. *See id.* ¶¶ 106, 111.  She also stated that "[t]he Oxford impact to our third quarter results was significantly lower than the second quarter and we expect continued improvement going forward." *Id.* ¶ 111.

C.  ICFR Statements

Plaintiffs also argue that defendants made false or misleading statements concerning the company's ICFR in Revlon's financial statements during the Class Period.  As relevant to that claim, Revlon's 2016 10-K stated that "Revlon's management determined that the Company's internal control over financial reporting was effective as of December 31, 2016." *Id.* ¶ 83.  Revlon's 2017 10-K contained an identical statement affirming the effectiveness of the company's ICFR as of December 31, 2017. *Id.* ¶ 93.  Revlon's financial report for the first quarter of 2018 maintained that "the ERP implementation has not materially affected, nor is it reasonably likely to materially affect, the Company's ICFR." *Id.* ¶ 98.  The company's financial reports for the second and third quarters of 2018 repeated these representations. *Id.* ¶¶ 105, 110.  Each of these quarterly reports contained signed SOX certifications attesting to the accuracy of financial reporting and the disclosure of any material changes to the company's ICFR. *Id.* ¶¶ 97, 104, 109.

D.  The Complaint's Allegations Regarding Falsity

For each of the above challenged statements, plaintiffs provide an identical explanation for why the statement was materially false and misleading in violation of the Exchange Act.  As to each, the Complaint states:

> The statements above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Revlon failed to create measures to monitor the ERP system appropriately once implemented; (2) Revlon failed to design, implement and consistently operate effective process level controls to ensure that it appropriately (a) recorded and accounted for inventory, accounts receivable, net sales and cost of goods sold, (b) reconciled balance sheet accounts, (c) reviewed and approved the complete population of manual journal entries, (d) used complete and accurate information in performing manual control, which constituted a material weakness in its internal controls over financial reporting, and (e) trained personnel; (3) as a result of the poor preparation and planning of the implementation of the ERP system, Revlon was unable to fulfill product shipments of approximately $64 million of net sales and the Company incurred $53.6 million of incremental charges to remediate the decline in customer services levels; and (4) as a result, Defendants' statements about Revlon's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis at all relevant times.

Am. Compl. ¶¶ 84, 88, 90, 96, 103, 108, 112.  The Complaint further alleges that defendants' false and misleading statements artificially inflated the price of Revlon's securities, causing putative class members to suffer losses when the truth about the SAP roll-out was revealed and Revlon's share price fell.  *Id.* ¶¶ 119-126.

4.  Defendants' Motion to Dismiss

Defendants have now moved to dismiss the complaint for failure to state a claim under Federal Rules of Civil Procedure 9(b) and 12(b)(6).  *See* Mot. to Dismiss for Failure to State a Claim (Dkt. #31).  They argue that plaintiffs have failed to adequately allege that any of defendants' public statements were materially false or misleading.  *See* Defs.' Mem. of L. in Supp.

12

of Mot. to Dismiss 10-21 (Dkt. #32).  Defendants also argue that plaintiffs have not adequately

pleaded corporate or individual scienter as required to state a claim under Section 10(b) and Rule

10b-5.  *Id.* at 22-26.  Finally, defendants argue that because plaintiffs fail to establish a primary

violation of the Exchange Act, their control-person liability claim under Section 20(a) against the

individual defendants must fail as well.  *Id.* at 27 n.11.

DISCUSSION

The Complaint in this case does not satisfy the heightened pleading requirements that apply

to plaintiffs' securities fraud claims under Rule 9(b) and the PSLRA.  As explained below, the

Complaint (i) copies and pastes identical allegations as a basis for challenging varied statements

by different defendants, instead of alleging falsity and scienter with specificity; (ii) does not

adequately allege that any of the challenged statements were materially false or misleading; and

(iii) fails to adequately plead scienter.  Moreover, because plaintiffs have failed to state a claim for

a primary violation of the Exchange Act, their control-person claims under Section 20(a) against

the individual defendants must also be dismissed.

1.  Elements of Claims Under Section 10(b) of the Exchange Act and Rule 10(b)(5)

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection

with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance

in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).

Pursuant to this section, the SEC promulgated Rule 10b-5, which makes it unlawful "for any

person, directly or indirectly . . . [t]o make any untrue statement of material fact or to omit to state

a material fact necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading."  17 C.F.R. § 240.10b-5.  To state a claim under

these provisions, "a plaintiff must allege that the defendant (1) made misstatements or omissions

13

of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007)).  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); *see Setzer*, 968 F.2d at 212.

2.  Motions to Dismiss Securities Fraud Claims Under Rules 9(b) and 12(b)(6)

In evaluating a motion to dismiss under Rule 12(b)(6), a court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010), *abrogated on other grounds by Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)).  To avoid dismissal, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  The complaint, in other words, must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. While the plausibility standard "is not akin to a 'probability requirement,'" it requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

A complaint alleging securities fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA by "stating with particularity the circumstances constituting the fraud." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs*, 551 U.S. at 308).  To

14

satisfy these requirements, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 94 (2d Cir. 2018) (quoting *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015)).   The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)(2)).

3.  Plaintiffs Have Failed to Satisfy the Heightened Pleading Requirements for Securities Fraud Claims

The Complaint in this case does not satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA.

A.  Plaintiffs' Inadequately Tailored Allegations Do Not Meet the Particularity Requirements of Rule 9(b) and the PSLRA

As an initial matter, the Complaint's boilerplate manner of pleading does not satisfy the requirements of Rule 9(b) and the PSLRA.   Plaintiffs do not "demonstrate *with specificity* why and how each statement" they challenge "is false or misleading." *Boca Raton Firefighters and Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)) (emphasis added) (internal quotation marks omitted).   Instead of explaining what aspect of each quoted statement is materially false or misleading and why, plaintiffs reproduce "the same conclusory formula," seven "separate times . . . to cover *all* of the allegedly material misrepresentations." *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16-cv-3495 (AT), 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018); *see* Am. Compl. ¶¶ 84, 88, 90,

96, 103, 108, 112.  Plaintiffs repeat this identical, untailored allegation even when portions of it are plainly inapplicable.  For instance, plaintiffs contend that statements made in Revlon's 2016 10-K, filed nearly a year before the SAP launch, were false or misleading because defendants failed to disclose the losses suffered as a result of the launch.  Am. Compl. ¶¶ 81-84.  By employing the same rote explanation for why each challenged statement was false or misleading—regardless of the statement's context, content, or timing—plaintiffs improperly force the Court to "determine on its own initiative how and why the statements were false."  *Bahash*, 506 F. App'x at 38.

Plaintiffs' copy-and-paste approach also fails to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each challenged statement.  15 U.S.C. § 78u-4(b)(2)(A).  Plaintiffs invoke the same set of "adverse facts . . . which were known to Defendants or recklessly disregarded by them" as the basis for inferring scienter with respect to each misrepresentation and each defendant.  *See* Am. Compl. ¶¶ 84, 88, 90, 96, 103, 108, 112.  But as the Second Circuit explained in *Bahash*, it is not enough for a complaint to merely "alleg[e] 'true facts' that were 'then known to or recklessly disregarded by each of the Defendants'" without also "identify[ing] or clearly cross-referenc[ing] any facts demonstrating a strong inference of scienter."  506 F. App'x at 38.  Plaintiffs' pleadings inappropriately "leav[e] the District Court" the responsibility of determining on its own initiative how the Complaint's list of "other facts" known to the defendants "might show a strong inference of scienter."  *Ibid.*  Accordingly, plaintiffs have failed to meet the pleading requirements for securities fraud.  *Cf. In re Deutsche Bank*, 2017 WL 4049253, at *5.

B.  <u>Plaintiffs Have Not Adequately Pleaded That Defendants Made Materially False or Misleading Statements</u>

Even when the Court attempts to "determine on its own initiative how and why the [challenged] statements were false and how other facts might show a strong inference of scienter,"

*Bahash*, 506 F. App'x at 38, the Complaint does not appear to adequately plead actionable misstatements or omissions.

a. Legal Standard

Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).   A statement is misleading when "a reasonable investor would have received a false impression from the statement."  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017) (quoting *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010)). Statements are actionable under Rule 10b-5 only if they were "false when made" and do not qualify as mere "optimistic statements or puffery."  *Stratte-McClure v. Morgan Stanely*, 784 F. Supp. 2d 373, 383 (S.D.N.Y. 2011) (citing *Rombach*, 355 F.3d at 174).   In addition, to be actionable, a misstatement must be "material," meaning that there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act."  *ECA*, 553 F.3d at 197 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

Section 10(b) and Rule 10b-5 do not prohibit all material omissions or "create an affirmative duty to disclose any and all material information."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)).   Rather, those provisions make material omissions actionable only when the defendant is subject to an underlying duty to disclose the omitted information.  *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013) (citing *Basic*, 485 U.S. at 239 n.17).   Such a duty arises when new information "renders prior public statements materially misleading,"  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993), or when an actor "chooses, even without obligation, to

speak" on a given issue or topic, *In re Vivendi*, 838 F.3d at 258.  If a corporation chooses to speak on a topic, "it has a 'duty to be both accurate and complete.'"  *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273 (S.D.N.Y. 2012) (quoting *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)).  That obligation does not require a company to "reveal all facts on the subject," but the company must ensure that "what was revealed would not be so incomplete as to mislead." *Id.* at 274 (quoting *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008)).

     b.  The Pre-SAP Launch Statements

Plaintiffs have not adequately alleged any actionable misstatement or omission in defendants' statements regarding SAP before the system was launched.  Plaintiffs challenge Revlon's 2016 10-K, which notified investors that the company was "currently implementing a company-wide SAP enterprise resource planning ('ERP') system" and identified "inherent risks associated with migrating from the Company's legacy systems."  Am. Compl. ¶ 82.  Revlon stated that the risks "could include, but are not limited to" a number of dangers, including the "inability to fill customer orders accurately or on a timely basis, or at all" and "disruption of the Company's internal control structure."  *Ibid.*  The Company further warned that if it was "unable to successfully plan, design or implement this new SAP ERP system," it "could have a material adverse effect on the Company's business, prospects, result of operations, financial condition and/or cash flows."  *Ibid.*

Plaintiffs suggest that the 2016 10-K is actionable because it did not contain more warnings about unspecified "risks known to the Defendants" relating to the SAP launch, including "risks that had already materialized."  Pls.' Mem. of L. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Mem.") 12-13 (Dkt. #36).  The Complaint suggests that one of the dangers requiring additional warnings

was the company's failure "to create measures to monitor the ERP system appropriately once implemented." Am. Compl. ¶ 84.  Plaintiffs' theory lacks merit.  As noted above, Rule 10b-5 does not impose a blanket obligation to disclose all information that would be material to investors. Revlon therefore did not have a freestanding obligation to advise investors of every material risk associated with the SAP rollout.  Nor was Revlon required to advise investors of every such risk in order to make the statements in its 10-K "not misleading."  17 C.F.R. § 240.10b-5(b); *see Richman*, 868 F. Supp. 2d at 274.  Revlon's statement that it was planning to move to a new ERP system, and that the move carried substantial risks that could materially affect Revlon's "business, prospects, result of operations, financial condition and/or cash flows," was accurate—even if Revlon did not disclose what each of those risks were.  Similarly, Revlon's enumeration of a number of the risks could not reasonably be read to imply that other risks did not exist, because the 2016 10-K made clear that enumeration of risks was non-exclusive.  Am. Compl. ¶ 82.

In any event, plaintiffs do not plead facts supporting the inference that defendants knew of additional material risks from the SAP launch at the time the 2016 10-K was issued.  While plaintiffs fault Revlon for failing to disclose "risks that had already materialized," on the theory that "the Company had already failed to plan and design the ERP rollout" at the time of the 2016 10-K, *see* Pls.' Mem. 17, the company was still planning and designing the SAP system when the 2016 10-K was issued, *see* Am. Comp. ¶¶ 41-46, 81.  Revlon's failure to have SAP fully planned and designed nearly a year before it was launched was not a "risk" that "had already materialized." Plaintiffs' failure to plead facts supporting the inference that defendants knew of additional material risks at the time of the 2016 10-K is an additional reason that the alleged omission is not actionable.  *Cf. Shemian v. Research In Motion Ltd.*, No. 11-cv-4068 (RJS), 2013 WL 1285779, at *21 (S.D.N.Y. Mar. 29, 2013) (finding omission nonactionable because plaintiff "failed to allege

sufficient facts regarding the existence and timing of Defendants' knowledge of defects to give rise to a duty to disclose").

Next, plaintiffs argue that Revlon's 2017 Proxy Statement was misleading because the statement explained that bonus awards were granted to two executives based on Revlon's integration of Elizabeth Arden. *See* Am. Compl. ¶¶ 86-87. Plaintiffs highlight the explanation of the bonuses as based, in part, on "approximately $190 million of annualized synergies and cost reductions that would be achieved through integration activities such as . . . moving to a single ERP system." *Ibid.* Plaintiffs' pleadings do not support any inference that this explanation was false or misleading. Plaintiffs provide no basis to doubt that the bonuses were, in fact, awarded based on the expected synergies that the statement describes. And even if Revlon's explanation were read as an implied guarantee that $190 million in synergies and cost reductions would ultimately be achieved, plaintiffs have not argued that the integration failed to yield the expected synergies and cost reductions. Indeed, plaintiffs do not even dispute that the adoption of SAP ultimately contributed to those synergies and cost reductions, despite the system's troubled rollout. Contrary to plaintiffs' suggestion, the statement regarding the basis for certain executives' bonuses cannot be read as a representation that Revlon's adoption of a single ERP system would not involve substantial transitional risks or costs.

Finally, plaintiffs challenge comments made by defendant Peterson on a conference call on November 3, 2017. On the call, Peterson discussed "significant opportunities for improvements in operational excellence" which included, among other things, "new ERP systems." Am. Compl. ¶ 89. Peterson stated that "[a]ll of these initiatives are contributing to an aggressive transformation agenda for the company, which we expect to lead to better financial results over the next several years." *Ibid.* These remarks are not actionable under the federal securities laws because they are

mere puffery—that is, "statements that are too general to cause a reasonable investor to rely upon them." *In re Vivendi*, 838 F.3d at 245 (quoting *ECA*, 553 F.3d at 206); *see City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014) ("To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim."). Here, Peterson's references to "opportunities for improvements in operational excellence" and "an aggressive transformation agenda for the company" were merely "vague expressions of optimism for the future" which, when unaccompanied by specific facts that could later require correction, have been deemed "too indefinite to be actionable under the securities laws." *In re Northern Telecom Ltd. Sec. Litig.*, 42 F. Supp. 2d 234, 237 (S.D.N.Y. 1998) (citing *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 108-09 (2d Cir. 1998)). Peterson's statement that Revlon "expect[ed]" its transition to a new ERP system "to lead to better financial results over the next several years," Am. Compl. ¶ 89, is similarly unactionable, because it was "not sufficiently specific for a reasonable investor to have relied on [it] 'as a guarantee of some concrete fact or outcome.'" *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 14-cv-950 (LAK) (AJP), 2015 WL 4931357, at *13 (S.D.N.Y. Aug. 19, 2015) (quoting *City of Pontiac*, 752 F.3d at 185); *see In re Adient plc Sec. Litig.*, No. 18-cv-9116 (RA), 2020 WL 1644018, at *22 (S.D.N.Y. Apr. 2, 2020) (noting that when a statement merely expressed what a corporation "expected" to see, it is particularly likely to constitute puffery); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (finding defendant's statements that it was "optimistic" about its earnings and "expected" its product to perform well were unactionable puffery).

Peterson's statements regarding Revlon's expectations for the future are also nonactionable opinion statements.  Statements about what a company "expects" are not actionable unless the expectations do not pan out and the speaker did not really believe them.  *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015) (citing *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013)).  Plaintiffs have alleged neither that Revlon did not in fact achieve "better financial results over the next several years" nor that Peterson lacked a genuine belief that Revlon would do so at the time he made this statement.  Accordingly, plaintiffs have not alleged that these statements constituted actionable misstatements or omissions.

c.  The Post-SAP Launch Statements

Plaintiffs fare no better with respect to their allegations that several of defendants' post-launch statements were materially false and misleading.  Plaintiffs first suggest that Revlon's 2017 10-K—released about six weeks after the SAP launch—"misl[ed] investors about the severity of the implementation problems and the Company's remediation efforts."  Pls.' Mem. 18.  That argument lacks merit.  The 2017 10-K stated that the SAP implementation had caused disruptions at the Revlon Oxford facility that "have impacted the Company's ability to manufacture certain quantities of finished goods and fulfill shipments to several large retail consumers in the U.S.," noted that the "[d]ifficulties in implementing the Company's new ERP system ha[d] disrupted the Company's business operations," and warned of possible material adverse effects to myriad aspects of the company's business.  Am. Compl. ¶ 92.  Plaintiffs point to nothing false about those warnings.  And plaintiffs' suggestion that these disclosures were misleading because they were mere "boilerplate" that did not disclose the risks of "Revlon's actual ERP implementation," Pls.' Mem. 18, is inaccurate, given that Revlon detailed service level disruptions at the Oxford plant and the negative consequences flowing from those disruptions, Am. Compl. ¶ 92.

Plaintiffs likewise identify no actionable false or misleading statements in the earnings call hosted the day that the 2017 10-K was published.  Defendant Peterson stated on the call that the "overall implementation" of SAP was "on schedule," but that "production capabilities and inventory recovery ha[d] been slower than expected, affecting our current order fulfillment levels." Am. Compl. ¶ 94.  He then stated that the company had "taken immediate actions to address the situation" and that it still expected SAP "to provide significant new capabilities and benefits for the company."  *Ibid.*  Plaintiffs argue that these statements "misled investors about the success and immediacy of the Company's remediation efforts" and "downplayed the severity of the problems the Company faced."  Pls.' Mem. 18.  But the statements in question did neither.  Peterson did not claim that the company's remediation efforts had already been successful.  He simply stated that Revlon had immediately taken action to address the problems caused by the SAP launch.  *See* Am. Compl. ¶¶ 94-95.  That statement is consistent with the allegations in the complaint.  *See id.* ¶¶ 62, 66-68.  Nor have plaintiffs pleaded any basis to conclude that Peterson's statement that SAP's implementation was "on schedule" was false when made.  And given Peterson's additional remarks regarding the adverse consequences of the rollout, Peterson's statement could not reasonably be read to imply that SAP's implementation had been smooth, rather than simply "on schedule."  Nor have plaintiffs identified an actionable statement in Peterson's remark that officials "expect[ed]" that SAP would ultimately deliver "significant new capabilities and benefits," because such "expressions of . . . corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174; *see Lasker v. New York State Electric & Gas Corp.*, No. 94-cv-3781 (ARR), 1995 WL 867881, at *6 (E.D.N.Y. Aug. 22, 1995) (noting that "predictive statements of opinion and belief" are generally not actionable under the federal securities laws).

Plaintiffs similarly fail to identify a materially false or misleading statement on the company's quarterly earnings call of May 10, 2018.  Plaintiffs suggest that defendants misled investors through statements that Revlon had "implemented a recovery plan that returned our manufacturing capacity to normal levels by early April"; that Revlon and its Oxford plant were again operating at capacity; and that the Oxford plant was "now producing at levels in excess of those pre-SAP."  Am. Compl. ¶¶ 99-101; *see* Pls.' Mem. 19.  But plaintiffs posit no facts suggesting any of these statements regarding the resumption of manufacturing were "false when made."  *Rombach,* 355 F.3d at 172; *cf. City of Roseville Emps.' Ret. Sys. v. Nokia Corp.*, No. 10-cv-967 (GBD), 2011 WL 7158548, at *9 (S.D.N.Y. Sept. 6, 2011).  Nor have plaintiffs pleaded facts suggesting those statements gave a misleadingly rosy impression of the harms from SAP or the extent to which remediation had been achieved, given surrounding statements on the call.  *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) (stating that reasonable investors assess statements "in light of all [their] surrounding text, including hedges, disclaimers, and apparently conflicting information").  Revlon executives accompanied their statements that manufacturing capacity had returned with express acknowledgements that tens of millions of dollars in losses were directly attributable to the SAP launch and a warning that net sales would continue to be impacted by the SAP disruptions in the future.  *See* Am. Compl. ¶¶ 99-101.  Plaintiffs suggest these disclosures were mere "half-truths" because Revlon did not elaborate on the reasons why the launch did not succeed in the first instance.  *See* Pls.' Mem. 20.  But even if investors would have been interested to learn additional information regarding the causes of the failure, Revlon's acknowledgements of the harms from SAP were not misleading because they failed to include that further detail.  *Cf. In re Rockwell Med., Inc. Sec. Litig.*, No. 16-cv-1691 (RJS), 2018 WL 1725553, at *11 (S.D.N.Y. Mar. 30, 2018)

("[S]imply because an omitted fact would be 'interesting' to an investor does not render all other statements on that topic misleading absent disclosure.") (citing *In re Bristol Myers Squibb*, 586 F. Supp. 2d at 160).

Plaintiffs have adequately pleaded that one statement on the May 10 call was false—but not that the statement was material.  In responding to a question about the timing of various problems at Revlon, defendant Meister stated that "we were expecting to execute flawlessly on the SAP situation at Oxford."  Am. Compl. ¶ 102.  The Complaint plausibly alleges that this statement was not accurate, because Revlon officials were aware that tests of the SAP rollout had gone poorly.  But that statement is immaterial when considered in the context of Revlon's post-launch disclosures.  *See ECA*, 553 F.3d at 197 ("[T]he determination of whether an alleged misrepresentation is material necessarily depends on all relevant circumstances.").  By the time defendant Meister stated that Revlon officials had previously expected the rollout to go well, Revlon officials had made public that the rollout had in fact gone very poorly.  To a "reasonable investor" who knew that the roll-out had been far from "flawless," Meister's post-launch remark about executives' purported pre-launch expectations would be "so obviously unimportant" as to be immaterial as a matter of law.  *See ibid.* (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)).

Plaintiffs similarly fall short in pleading materially false or misleading statements based on Revlon's conference call of August 9, 2018.  Plaintiffs target defendant Perelman's statement on that call that the company had "resolved the fundamental issues" with SAP and that "most of the SAP disruption" was "behind" the company, as well as defendant Dolan's statement that Revlon was "completing the final phases of improvements."  Am. Compl. ¶¶ 106-07; *see* Pls.' Mem. 19.  Contrary to plaintiffs' suggestions, however, the Complaint does not contain allegations that

support the inference that these representations were false.  Plaintiffs suggest that Revlon admitted those statements were false and misleading in its 2018 10-K, because that document "admitted that the new ERP system was still disrupting the Company's business."  Pls.' Mem. 19.  But those statements do not contradict the statements of the August 9 call because defendants acknowledged in that call that the ERP disruptions were ongoing, even as they claimed that substantial progress had been made.  *See* Am. Compl. ¶ 106 ("With *most* of the SAP disruption behind us . . . .") (emphasis added); *id.* ¶ 107 (noting that despite the significant "recovery duration," Revlon "continue[s] to see *improvements* with each successive month") (emphasis added).  Defendants did not commit fraud by noting that progress had been made since the SAP launch—a representation that plaintiffs allege no facts to contradict.

Finally, plaintiffs have not adequately pleaded that defendant Perelman made false or misleading statements on Revlon's November 9, 2018 earnings call.  Plaintiffs target Perelman's claim that "[t]he Oxford impact to our third quarter results was significantly lower than the second quarter and we expect continued improvement going forward."  Am. Compl. ¶ 111; *see* Pls.' Mem. 19.  But again, plaintiffs do not allege that these statements were false when made.  The amended complaint does not allege that Perelman's account of the third quarter results was incorrect.  And Perelman's statement that the company "expect[s] continued improvement going forward" is an "expression of optimism that is too indefinite to be actionable under the securities laws."  *In re Int'l Bus. Machs.*, 163 F.3d at 108-09.  In any event, plaintiffs have not pleaded that company executives did *not* expect continued improvement in SAP's implementation going forward.  *See City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 69 n.135 (noting that "[w]here the speaker's opinion or belief is genuine, a bare allegation that her opinion or belief

ultimately proved incorrect is not enough to survive a motion to dismiss") (citing *Omnicare*, 575 U.S. at 185-86).

  d. The ICFR Statements

  Plaintiffs have also failed to identify materially false or misleading components of defendants' statements on Revlon's internal controls over financial reporting.  Plaintiffs challenge Revlon's SOX certifications that its ICFR was effective as of the dates that it published its 10-K's for 2016 and 2017 and its 10-Q's for the first three quarters of 2018.  Am. Compl. ¶¶ 81, 91, 97, 104, 109.  Plaintiffs also challenge Revlon's claim—repeated in each of the 2018 10-Q's—that the disruptions caused by SAP were not likely to materially affect the company's ICFR.  *See id.* ¶¶ 98, 105, 110.  That assessment was proven untrue when Revlon ultimately identified a material weakness in its ICFR stemming from the SAP launch, which it disclosed in its 2018 10-K.  *See id.* ¶ 79.

  Plaintiffs fail to allege that Revlon's SOX certifications were materially false or misleading simply because a weakness in Revlon's ICFR was later discovered.  The SOX certifications that plaintiffs challenge all "contained an important qualification that the certifying officer's statements are true 'based on his [or her] knowledge.'"[*] *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017).  The certifications accordingly were statements of opinion. *See Chapman v. Mueller Water Prods., Inc.*, __ F. Supp. 3d __, 2020 WL 3100243, at *19 (S.D.N.Y. June 11, 2020); *Lewis v. YRC Worldwide Inc.*, No. 19-cv-1 (GTS), 2020 WL 1493915,

---

[*] *See* 2016 10-K Certifications (Exs. 31.1-32.2); 2017 10-K Certifications (Exs. 31.1-32.2); 1Q18 10-Q Certifications (Exs. 31.1-32.2); 2Q18 10-Q Certifications (Exs. 31.1-32.2); 3Q18 10-Q Certifications (Exs. 31.1-32.2).  I may consider these reports in resolving defendants' motion to dismiss because plaintiffs rely on these filings to establish their securities fraud claims.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 n.3 (2d Cir. 2002) (collecting cases).  Additionally, because the Complaint makes "clear, definite, and substantial reference[s]" to these documents, they are incorporated into the Complaint by reference, *Alexander v. Possible Prods., Inc.*, 336 F. Supp. 3d 187, 194 n.3 (S.D.N.Y. 2018), and may be considered on a motion to dismiss, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

at *16 (N.D.N.Y. Mar. 27, 2020); *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-cv-1545 (LAK), 2019 WL 4257110, at *24 (S.D.N.Y. Sept. 9, 2019); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 812 (S.D.N.Y. 2018).  As noted above, a statement of opinion is only actionable if the opinion turns out to be incorrect *and* the speaker did not genuinely believe it when the statement was made.  Plaintiffs try to clear this bar by asserting that "each Defendant was aware that the ERP implementation had caused a material weakness in the Company's internal control over financial reporting," Pls.' Mem. 21, but plaintiffs allege no facts in support of this claim.  While the Complaint does allege that defendants were aware of certain problems with SAP, *see, e.g.*, Am. Compl. ¶¶ 41-46, 60-68, none of the problems plaintiffs identify specifically related to Revlon's ICFR.  At most, plaintiffs suggest that certain operational issues that defendants were allegedly aware of—such as Revlon's failure to adequately train its employees in SAP—in fact contributed to a material weakness in Revlon's financial controls.  *See* Pls.' Mem. 22.  But defendants' purported awareness of the underlying operational issues, even if established, would not imply their knowledge that those issues had caused a material weakness in Revlon's ICFR, particularly given that not every deficiency in a company's financial controls amounts to a material weakness. *See Lefkowitz v. Synacor, Inc.*, No. 18-cv-2979 (LGS), 2019 WL 4053956, at *10 (S.D.N.Y. Aug. 28, 2019) (citing *Tellabs,* 551 U.S. at 323-24).  Because plaintiffs do not adequately allege that these statements of opinion were not believed when made, the statements are not actionable.

Plaintiffs' claims with respect to Revlon's representations concerning the likely effect of the SAP launch on its ICFR fail for the same reason.  Because those statements concerned Revlon's expectations about the future, they were also statements of opinion.  *See In re Sanofi*, 87 F. Supp. 3d at 531 (defining "statements of opinion" as encompassing those which "express . . . expectations for the future rather than presently existing, objective facts").  As noted, plaintiffs have alleged no

facts to support the inference that Revlon or the defendant executives actually knew that the company had a material weakness in its ICFR at the time these statements were made. Accordingly, plaintiffs fail to state a claim under Section 10(b) and Rule 10b-5 of the Exchange Act because they have not adequately alleged an actionable misstatement or omission of material fact.

   C.   Plaintiffs Have Not Adequately Pleaded Scienter

Even if plaintiffs had alleged a material misstatement or omission of fact, their claims would fail because they have not adequately pleaded scienter for any defendant.

   a.   Legal Standard

Under the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The required state of mind for liability under Section 10(b) and Rule 10b-5 is "an intent to deceive, manipulate or defraud." *Ganino*, 228 F.3d at 168 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). The Second Circuit has concluded that this *mens rea* can be established through proof of either intent or recklessness. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008).

Since plaintiff must allege facts supporting a "strong inference" of scienter, it is not enough for plaintiffs to "allege facts from which an inference of scienter rationally *could* be drawn." *Tellabs*, 551 U.S. at 323. Rather, the inference of intent to defraud "must be cogent and *at least as compelling* as any opposing inference of nonfraudulent intent." *Id.* at 314 (emphasis added). Because "[t]he strength of an inference cannot be decided in a vacuum," *id.* at 323, a court must take into account "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged," *id.* at 314. The critical question is "whether *all* of the

facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets th[e] standard." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 291-92 (S.D.N.Y. 2014) (citing *Tellabs*, 551 U.S. at 322-23).

Plaintiffs can establish scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino*, 228 F.3d at 168-69 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

b.  Motive and Opportunity

Plaintiffs do not allege facts sufficient to support the inference that defendants had "both motive and opportunity to commit fraud." *Ganino*, 228 F.3d at 168-69 (quoting *Shields*, 25 F.3d at 1128). While "[t]he opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer," *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013) (citing cases), plaintiffs have not alleged facts supporting an inference that defendants had a motive to commit fraud. To allege such a motive, plaintiffs "must do more than allege that defendants wished to maintain 'the appearance of corporate profitability' or to 'prolong the benefits of holding corporate office.'" *Sfiraiala*, 729 F. App'x at 57 (quoting *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)). Rather, plaintiffs must allege "that the individual defendants received a 'concrete and personal benefit' from making their alleged misrepresentations." *Ibid.* (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)). The Complaint does not claim that any defendant received such a "concrete and personal benefit" from making any of the alleged misrepresentations. Accordingly, plaintiffs have not established scienter by pleading motive and opportunity to defraud.

c.   Circumstantial Evidence of Conscious Misbehavior or Recklessness

Plaintiffs have also failed to adequately plead scienter based on circumstantial evidence. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (quoting *Beck v. Mfrs. Hanover Tr. Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled on other grounds by United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) (en banc)).  Conscious misbehavior or recklessness can be established through allegations of "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Ibid.* (quoting *Honeyman v. Hoyt (In re Carter-Wallace, Inc. Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000)).  To plead securities fraud based on recklessness, plaintiffs must, as a general matter, "specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308.  Under such circumstances, scienter may be inferred because "defendants knew or . . . should have known that they were misrepresenting material facts related to the corporation." *Ibid.*

i.   *Pre- and Post-SAP Launch Statements*

Under this standard, plaintiffs have failed to plead scienter as to the individual defendants in their challenge to their statements about the SAP launch.  With respect to defendants Meister, Perelman, Dolan, Kralovich, Anderson, Garcia, and Figuereo, the Complaint contains no specific allegations that these individuals had knowledge of facts or access to information that contradicted their public statements.  Rather, plaintiffs attempt to establish scienter against these defendants through general allegations of communications between the employees involved in the SAP

transition and "upper management" or "senior management." *See, e.g.*, Am. Compl. ¶¶ 60, 62, 64-65.  Those allegations are insufficient to establish scienter.  "Courts in this Circuit have rejected . . . attempts to hold senior officers liable based on their position and complaints to 'senior management' in the absence of specific allegations that the named defendant[s] actually received information about the fraud."  *In re Veon Ltd. Sec. Litig.*, No. 15-cv-8672 (ALC), 2018 WL 4168958, at *18 (S.D.N.Y. Aug. 30, 2018) (citing cases).  Plaintiffs make no such "specific allegations" with respect to these defendants.

Plaintiffs argue in their opposition that they establish scienter for defendants Garcia and Figuereo because they "led the planning and implementation of the new ERP system." Pls.' Mem. 24; *see* Am. Compl. ¶¶ 86-87.  But such a general allegation does not support a "strong inference" of scienter because defendants' role in leading the ERP implementation does not establish that they "actually received information about the fraud."  *In re Veon Ltd.*, 2018 WL 4168958, at *18. For the same reason, plaintiffs do not adequately plead scienter for defendants Meister, Perelman, Dolan, Karolvich, and Anderson simply because they were "involved in the remediation efforts." Pls.' Mem. 24.  Such generic allegations are insufficient because they "do not establish what specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 581 (S.D.N.Y. 2014) (citing *Novak*, 216 F.3d at 309).

Plaintiffs' allegations of scienter with respect to defendant Peterson are also deficient.  The Complaint alleges that Peterson attended "weekly meetings" before the SAP launch during which participants discussed failed test runs and low preparedness ratings that the system had received from operational personnel.  Am. Compl. ¶ 61.  The Complaint also avers that defendant Peterson was "directly provided with negative information from Oxford" and was "personally informed that

the SAP system was not working." *Id.* ¶ 64. These claims fail in the first instance because they are insufficiently specific. "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Dynex*, 531 F.3d at 196 (quoting *Novak*, 216 F.3d at 309). Plaintiffs do not identify any such "reports" or "statements." At most, they suggest that Peterson had conversations with Revlon employees who told him that SAP was not ready. That is insufficient to establish scienter based on knowledge of or access to contrary information. Perhaps more importantly, plaintiffs' claims fail because they have not alleged that Peterson had knowledge of or access to any information "contradicting [Revlon's] public statements." *Novak*, 216 F.3d at 308. As noted above, Revlon informed the market of various risks associated with the SAP launch. Plaintiffs' allegations that defendant Peterson received negative information regarding the company's readiness to adopt the SAP system do not contradict those risk disclosures.

Moreover, the actions of defendant Peterson and the other individual defendants before and after the launch undermine any inference of scienter. As the complaint details, Revlon disclosed before the SAP rollout that the transition carried substantial risks, ranging from an "inability to fill customer orders accurately or on a timely basis, or at all" to "disruption of the Company's internal control structure." Am. Compl. ¶ 82. It warned that the transition could have a material adverse effect on the company's "business, prospects, results of operations, financial condition and/or cash flows." *Ibid.* Following the flawed rollout, the company similarly made abundant disclosures regarding the disruptions that the transition had caused. *See, e.g.,* ¶¶ 70-71, 92. And it explained that those disruptions could have a material adverse effect on Revlon's business, operations, competitive position, and financial condition, among other warnings. *Id.* ¶ 92. This steady stream of warnings renders implausible plaintiffs' suggestion that defendants were engaged in a scheme

to deliberately or recklessly mislead investors because they did not offer the specific additional warnings that plaintiffs allege were warranted. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (describing reckless conduct as that which "is highly unreasonable and which represents an extreme departure from the standards of ordinary care"). At worst, plaintiffs have established that "defendants should have been more alert and more skeptical" about the viability of SAP when it was launched. *See Shields*, 25 F.3d at 1129. But even if so, "nothing alleged indicates that management was promoting a fraud." *Ibid.*

### ii. ICFR Statements

Plaintiffs also fail to adequately plead that the individual defendants had scienter with respect to the company's statements regarding its ICFR. Plaintiffs suggest that defendants Perelman, Dolan, Garcia, Figureo, and Peterson had scienter concerning alleged misrepresentations that the SAP rollout had not materially affected, and was not reasonably likely to materially affect, Revlon's ICFR on the basis that those executives were "responsible for establishing and maintaining adequate internal controls over financial reporting" and "knew the Company's internal controls were insufficient to prevent accounting violations that *they were overseeing.*" Pls.' Mem. 25. But again, plaintiffs fail to allege any specific facts to suggest that these defendants were actually aware of any weakness in Revlon's internal controls at the time of the challenged statements. Plaintiffs' argument at bottom is that defendants exhibited scienter because it was their job to monitor Revlon's internal controls, and a material weakness in those controls was ultimately disclosed. But a mere "failure 'to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability.'" *In re Magnum Hunter Res. Corp.*, 26 F. Supp. 3d at 298 (quoting

*Plumbers & Pipefitters Local Union No. 719 Pension Tr. Fund v. Conseco, Inc.*, No. 09-cv-6966 (JGK), 2011 WL 1198712, at \*22 (S.D.N.Y. Mar. 30, 2011)).

    d.  Corporate Scienter

    Finally, plaintiffs fail to adequately plead corporate scienter.  Generally speaking, "[w]hen the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Dynex*, 531 F.3d at 195.  But in "exceedingly rare instances," *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020), "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud," *Tellabs*, 513 F.3d at 710. In such circumstances, scienter will only be found where the "fraudulent statement[s] [are] . . . so 'dramatic,'" *Jackson*, 860 F.3d at 99 (quoting *Tellabs*, 531 F.3d at 710), that they "would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading," *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Dynex*, 531 F.3d at 195-96).  Plaintiffs identify no such statement.

    Accordingly, plaintiffs' Section 10(b) and Rule 10b-5 claims also fail because they have not pleaded facts that support a strong inference of scienter for any defendant.

4.  Plaintiffs' Control-Personal Liability Claims Fail

    Plaintiffs' claims of control-person liability under Section 20(a) of the Exchange Act against the individual defendants must also be dismissed.  Section 20(a) establishes liability for those who control persons or entities who violate provisions of the Exchange Act.  *See* 15 U.S.C. § 78t(a).  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant,

and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108.  Because plaintiffs fail to adequately plead a primary violation of the Exchange Act, their claims of control-person liability under Section 20(a) must also be dismissed.  *See ibid.*

## CONCLUSION

Because plaintiffs have failed to state a claim under the Exchange Act, defendants' motion to dismiss is granted.  Plaintiffs have requested leave to file a Second Amended Complaint.  *See* Pls.' Mem. 25 n.5.  The Federal Rules of Civil Procedure provide that courts should "freely give" leave to amend "when justice so requires," Fed. R. Civ. P. 15(a)(2), and "[c]omplaints dismissed under Rule 9(b) are almost always dismissed with leave to amend," *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 657 (S.D.N.Y. 2015) (quoting *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)); *accord. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b).").  Accordingly, I dismiss plaintiffs' claims without prejudice.  If plaintiffs wish to amend their pleadings, they shall file a motion within 21 days seeking leave to amend with the proposed Second Amended Complaint attached as an exhibit.  The motion should explain how the Second Amended Complaint addresses the pleading defects identified in this opinion.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: Brooklyn, New York
       September 17, 2020